UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

PETER O'BRIEN, AS ADMINISTRATOR OF THE
ESTATE OF ALLISON MARIE LAKIE,

                                                      Plaintiff,      **COMPLAINT**  5:22-cv-00948 (MAD/TWD)

                  -against-

THE CITY OF SYRACUSE, SYRAUSE MAYOR BEN      <u>Jury Trial Demanded</u>
WALSH, SYRACUSE POLICE DEPARTMENT CHIEF
KENTON BUCKNER, DEPUTY MAYOR SHARON
OWENS, LT. DAVID HART, SERGEANT MATTHEW
LIADKA, OFFICER KENNETH SHEEHAN, OFFICER
NICOLAS SARALEGUI-MARTIN, OFFICER
SARGENT, OFFICER FRANCISCO, OFFICER
MAKENZIE GLYNN, OFFICER NIKKO,
POLICE OFFICERS JOHN/JANE DOES 1-10,

                                             Defendants.

------------------------------------------------------------------------ x

## PRELIMINARY STATEMENT

      1.     This is an action brought pursuant to and Title II of the Americans with

Disabilities Act of 1990, Section 504 of the Rehabilitation Act of 1973, 42 U.S.C. § 1983, the

Fourth and Fourteenth Amendments to the United States Constitution, and New York state law,

concerning the unlawful fatal police shooting, on October 20, 2021, of Allison Marie Lakie, a 35

year-old mentally disabled woman, in the City of Syracuse.  Although Allison did not pose a

deadly threat to anyone, officers of the Syracuse Police Department ("SPD") shot her multiple

times in her head, chest, torso, legs and other parts of her body.  According to the medical

examiner's report, "[t]he overlapping gunshot wounds resulted in internal injuries to the lungs,

aorta, liver, right ovary, trachea, branches of the right jugular vein, and ribs.  Multiple projectiles

and projectile fragments were recovered."  Allison was transported to a hospital emergency room

where her death was pronounced at 4:01 a.m.  Plaintiff, Peter O'Brien, the duly appointed administrator of Allison's estate, seeks compensatory damages on behalf of the estate and all individuals entitled to compensation, punitive damages, attorney's fees and costs, and such other and further relief as the Court deems just and proper.

## JURISDICTION & VENUE

2.      This action is brought pursuant to Title II of the Americans with Disabilities Act of 1990, Section 504 of the Rehabilitation Act of 1973, 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments to the United States Constitution.  Jurisdiction is conferred upon this Court by the aforesaid statutes and 28 U.S.C. §§ 1331 and 1343.

3.      Plaintiff invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear and decide the estate's New York statutory and common law claims, which form part of the same case and controversy as plaintiff's federal claims under Article III of the United States Constitution.

4.      Venue is proper in the Northern District of New York pursuant to 28 U.S.C. § 1391(b) and (c) because the defendants are located in this District and because the incident in question occurred in this District.

## JURY TRIAL

5.      Pursuant to Fed. R. Civ. P. 38, plaintiff demands a jury trial.

## NOTICE OF CLAIM

6.      In connection with plaintiff's claims brought pursuant to New York law, a notice of claim was duly filed with the City of Syracuse within 90 days of the incident at issue, more than 30 days have elapsed since such filing, and the City has failed to settle plaintiff's state

law claims.  Peter O'Brien and Ann MacBain, the decedent's mother, both testified at a 50-h hearing.

7.     This action is brought within one year and 90 days of the incident at issue.

## PARTIES

8.     Plaintiff Peter O'Brien, the great uncle of Allison Marie Lakie, is a resident of the State of New York, and was issued limited letters of administration concerning the Estate of Allison Marie Lakie, by the Surrogate Court, Onondaga County, on February 25, 2022.

9.     The City of Syracuse is a municipal corporation organized under the laws of the State of New York.

10.     The named individual defendants are present and former high-level elected and appointed officials of the City of Syracuse, and members of the SPD.  There are several other police officers, whose names are presently unaware to plaintiff, who will be named as defendants once their identities are learned.  The individual defendants acted under color of state law and within the scope of their employment at all relevant times herein.  The individual defendants are sued in their individual capacities.

## STATEMENT OF FACTS

11.     Title II of the Americans with Disabilities Act ("ADA") prohibits any public entity from discriminating against "qualified" individuals with disabilities" in the provision or operation of public services, programs, or activities.  Similarly, § 504 of the Rehabilitation Act provides, in relevant part, that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in,

be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

12.   The anti-discrimination provisions of Title II of the ADA and § 504 of the Rehabilitation Act are enforceable through implied private rights of action.  A plaintiff may also bring a damages action under 42 U.S.C. § 1983 to enforce her statutory rights under the ADA and § 504.

13.   The New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL") also requires the defendants to accommodate disabled individuals.

14.   "An interaction between a law enforcement officer and a disabled person qualifies as a service, program, or activity subject to accommodation under—and protected from discrimination by—the ADA and Rehabilitation act."  *Thomas v. Town of Lloyd*, No. 1:21-CV-1358, 2022 U.S. Dist. LEXIS 96282, at *27 (N.D.N.Y. May 31, 2022 (citation omitted)); *Williams v. City of New York*, 121 F. Supp. 3d 354, 365 (S.D.N.Y. 2015) ("A number of courts have considered whether interactions between law enforcement and disabled individuals— whether initiated by the disabled individual or the police and whether the interaction culminates in an arrest—are 'services, programs, or activities' subject to the requirement of accommodation under Title II of the ADA." (citations omitted)).   The reasonableness of police conduct "must be assessed in light of the totality of the circumstances of the particular case."  *Id.*; *see also Durr v. Slator*, 558 F. Supp. 3d 1, 32 (N.D.N.Y. 2021) ("Title II of the ADA requires police officers to provide reasonable accommodations to arrestees and that any threatening or exigent circumstances should be considered when determining the reasonableness of the proposed accommodation."); *Butchino v. City of Plattsburg*, No. 8:20-cv-796 (MAD/CFH), 2022 U.S. Dist. LEXIS 7995, at *29 (N.D.N.Y. Jan. 14, 2022).

4

15.     "A plaintiff may base a Title II claim 'on any of three theories of liability: disparate treatment (intentional discrimination), disparate impact, or failure to make a reasonable accommodation.'" *Hamilton v. Westchester Cty.*, 3 F.4th 86, 91 (2d Cir. 2021); *see also Durr v. Slator*, 558 F. Supp. 3d 1, 27-28 (N.D.N.Y. 2021) (courts have found two fact patterns during the course of an arrest that can commonly raise a legitimate possibility of discrimination in violation of Title II or the Rehabilitation Act: when police officers misinterpret a suspect's disability as criminal activity, and when police fail to reasonably accommodate a suspect's disability); *Thomas v. Town of Lloyd*, No. 1:21-CV-1358, 2022 U.S. Dist. LEXIS 96282, at *27-28 (N.D.N.Y. May 31, 2022) (same).

16.     The reasonableness of an accommodation is a fact-specific question that often must be resolved by a factfinder. *Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transp. Auth.*, 11 F.4th 55, 67 (2d Cir. 2021).

17.     In response to Executive Order 203 concerning police reform in the State of New York, issued by former Governor Andrew Cuomo on June 12, 2020, Syracuse Mayor Ben Walsh, issued Executive Order 1: Syracuse Police Reform, on June 19, 2020. ourcity.syrgov.net/wp-content/uploads/2020/06/2020-06-19-EXECUTIVE-ORDER-Mayor-Walsh-Syracuse-Police-Reform.pdf.

18.     In June 2020, regarding his Executive Order, Mayor Walsh,

[E]mpowered Syracuse Police Department Chief *Kenton Buckner* to prioritize the implementation of policies and practices to improve and further modernize the Syracuse Police Department in line with 21st Century Policing strategy, while simultaneously mending strained relations with the community.  The murder of George Floyd on May 25, 2020 during an arrest by the Minneapolis Police Department launched massive calls for police reform throughout the world, our nation and the City of Syracuse. In response to a clear message from our community, Mayor Ben Walsh issued Executive Order 1: Syracuse Police Reform,

5

urgently directing his administration to take sixteen (16) actions to increase police accountability, improve transparency and strengthen police-community relations.  The local provisions in the Executive Order address critical issues in the police reform movement found in national data and reports on police concerns including, but not limited to: updating the Syracuse Police Department's (SPD) use of force policy…"

ourcity.syrgov.net/portfolio/reporting-progress-01 (emphasis added).

19.    On June 19, 2020, Mayor Ben Walsh issued Syracuse Police Reform Executive Order no. 1 Action #15, which called for the City of Syracuse to "research and consider innovative, community-based strategies for responding to non-criminal calls, with a goal of shifting the paradigm from primary police response, to response by non-police professionals in relevant fields."  On July 16, 2020, "Mayor Walsh issued a response to the People's Agenda for Police Reform.  In that response, Mayor Walsh committed to 'identifying SPD responsibilities and, where appropriate, spending reallocations and initiating participatory budgeting planning to begin December 1, 2020.'"

ourcity.syrgov.net/2020/12/executive-order-no-1-action-15-research-community-based-strategies-for-police-response/

20.    Regarding the Executive Order, Mayor Walsh stated in June 2020,

The *ultimate responsibility for implementing the Mayor's Executive Order lies with the Chief of Police [Kenton Buckner] and his department*.  Mayor Walsh is committed to ensuring that each of the 16 items in his Executive Order are implemented and has assigned *Deputy Mayor [Sharon] Owens* the responsibility of *managing* the process.

ourcity.syrgov.net/portfolio/reporting-progress-02 (emphasis added).

21.    In a report entitled, *Onondaga County and the City of Syracuse Speaks: Public Comments on Reforming and Reinventing Police*, dated February 8, 2021, final policymakers of the City of Syracuse, including Mayor Walsh, reported:

6

The Police Reform and Reinvention Collaborative ("PRRC") conducted six community forums in January 2021 to gather public comment about initiatives to be undertaken in Onondaga County and the City of Syracuse to address police reform pursuant to Executive Order No. 203, signed by Governor Andrew M. Cuomo on June 12, 2020.   The PRRC engaged InterFaith Works, a Syracuse-based human services non-profit agency, to gather all data based on public comments for each session and to develop this independent report.   The report qualitatively analyzes 211 public comments made by 375 participants about reforming and redefining the role of police in Onondaga County and the City of Syracuse. Seven overarching themes emerged …

Report at p. 2.  policereform.ongov.net/wp-content/uploads/2021/02/Appendix-B-Inter.faith-Works-

Police-Forum-Report.FINAL_.pdf.

22.     This report stated in relevant part,

There was resonance across the Community Forums for the *need for expanded mental health services to augment, or perhaps replace in certain instances, police interactions with people in mental health crisis*.  In this context, the idea of Crisis Response Teams was raised.   Some participants felt that police budgets should be reduced and these new funds should be directed towards expanded mental health services to produce better outcomes. …

Report at p. 18 (emphasis added).  policereform.ongov.net/wp-

content/uploads/2021/02/Appendix-B-Inter.faith-Works-Police-Forum-Report.FINAL_.pdf.

23.     In a report entitled, *Syracuse Police Reform and Reinvention Plan*, dated

March 2021, final policymakers of the City of Syracuse, including Mayor Walsh, reported

The Syracuse Police Department is the *first to acknowledge that not all dispatched calls require the presence of a sworn officer. Similarly it's understood that while police officers are not trained professional mental health clinicians, it is important that they are trained to recognize the symptoms of mental health issues and how to provide initial help and access the assistance of those trained in the field in order to guide a person towards appropriate professional help*.   Individuals in physical, mental health or substance abuse induced crisis *require the intervention*

7

of those who have made the care of these individuals their professional career.

Report at p. 36 (emphasis added).  ourcity.syrgov.net/wp-content/uploads/2021/03/2021-Syracuse-Police-Reform-and-Reinvention-Plan-with-Public-Comments-1.pdf.

24.     Despite having knowledge of the often perilous and tragic outcomes when armed police officers, who lack adequate training in dealing with individuals who are in the throes of a mental health crisis, and the danger in not having trained mental health professionals respond with the police to emergency calls involving mentally ill individuals, the City of Syracuse, Mayor Ben Walsh, Deputy Mayor Sharon Owens and Police Chief  Kenton Buckner failed to implement adequate remedial measures, leading to the tragic fatal police shooting of Allison Marie Lakie on October 20, 2021.

25.     Allison suffered from the mental disabilities of bipolar disorder, depression, self-harm and suicidal ideations, exacerbated by substance abuse, which had resulted in hospitalizations.  Upon information and belief, Allison suffered from other obvious and apparent mental health conditions, including paranoid schizophrenia and delusions.

26.     An individual is disabled under the ADA and other disability statutes if she suffers from a physical or mental impairment that substantially limits one or more of the major life activities of such individual, if she has a record of such an impairment, or if she is regarded as having such an impairment.  42 U.S.C. § 12102(1).  A mental impairment is "[a]ny mental or psychological disorder such as intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disability."  28 C.F.R. § 35.108(b)(1).

27.     On October 20, 2021, Allison was staying at her maternal grandmother's home, located at 216 Ulster Street, Syracuse with her mother, Ann MacBain, and Ann's husband, Anthony Lisi.  The incident at issue lasted from approximately 1:30 am to 3:30 a.m.

28.     At approximately 1:30 a.m., Ann MacBain called an ambulance because Allison was having a mental health crisis.  When the emergency medical technicians ("EMT") arrived approximately 10 minutes later, they immediately left because Allison thought they were impostors and Allison, fearing they were going to harm her, was holding a knife.

29.     Ann called the 911 operator, and the EMTs may have called as well, and the operator dispatched the police.  Ann told the operator that Allison was in a psychotic state.

30.     Allison thought someone was coming to hurt her, which is why she held a knife.  Ann convinced Allison to sit on the knife as Allison told her that they were "coming to hurt us."

31.     Some of the defendant police officers arrived a short time later and Allison made it apparent that she thought that the officers were impostors as well.  It was obvious to the defendant police officers that Allison was suffering from a mental illness.  Ann told the police "you have to help her."

32.     The first officers who addressed Allison, including Officer Makenzie Glynn, Sergeant Matthew Liadka and Officer "Francisco," were not trained in dealing with a mentally ill individual like Allison.  It was obvious to the officers, as evidenced by Allison's paranoia and delusions during the entire incident, and from what Ann, the EMTs and the 911 dispatcher told them, that Allison was mentally ill and in the throes of a mental health crisis.

33.     Officer Glynn and Sergeant Liadka, while at least one other officer, including Officer Francisco, observed, tried to coax Allison out of the kitchen in the home by making statements to Allison that aggravated and exacerbated her disability.  At no time did the officers call an officer or mental health professional trained in dealing with someone in Allison's state, were not told or trained that such resources were available, or knew that the SPD did not

have these resources.   These are all reasonable accommodations that the defendants did not
provide.

34.     At no time did Allison tell the officers that she was going to hurt them.
She simply told the officers to leave, repeatedly, and kept calling out for her mother, stating
"Mom, mom."   At first, the officers allowed Allison's mother, Ann, to consult with her, but then
Allison's mother was not permitted in the home, although Allison kept calling out for her.
Although Allison repeatedly told the officers to leave, they repeatedly told her that they were not
leaving, although they could have stepped back, created a perimeter around the house, and
afforded Allison a cooling-off period.  During this cooling off period, a social worker or other
mental health professional could have been dispatched to the scene to speak with Allison to calm
her and convince her to seek help.   These are all reasonable accommodations.

35.     For approximately 90 minutes, Officer Glynn and Sergeant Liadka,
repeatedly stated to Allison, in sum and substance, the following, which was not persuading
Allison to come out of the home and obtain help, and which increased her paranoia, agitated and
aggravated her, and caused her condition to worsen:

(a)  "I think something is wrong with your mom;"

(b)  Your mother is "so upset" and "very scared;"

(c)  Your mother is "on the ground;"

(d)  Your mother is "having trouble breathing;"

(e)  Your mother is in an ambulance "hooked up to monitors;"

(f)  Your mother "cannot speak to you;"

(g)  If something happens to your mother, "it's on you;"

10

(h) "If something happens to your mother, you're going to feel awful; you may never see her again;"

(i) "I am going to tell the ambulance to leave since you're not coming out; ok (pretending to be speaking with the EMTs), you can leave;"

(j) "Your mother is leaving in an ambulance to go to the hospital;"

(k) "Your mother is down the street in the ambulance;"

(l) "Your mother is gone."

36.     Although the officers' statements caused Allison's condition to worsen, she never threatened the officers, verbally or physically.  Allison removed some of her clothes, intentionally cut herself, broke some glass, threw something in the kitchen, and, at the end of the encounter, lit a cigarette, which she dropped, or started a flame, that was contained to the kitchen.

37.     Sergeant Liadka, who was speaking to Allison from the front door of the home, having no training on how to connect to an individual who is suffering from paranoia and delusions. and who thought the officers were not really the police and were there to harm her, agitated Allison by stating such things as: "What are you worried about?"; "What did you throw?"; What did you break"; "Why do you have knives?"; and "We're not leaving."

38.     One of the officers on the scene also stated out loud that they may have to shoot Allison.

39.     While Ann, Allison's mother, was outside, she heard Allison tell the officers to "get out" and not enter the room she was in, which was the kitchen, and that she was not coming out.  Ann tried to get inside to help her daughter but the officers would not allow it.

40.     SPD officers are trained on how to disarm a person with a knife.  There were numerous officers on the scene and they had shields, tasers, mace and firearms.  The mace sprays a distance of 6 feet.  The were also numerous firefighters on the scene.

41.     Approximately an hour and 45 minutes after the incident, Officer "Nikko" arrived and told Allison that he was "part of the Crisis Response Team," and Nikko, who was obviously not adequately trained in dealing with the mentally ill, further told Allison that he was "new to the situation, that he "just got there and had no clue what was going on," and misrepresented that her "mother was in the hospital."  Officer Nikko further told Allison that he observed that she was harming herself and that her wrist was injured.  Apparently, Allison cut her wrist(s) in a suicide attempt.  Allison's blood was on the floor.

42.     Although the fire was contained to the kitchen, no one was in the home except for Allison, and there were numerous firefighters on the scene, the defendant officers entered the home with their guns drawn, some with shields, and tased Allison repeatedly, and told the firefighters to "hose her" with the fire retardant.

43.     Allison was stunned and disoriented from the actions of the officers and the firefighters.  She did not verbally or physically threaten the officers, the officers were several feet from her, she did not charge at the officers with the knife and was retreating, and one officer stated the fire was "out."

44.     Although there was no reasonable fear of death or serious harm to the officers and the other first responders on the scene, one of the defendant officers shot Allison. Although Allison was now even less of a threat, four of the defendant officers, Lieutenant David Hart, Sergeant Matthew Liadka, Officer Kenneth Sheehan and Officer Nicolas Saralegui-Martin, then shot Allison multiple times.  Allison was transported to the emergency room at Upstate

University Hospital, where her death was pronounced at 4:01 a.m., despite resuscitative efforts. The medical examiner determined that the manner of death was homicide.

45.     As stated above, the defendant officers agitated Allison and aggravated and exacerbated her disability, would not allow her to speak to her mother who was outside of the home, increased her distress by misrepresenting that her mother was very ill and going to the hospital, blamed her for her mother's condition (*e.g.*, "it's on you"), did not provide Allison with a cooling-off period, failed to respect Allison's comfort zone, elongated the encounter, failed to create a safe perimeter and avoid unnecessary contact with Allison, and, significantly, failed to seek professional resources, which were apparently not available in the City of Syracuse, despite the Mayor, the Deputy Mayor and the Chief of the SPD being on notice that this type of encounter was certain to happen and had happened in the past.  Moreover, the City of Syracuse, the Mayor, the Deputy Mayor and the Chief of the SPD did not train their police officers on how to resolve encounters with the mentally ill without agitating their condition and using deadly, excessive and/or unnecessary force.  Moreover, even if officers received some training, it was obviously deficient, and officers who had acted improperly in the past were not re-trained, disciplined or terminated.  Further, City of Syracuse, the Mayor, the Deputy Mayor and the Chief of the SPD did not adequately investigate prior incidents between the police and the mentally disabled which often ended tragically.

46.     Instead of providing reasonable accommodations, the defendants' actions collectively precipitated a deadly confrontation.  Allison was not only disabled and had a record of impairment, but the defendants "regarded" her as disabled, and treated her as if her life and emotional state had no intrinsic value.  *See Vos v. City of Newport Beach*, 892 F.3d 1024, 1037 (9th Cir. 2018) (finding that the officers' "pre-shooting conduct" in responding to a call about a

man behaving erratically arguably demonstrated that "further accommodation was

possible"including "de-escalation, communication, or [providing] specialized help."); *Butchino*

*v. City of Plattsburg*, No. 8:20-cv-796 (MAD/CFH), 2022 U.S. Dist. LEXIS 7995, at *32

(N.D.N.Y. Jan. 14, 2022)  ("The failure to provide … a reasonable accommodation" such as "a

cooling off period" before using force on a mentally ill individual "is squarely cognizable under

the ADA."); *Sage v. City of Winooski*, No. 2:16-cv-116, 2017 U.S. Dist. LEXIS 43467, at *10

(D. Vt. Mar. 22, 2017) (plaintiff's "violent behavior could arguably have been avoided if the

officers had acknowledged and accommodated [plaintiff's] mental illness"); *Brunette v. City of*

*Burlington*, No. 2:15-cv-00061, 2018 U.S. Dist. LEXIS 148141, at *100-01 (D. Vt. Aug. 30,

2018) ("failing to respect [plaintiff's] comfort zone, elongate the time of the encounter, create a

safe perimeter, avoid unnecessary contact and agitation, and seek professional resources"); *Durr*

*v. Slator*, 558 F. Supp. 3d 1, 33 (N.D.N.Y. 2021) ("[W]hile the plaintiff bore 'the initial burden

of producing evidence of the existence of a reasonable accommodation,' she had met her burden

at the motion to dismiss stage by asserting that 'the officers should have respected her comfort

zone, engaged in non-threatening communications and used the passage of time to defuse the

situation rather than precipitating a deadly confrontation.'"); *Chamberlain v. City of White*

*Plains*, 960 F.3d 100, 108 (2d Cir. 2020) ("It seems to us that a reasonable officer likely would

have known—or at least learned quickly during the course of the encounter—that the officer's

actions were exacerbating Chamberlain's condition."); *Id,* at 107-108 ("Despite Chamberlain's

rising anxiety about the officers' presence and aggressive actions, the officers escalated the

confrontation by making derisive comments and by declining to permit or arrange for

Chamberlain to speak with members of his immediate family (citing *Bah v. City of New York*,

No. 13 Civ. 6690 (PKC) (KNF), 2014 U.S. Dist. LEXIS 60856, 2014 WL 1760063, at *7

14

(S.D.N.Y. May 1, 2014) (denying motion to dismiss after finding plausible an allegation of unlawful entry where, in response to a report of a son having a mental health crisis, officers prevented his mother, who was present, from seeing him, since 'it [was] plausible that immediate action was not necessary as the [officers], at minimum, may have been able to enlist [her] help')). And when, eventually, the officers entered Chamberlain's apartment, they did so not with a gurney and paramedics, or other equipment or personnel related to a possible health emergency, but with a Taser, a beanbag shotgun, and handguns. Instead of treating Chamberlain as a critically ill patient, the officers acted as though he were a criminal suspect."); *Id.* at 118 ("What factors and reasoning supported the officers' decision to force entry when they did rather than seeking to de-escalate the situation before doing so? Why were Chamberlain's close relatives, one of whom was on site, not employed by the police in an attempt to resolve the confrontation without bloodshed? What was the significance, if any, of the crude epithets (if ultimately proven to have in fact been uttered) used by the police at or about Chamberlain before their fatal forced entry? Why did the officers enter the apartment with a Taser, handguns, and a beanbag shotgun if they were there to administer emergency medical aid? And, in broader focus, why did the police officers, after the various events of the morning of November 19, 2011, decide they had to break down the door and enter Chamberlain's home?").

47.     Further, the use of deadly force by the officers on the scene was objectively unreasonable under the Fourth and Fourteenth Amendments as Allison did not charge or threaten the officers with a weapon or knife, firefighters were on the scene who had put out the fire, which was contained to the kitchen, and the numerous officers on the scene had shields and non-lethal weapons. The officers, upon entering the room, had other reasonable alternatives than to use deadly force on the stunned and disoriented Allison, who did not pose a threat of

15

death or serious injury to any of the first responders on the scene, and then, after shooting

Allison once, proceeding to shoot her multiple times.

48.     Municipalities may be held liable under 42 U.S.C. § 1983 where an "action

pursuant to official municipal policy of some nature caused a constitutional tort."  *Monell v. Dep't of*

*Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).  These practices and procedures need not

be formally adopted for liability to attach.  *Id*.

49.     A municipality is liable for a *Monell* claim under the theory of

acquiescence "where a policymaking official exhibits deliberate indifference to constitutional

deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate

choice.'"  Where this occurs, "that acquiescence may be properly thought of as a city 'policy or

custom' that is actionable under § 1983."  *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113,

126 (2d Cir. 2004) (internal quotations omitted).

50.     A municipality is liable for a *Monell* claim under the theory of failure to

train if "a policymaker knows 'to a moral certainty' that her employees will confront a given

situation"; "the situation either presents the employee with a difficult choice of the sort that

training or supervision will make less difficult or . . . there is a history of employees mishandling

the situation"; and "the wrong choice by the city employee will frequently cause the deprivation

of a citizen's constitutional rights."  *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007).

51.     Final policymakers for the City of Syracuse, including the Mayor, Deputy

Mayor and Chief of the SPD, knew to a moral certainty that its police officers would be

confronting mentally ill individuals, as they did in the past, yet they did not adequately train their

officers or make mental health resources available, although mentally ill individuals had been

subjected to avoidable deadly and excessive force.  By not training their officers or making

16

mental health resources available, this frequently deprived individuals of their constitutional rights.  Moreover, by failing to adequately supervise its officers during its encounters with mentally disabled individuals, failing to adequately investigate prior  incidents of deadly and unreasonable force used against the mentally ill, and failing to re-train and/or discipline police officers who violate the constitutional rights of such persons, the City of Syracuse, the Mayor, the Deputy Mayor and the Chief of the SPD exhibited deliberate indifference to those mentally ill individuals who come into contact with SPD officers.  *Fiacco v. Rensselaer*, 783 F.2d 319, 326-27 (2d Cir. 1986); *Moses v. Westchester Cty. Dep't of Corr.*, No. 10-cv-9468 (ER), 2017 U.S. Dist. LEXIS 163030, at *51-52 (S.D.N.Y. Sep. 29, 2017); *Durr v. Slator*, 558 F. Supp. 3d 1, 35-36 (N.D.N.Y. 2021).

52.     The City of Syracuse, the Mayor, the Deputy Mayor and the Chief of the SPD further exhibited deliberate indifference by not having mental health professionals, such as social workers, respond with the police to emergency encounters with the mentally ill.  No social workers showed up at Allison's home on October 20, 2021, before the defendant police officers shot her, although the police were at the home for approximately 2 hours.  These defendants were on notice of the problems with armed police encounters with the mentally ill well before the incident with Allison, as evidenced by their own public documents cited herein, yet they failed to take adequate measures.

53.     After the shooting death of Allison, Mayor Walsh, as reported by CNY Central on October 20, 2021, misleadingly stated,

> Syracuse Mayor Ben Walsh said that Liberty Resources, a local mental health facility, was on-site for the deadly officer-involved shooting in Tipperary Hill early on Wednesday morning.  The partnership is part of an executive order signed back in May that allocated an on-scene mobile crisis team, through Liberty

Resources, to the Syracuse Police Department to assist in responding to mental health calls.

cnycentral.com/news/local/police-chief-weighs-in-on-benefits-of-mental-health-crisis-response-partnerships.  This is misleading.  No mental health professionals or social workers spoke with Allison or assisted the officers.

54.     After the shooting death of Allison, the City of Syracuse and other defendants attempted to make it appear that some action was being taken.  As reported in Syracuse.com on April 11, 2022, in *City Re-Ups Contract To Keep Sending Mental Health Workers To 911 Calls With Syracuse Police*, it was reported that,

> Syracuse lawmakers approved spending Monday to keep sending mental health workers to 911 calls with Syracuse police.  The city will spend $257,000 of federal stimulus money to support the program through June 30, 2023.  'We know it's expensive,' Deputy Mayor Sharon Owens said at an earlier Common Council meeting, '*but we know it's needed*.'  The program was created in the wake of George Floyd's murder by a Minneapolis police officer and the death of Daniel Prude in Rochester.  *Activists across the country and in Syracuse called for reform in how police deal with people experiencing a mental health crisis*.  In June of 2020 Mayor Ben Walsh put out a 16-point executive order for police reform.  *One of the 16 points alluded to developing a way to direct some non-criminal 911 calls away from police*.  The Covid-19 pandemic has also increased demand for mental health services.  Mental health workers from Liberty Resources have been going to 911 calls involving people in crisis with Syracuse police officers since January 2021. Together, officers and mental health workers have responded to 183 calls.  In most cases, police respond to a 911 call and find the call involves a person in crisis.  They then call a member of Liberty Resources' mobile crisis team.  Liberty Resources' mental health workers have also helped give officers crisis intervention training and participate in training with Syracuse police's hostage negotiations team.  Deputy Chief Richard Trudell said calls about a person in crisis are among the most dangerous for officers *and the person who had the police called on them*.  He lauded the program with Liberty Resources as having diverted calls that did not need to be handled *by police from being handled by police.*  'We don't have to go to that next level of

force,' Trudell said. '*That's exactly what we want to avoid. Adding an officer with a gun to the equation with a gun has the potential for that.*'

syracuse.com/news/2022/04/city-re-ups-contract-to-keep-sending-mental-health-workers-to-911-calls-with-syracuse-police.html (emphasis added).

55.     Training apparently began months after the shooting of Allison.  On April 22, 2022, Spectrum News, in an article, *Syracuse Police Learn Techniques to Diffuse Crises,* reported,

> Members of the Syracuse Police Department and other local agencies attended crisis intervention training *this week*.  Designed to teach officers valuable de-escalation techniques, the training culminated with a graduation ceremony Friday afternoon.  The training was held as the department has faced criticism related to a viral video showing a Syracuse police officer detaining an 8-year-old boy earlier this week.  Criticism of the department's response has included calls for more crisis response and metal health training.  While the training was not held in response to the incident, department leaders said it will help officers not only with mental health calls, but any time they encounter an individual in distress.  'It really is a very important class,' said Lt. Steven Abbott, who leads the Crisis Intervention Training hosted annually by the Syracuse Police Department.  '*It teaches officers different de-escalation techniques and different ways to deal with individuals in different states of crisis and mental illness,*' the instructor said.  For Abbott, the training is personal.  'These are my sons, Steven Abbott and John Abbott. Both of my sons are on different levels of the autism spectrum,' he said.  Abbott's sons are part of the training.  They help officers learn how to handle a call involving an individual with autism.  Because of that difference in brain function, a unique style of communication is needed," said Steven Abbott, the lieutenant's son.  *One of the primary goals of the training is to teach officers the importance of empathy, and that involves familiarizing themselves with how someone with autism — or any mental health condition — reacts to stress*.  'Everything would be haywire, and if the officer didn't see the signs that the person has autism, they might think they're drunk, high,' John Abbott said.  While Lt. Abbott said he couldn't comment specifically on the video of the incident involving the 8-year-old boy, he said that ability to understand what another person is going through can help on any call where officers encounter

19

> someone in distress. '*Once that rapport is established, we call it connect and direct. They can connect with the person, and then direct them to resolve the call in the easiest way possible*,' Abbott said.

spectrumlocalnews.com/nys/central-ny/news/2022/04/23/syracuse-police-train-to--connect-and-direct--with-subjects-in-distress (emphasis added).

56.     Thus, training officers on how to deal with individuals in a mental health crisis without killing them apparently began in earnest after Allison was shot and killed, although the City of Syracuse, the Mayor, the Deputy Mayor and the Chief of the SPD were on notice of the problem well before the incident, as demonstrated above.

57.     Many tragic deaths and injuries of people with disabilities in police encounters are avoidable. There are safe and effective ways for police officers to do their jobs and take disability into account. Traditional police tactics, such as verbal commands, displays of authority, and threats of physical force, can escalate already-sensitive encounters.

58.     Over the last several years, mental health professionals and policymakers have developed several frameworks and training programs designed to improve police interaction with individuals with mental-health issues. For instance, police training programs recommend refraining from pointing a weapon at the individual, and recommend that only one officer communicate with the civilian while other officers establish perimeter and provide cover. Moreover, when an individual has a knife, it is recommended that officers maintain a safe distance and use available cover. Further, having a trained supervisor and mental health professionals on the scene is critical to ensuring the scene remains stabilized and may reduce the likelihood of the use of deadly force. Crisis intervention and de-escalation practices are widely accepted and are safer for both police officers and persons with mental disabilities.

59.    Although it was clear that Allison was in emotional distress and experiencing a mental health crisis, no de-escalation techniques and other reasonable measures were utilized and no mental health professional was on the scene before Allison was shot and killed, although the defendant officers were agitating Allison for approximately 2 hours.  This disregard and failure had fatal implications for Allison and resulted in the unnecessary and untimely loss of her life in violation of her rights under the Fourth and Fourteenth Amendments, the ADA, the Rehabilitation Act, and New York law.  Defendants' actions were objectively unreasonable, they failed to provide a reasonable accommodation and they acted in this manner because they considered the life of someone with Allison's disabilities to be not worth the cost of implementing reasonable measures.

60.    As a result of the defendants' actions, Allison experienced conscious physical and emotional pain and suffering prior to her death, loss of enjoyment of life, and other personal injuries.  Allison's estate incurred funeral expenses, medical expenses and other expenses.  Allison's family and statutory distributes suffered damages.  Further, Allison's life had value to herself, her family, and her community.

**FIRST CLAIM**

**(ADA & § 1983)**
**(Against all Defendants)**

61.    Plaintiff repeats the foregoing allegations.

62.    Allison Lakie was a qualified individual with a disability; the defendants are subject to the ADA as a public entity and public officials; defendants were required to make reasonable modifications in policies, practices, or procedures to avoid discrimination on the basis of disability; and Allison was denied the opportunity to participate in or benefit from the

defendants' services, programs, or activities, and was otherwise discriminated against by the defendants by reason of her disabilities.

63.     The City of Syracuse and its policymakers, including the Mayor, the Deputy Mayor and the Chief of the SPD, were aware that its existing policies and practices made it substantially likely that mentally disabled individuals would be denied their federally protected rights under the ADA in use of force interactions with its police officers and acted with deliberate indifference in failing to prevent or mitigate the denial of those rights.  The fatal shooting of Allison and her pre-death emotional and physical injuries, and all other damages alleged herein, were a direct and proximate result of the defendants' violations of Title II of the ADA.

64.     The defendants are liable for compensatory and punitive damages in an amount to be determined at trial.

## SECOND CLAIM

### (REHABILITATION ACT & § 1983)
### (Against all Defendants)

65.     Plaintiff repeats the foregoing allegations.

66.     Allison Lakie was a qualified individual with a disability; the defendants are subject to the Rehabilitation Act as the recipients of federal funds; defendants were required to make reasonable modifications in policies, practices, or procedures to avoid discrimination on the basis of disability; and Allison was denied the opportunity to participate in or benefit from the defendants' services, programs, or activities, or was otherwise discriminated against by the defendants by reason of her disabilities.

67.     The City of Syracuse and its policymakers, including the Mayor, the Deputy Mayor and the Chief of the SPD, were aware that its existing policies and practices made

it substantially likely that mentally disabled individuals would be denied their federally protected rights under the Rehabilitation Act in use of force interactions with its police officers and acted with deliberate indifference in failing to prevent or mitigate the denial of those rights.  The fatal shooting of Allison and her pre-death emotional and physical injuries, and all other damages alleged herein, were a direct and proximate result of the defendants' violations of the Rehabilitation Act.

68.     The defendants are liable for compensatory and punitive damages in an amount to be determined at trial.

## **THIRD CLAIM**

### **(EXCESSIVE FORCE/DEADLY FORCE § 1983/FOURTH & FOURTEENTH AMENDMENTS)**
### **(Against all Defendants)**

69.     Plaintiff repeats the foregoing allegations.

70.     The standards applicable to excessive-force claims under the Fourth and Fourteenth Amendments are largely the same -- both relate to the objective reasonableness of the defendants' use of force.  Proper application of this objective test requires examination of the facts and circumstances of each particular case, and consideration of the totality of the circumstances, including the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

71.     The Supreme Court has explained that if "the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary

to prevent escape, and if, where feasible, some warning has been given." *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985).

72.     The use of deadly force on Allison Lakie was objectively unreasonable under the Fourth and Fourteenth Amendments as Allison did not pose a deadly threat, or a threat of serious harm, to anyone.  Also, after shooting her once, Allison was not posing a threat to anyone, but the officers nevertheless then proceeded to shoot her multiple times.

73.     As demonstrated herein, the failure to train and deliberate indifference by the City of Syracuse and its policymakers, including the Mayor, Deputy Mayor and Chief of SPD, were the proximate cause of the death of Allison and her pre-death emotional and physical injuries, and all other damages alleged herein.

74.     The defendants are liable for compensatory and punitive damages in an amount to be determined at trial.

**FOURTH CLAIM**

**(DELIBERATE INDIFFERENCE TO MEDICAL NEEDS-§ 1983/FOURTEENTH AMENDMENT)**
**(Against all Defendants)**

75.     Plaintiff repeats the foregoing allegations.

76.     A police officer exhibits deliberate indifference to an arrestee's medical needs in violation of the Constitution by providing inadequate treatment, intentionally denying or delaying access to medical care, or intentionally interfering with treatment.  *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Whitley v Albers*, 475 U.S. 312, 319 (1986); *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).

77.     The use of deadly force on Allison Lakie rather than providing her with mental health intervention, and shooting Allison multiple times, after she was completely

24

harmless from being shot once, rather than providing her with medical treatment, amounted to deliberate indifference to Allison's serious medical needs.

78.     As demonstrated herein, the failure to train and deliberate indifference by the City of Syracuse and its policymakers, including the Mayor, Deputy Mayor and Chief of SPD, were the proximate cause of the death of Allison and her pre-death emotional and physical injuries, and all other damages alleged herein.

79.     The defendants are liable for compensatory and punitive damages in an amount to be determined at trial.

## FIFTH CLAIM

### (§ 1983; FAILURE TO INTERVENE)
### (Against all Defendants)

80.     Plaintiff repeats the foregoing allegations.

81.     Defendants, acting in concert and under color of state law, had a reasonable opportunity to prevent the violations of Allison Lakie's constitutional rights under the Fourth and Fourteenth Amendments, and her federal rights under the ADA and the Rehabilitation Act, but they failed to fulfill their obligation to intervene.

82.     Defendants' conduct was the proximate cause of the death of Allison and her pre-death emotional and physical injuries, and all other damages alleged herein.

83.     The defendants are liable for compensatory and punitive damages in an amount to be determined at trial.

## FIFTH CLAIM

### (VIOLATION OF N.Y. CIVIL RIGHTS LAW § 28)
### (Against all Defendants)

84.     Plaintiff repeats the foregoing allegations.

85.     "When a person is under arrest or otherwise in the custody of a police officer, peace officer or other law enforcement representative or entity, such officer, representative or entity shall have a duty to provide attention to the medical and mental health needs of such person, and obtain assistance and treatment of such needs for such person, which are reasonable and provided in good faith under the circumstances.  Any person who has not received such reasonable and good faith attention, assistance or treatment and who, as a result, suffers serious physical injury or significant exacerbation of an injury or condition shall have a cause of action against such officer, representative, and/or entity.  In any such civil action, the court, in addition to awarding actual damages and costs, may award reasonable attorneys' fees to a successful plaintiff.  The provisions of this section are in addition to, but shall not supersede, any other rights or remedies available in law or equity."  N.Y. Civil. Rights Law § 28 (Consol., Lexis Advance through 2022 released Chapters 1-500).

86.     Defendants breached their duty to provide attention to Allison Lakie's mental and medical health needs, resulting in the death of Allison and her pre-death emotional and physical injuries, and all other damages alleged herein.

87.     The defendants are liable for compensatory and punitive damages in an amount to be determined at trial.

## SIXTH CLAIM

### (DISABILITY DISCRIMINATION UNDER THE N.Y. HUMAN RIGHTS LAW)
### (Against all Defendants)

88.     Plaintiff repeats the foregoing allegations.

89.     Allison Lakie was an individual with a disability, the defendants were required to provide her with reasonable accommodations, and to refrain from discriminating against her by reason of her disabilities, or what they regarded as disabilities.

26

90.     Defendants were the proximate cause of the death of Allison and her pre-death emotional and physical injuries, and all other damages alleged herein.

91.     The defendants are liable for compensatory and punitive damages in an amount to be determined at trial.

## SEVENTH CLAIM

### (ASSAULT & VICARIOUS LIABILITY)
### (Against all Defendants)

92.     Plaintiff repeats the foregoing allegations.

93.     The defendant police officers, without lawful privilege, placed Allison Lakie in fear of imminent harmful or offensive contact, proximately causing injury to her.  Because the defendant officers were acting within the scope of their employment, the City of Syracuse is vicariously liable for their unlawful conduct.

94.     Defendants' conduct caused Allison to suffer various personal injuries, and caused the other injuries and damages described herein.

95.     The defendants are liable for compensatory and punitive damages in an amount to be determined at trial.

## EIGHTH CLAIM

### (BATTERY & VICARIOUS LIABILITY)
### (Against all Defendants)

96.     Plaintiff repeats the foregoing allegations.

97.     The defendant officers, without lawful privilege, touched and made physical contact with Allison Lakie in an offensive manner without her consent, proximately causing injury to her.  Because the defendant officers were acting within the scope of their employment, the City of Syracuse is vicariously liable for their unlawful conduct.

27

98.     Defendants were the proximate cause of the death of Allison, her pre-death emotional and physical injuries, and all other injuries and damages alleged herein.

99.     The defendants are liable for compensatory and punitive damages in an amount to be determined at trial.

### NINTH CLAIM

### (NEGLIGENCE &VICARIOUS LIABILITY)
### (Against all Defendants)

100.    Plaintiff repeats the foregoing allegations.

101.    Because Allison Lakie was in their custody, the defendants had a duty to safeguard her against foreseeable dangers, and owed her a duty of due care.  *Sanchez v State of New York*, 99 N.Y.2d 247, 252-255, 754 N.Y.S.2d 621, 624-26 (Ct. of App. 2002).

102.    Defendants breached their duty of care owed to Allison, causing her to suffer various personal injuries and death, and caused the other injuries and damages alleged herein.  Because the defendant officers and other City personnel were acting within the scope of their employment, the City of Syracuse is vicariously liable for their unlawful conduct.

103.    The defendants are liable for compensatory and punitive damages in an amount to be determined at trial.

### TENTH CLAIM

### (WRONGFUL DEATH)
### (Against all Defendants)

104.    Plaintiff repeats the foregoing allegations.

105.    For wrongful death, a plaintiff must show (1) the death of a human being; (2) a wrongful act, neglect or an act of the defendant that caused the decedent's death; (3) the survival of distributees who suffered pecuniary loss by reason of the decedent's death; and (4)

the appointment of a personal representative of the decedent.  N.Y. Est. Powers & Trusts Law §
5-4.1

106.    As a result of the foregoing, the statutory distributees of Allison Lakie's
estate sustained pecuniary loss, including funeral expenses, and non-economic loss resulting
from the loss of love, comfort, companionship, society, support, and services provided by
Allison.

**ELEVENTH CLAIM**

**(CONSCIOUS PAIN AND SUFFERING)**
**(Against all Defendants)**

107.    Plaintiff repeats the foregoing allegations.

108.     In New York, a personal representative of an estate may assert a claim for
the conscious pain and suffering suffered by a decedent pursuant to New York's survival statute,
N.Y. Est. Powers & Trusts Law § 11-3.2.

109.    In determining damages for conscious pain and suffering experienced in
the interval between injury and death, when the interval is relatively short, the degree of
consciousness, severity of pain, apprehension of impending death along with duration are all
elements to be considered.

110.    As a result of the foregoing, defendants are liable for their wrongful
conduct resulting in Allison Lakie's pre-death conscious pain and suffering.

WHEREFORE, plaintiff requests the following relief jointly and severally against
the defendants:

a.    Compensatory damages in an amount to be determined by a jury;

b.    Punitive damages in an amount to be determined by a jury;

c.    Attorney's fees and costs;

d.      Pre- and post-judgment interest to the fullest extent permitted by law;

e.      Such other and further relief as the Court may deem just and proper.

DATED:  September 12, 2022

                                                    */s/ Richard Cardinale*

                                                    _____

                                                    RICHARD CARDINALE
                                                    Attorney at Law
                                                    26 Court Street, Suite # 1507
                                                    Brooklyn, New York 11242
                                                    (718) 624-9391
                                                    richcardinale@gmail.com

<u>Of Counsel</u>
MICHAEL HUESTON
Attorney at Law
16 Court Street, 35th Floor
Brooklyn, New York 11241
(718) 246-2900
mhueston@nyc.rr.com
(applying for admission to NDNY)