**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**PETER O'BRIEN,** *as Administrator of Estate of*
*Allison Marie Lakie*,

                                    **Plaintiff,**

    **vs.**                                                                    **5:22-cv-948**
                                                                                **(MAD/TWD)**

**THE CITY OF SYRACUSE; BEN WALSH,**
*Syracuse Mayor***; KENTON BUCKNER,** *Syracuse*
*Police Department Chief***; SHARON OWENS,**
*Deputy Mayor***; DAVID HART,** *Lt.***; MATTHEW**
**LIADKA,** *Sergeant***; KENNETH SHEEHAN,**
*Officer***; NICOLAS SARALEGUI-MARTIN,**
*Officer***; SARGENT,** *Officer***; FRANCISCO,**
*Officer***; MAKENZIE GLYNN,** *Officer***; NIKKO,**
*Officer***; and JOHN/JANE DOES 1-10,** *Police*
*Officers*,

                                    **Defendants.**

_____

**APPEARANCES:**                                    **OF COUNSEL:**

**OFFICE OF RICHARD CARDINALE**              **RICHARD CARDINALE, ESQ.**
26 Court Street – Suite 1507
Brooklyn, New York 11242
Attorneys for Plaintiff

**MICHAEL HUESTON, ATTORNEY AT LAW**       **MICHAEL HUESTON, ESQ.**
16 Court Street, 35th Floor
Brooklyn, New York 11241
Attorneys for Plaintiff

**HANCOCK ESTABROOK, LLP**                   **JOHN G. POWERS, ESQ.**
1800 AXA Tower I                              **MARY L. D'AGOSTINO, ESQ.**
100 Madison Street                           **RYAN M. POPLAWSKI, ESQ.**
Syracuse, New York 13202
Attorneys for Defendants

**SYRACUSE CORPORATION COUNSEL**            **DANIELLE PIRES, ESQ.**
City Hall Room 300
233 East Washington Street
Syracuse, New York 13202
Attorneys for Defendants

**SYRACUSE LAW DEPARTMENT**                    **TODD M. LONG, ESQ.**
City Hall Room 300
233 East Washington Street
Syracuse, New York 13202
Attorney for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff, as administrator of the estate of Allison Marie Lakie, commenced this action on

September 12, 2022, pursuant to Title II of the Americans with Disabilities Act of 1990, Section

504 of the Rehabilitation Act of 1973, 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments

to the United States Constitution, and New York state law, concerning an allegedly unlawful fatal

police shooting, on October 20, 2021, of Allison Marie Lakie, a 35 year-old mentally disabled

woman, in the City of Syracuse, New York. *See* Dkt. No. 1.  The named defendants in this action

are Lieutenant David Hart, Sergeant Matthew Liadka, Officer Kenneth Sheehan, Officer Nicolas

Saralegui-Martin, Officer Christopher Sargent, Officer Evan Francisco, and Officer Makenzie

Glynn (hereinafter, the "Police Officer Defendants"), Mayor Ben Walsh, Syracuse Police

Department Chief Kenton Buckner, and Deputy Mayor Sharon Owens (hereinafter, the

"Supervisory Defendants"), and the City of Syracuse (hereinafter, the "City").

Currently before the Court are Defendants' motions to dismiss Plaintiff's complaint. *See*

Dkt. Nos. 22, 23 & 25.

### II. BACKGROUND

Plaintiff Peter O'Brien, the great uncle of Allison Marie Lakie ("Ms. Lakie" or "Allison"),

is a resident of the State of New York, and was issued limited letters of administration concerning

the Estate of Allison Marie Lakie by the Surrogate Court, Onondaga County, on February 25,

2022.  *See* Dkt. No. 1 at ¶ 8.  The City of Syracuse is a municipal corporation organized under the

laws of the State of New York.  *See id.* at ¶ 9.  The named individual Defendants are present and

former high-level elected and appointed officials of the City of Syracuse, and members of the

Syracuse Police Department.  *See id.* at ¶ 10.

In response to Executive Order No. 203 concerning police reform in the State of New

York, issued by former Governor Andrew Cuomo on June 12, 2020, Syracuse Mayor Ben Walsh

issued Executive Order No. 1: Syracuse Police Reform, on June 19, 2020.  *See id.* at ¶ 17.

Regarding Executive Order No. 1, Mayor Walsh stated that it

> empowered Syracuse Police Department Chief Kenton Buckner to
> prioritize the implementation of policies and practices to improve
> and further modernize the Syracuse Police Department in line with
> 21st Century Policing strategy, while simultaneously mending
> strained relations with the community.  The murder of George
> Floyd on May 25, 2020 during an arrest by the Minneapolis Police
> Department launched massive calls for police reform throughout the
> world, our nation and the City of Syracuse.  In response to a clear
> message from our community, Mayor Ben Walsh issued Executive
> Order 1: Syracuse Police Reform, urgently directing his
> administration to take sixteen (16) actions to increase police
> accountability, improve transparency and strengthen
> police-community relations.  The local provisions in the Executive
> Order address critical issues in the police reform movement found
> in national data and reports on police concerns including, but not
> limited to: updating the Syracuse Police Department's (SPD) use of
> force policy ...

*Id.* at ¶ 18.  One of the actions called for in Mayor Walsh's Executive Order No. 1 called for the

City of Syracuse to "research and consider innovative, community-based strategies for responding

to non-criminal calls, with a goal of shifting the paradigm from primary police response, to

response by non-police professionals in relevant fields." *Id.* at ¶ 19.  In a press release, it was

stated that "[t]he ultimate responsibility for implementing the Mayor's Executive Order lies with

the Chief of Police [Kenton Buckner] and his department.  Mayor Walsh is committed to ensuring

that each of the 16 items in his Executive Order are implemented and has assigned Deputy Mayor

[Sharon] Owens the responsibility of managing the process." *Id.* at ¶ 20.

In a report entitled "Onondaga County and the City of Syracuse Speaks: Public Comments

on Reforming and Reinventing Police," dated February 8, 2021, policymakers from the City of

Syracuse reported as follows:

> The Police Reform and Reinvention Collaborative ("PRRC")
> conducted six community forums in January 2021 to gather public
> comment about initiatives to be undertaken in Onondaga County
> and the City of Syracuse to address police reform pursuant to
> Executive Order No. 203, signed by Governor Andrew M. Cuomo
> on June 12, 2020.  The PRRC engaged InterFaith Works, a
> Syracuse-based human services non-profit agency, to gather all data
> based on public comments for each session and to develop this
> independent report.  The report qualitatively analyzes 211 public
> comments made by 375 participants about reforming and redefining
> the role of police in Onondaga County and the City of Syracuse.
> Seven overarching themes emerged …

Dkt. No. 1 at ¶ 21.  In relevant part, the report found that "[t]here was resonance across the

Community Forums for the need for expanded mental health services to augment, or perhaps

replace in certain instances, police interactions with people in mental health crisis. In this context,

the idea of Crisis Response Teams was raised.  Some participants felt that police budgets should

be reduced and these new funds should be directed towards expanded mental health services to

produce better outcomes[.]" *Id.* at ¶ 22.

In a March 2021 report entitled "Syracuse Police Reform and Reinvention Plan," Syracuse

policymakers reported that

> [t]he Syracuse Police Department is the first to acknowledge that
> not all dispatched calls require the presence of a sworn officer.
> Similarly it's understood that while police officers are not trained
> professional mental health clinicians, it is important that they are
> trained to recognize the symptoms of mental health issues and how
> to provide initial help and access the assistance of those trained in
> the field in order to guide a person towards appropriate professional

> help.  Individuals in physical, mental health or substance abuse
> induced crisis require the intervention of those who have made the
> care of these individuals their professional career.

*Id.* at ¶ 23.

In his complaint, Plaintiff alleges that, "[d]espite having knowledge of the often perilous and tragic outcomes when armed police officers, who lack adequate training in dealing with individuals who are in the throes of a mental health crisis, and the danger in not having trained mental health professionals respond with the police to emergency calls involving mentally ill individuals, the City of Syracuse, Mayor Ben Walsh, Deputy Mayor Sharon Owens and Police Chief Kenton Buckner failed to implement adequate remedial measures, leading to the tragic fatal police shooting of Allison Marie Lakie on October 20, 2021." *Id.* at ¶ 24.  Ms. Lakie suffered from mental disabilities of bipolar disorder, depression, self-harm and suicidal ideations, exacerbated by substance abuse, which had resulted in hospitalizations.  *See id.* at ¶ 25.  Upon information and belief, the complaint further alleges that Ms. Lakie suffered from other obvious and apparent mental health conditions, including paranoid schizophrenia and delusions.  *See id.*

On October 20, 2021, Ms. Lakie was staying at her maternal grandmother's home, located at 216 Ulster Street, in Syracuse, New York with her mother, Ann MacBain, and Ann's husband, Anthony Lisi.  *See id.* at ¶ 27.  The incident at issue lasted from approximately 1:30 a.m. to 3:30 a.m.  *See id.*

At approximately 1:30 a.m., Ann MacBain called an ambulance because Ms. Lakie was having a mental health crisis.  When the emergency medical technicians ("EMTs") arrived approximately ten minutes later, they immediately left because Ms. Lakie thought they were impostors and Ms. Lakie, fearing they were going to harm her, was holding a knife.  *See id.* at ¶ 28.  Ms. MacBain called the 911 operator, and the EMTs may have called as well, and police

were dispatched to the residence.  *See id.* at ¶ 29.  Ms. MacBain told the operator that Ms. Lakie was in a psychotic state.  *See id.*  The complaint alleges that Ms. Lakie thought someone was coming to hurt her, which is why she held a knife.  *See id.* at ¶ 30.  Ms. MacBain convinced Ms. Lakie to sit on the knife as Ms. Lakie told her that they were "'coming to hurt us.'" *Id.*

Some of the Police Officer Defendants arrived a short time later and Ms. Lakie made it apparent that she thought that the officers were impostors as well.  *See id.* at ¶ 31.  The complaint contends that it was obvious to the Police Officer Defendants that Ms. Lakie was suffering from a mental illness and that Ms. MacBain told the police that "'you have to help her.'" *Id.*

"The first officers who addressed Allison, including Officer Makenzie Glynn, Sergeant Matthew Liadka and Officer 'Francisco,' were not trained in dealing with a mentally ill individual like Allison.  It was obvious to the officers, as evidenced by Allison's paranoia and delusions during the entire incident, and from what Ann, the EMTs and the 911 dispatcher told them, that Allison was mentally ill and in the throes of a mental health crisis." *Id.* at ¶ 32.  The complaint alleges that Officer Glynn and Sergeant Liadka, while at least one other officer, including Officer Francisco, observed, tried to coax Ms. Lakie out of the kitchen in the home by making statements to Ms. Lakie that aggravated and exacerbated her disability.  *See id.* at ¶ 33.  "At no time did the officers call an officer or mental health professional trained in dealing with someone in Allison's state, were not told or trained that such resources were available, or knew that the SPD did not have these resources.  These are all reasonable accommodations that the defendants did not provide." *Id.*

The complaint further alleges that at no time did Ms. Lakie tell the officers that she was going to hurt them; rather, she simply told the officers to leave, repeatedly, and kept calling out for her mother.  *See* Dkt. No. 1 at ¶ 34.  At first, the officers allowed Ms. Lakie's mother to

consult with her, but was later not permitted in the home, despite the fact that Ms. Lakie kept calling out for her. *See id.* "Although Allison repeatedly told the officers to leave, they repeatedly told her that they were not leaving, although they could have stepped back, created a perimeter around the house, and afforded Allison a cooling-off period." *Id.* Plaintiff claims that during this cooling-off period, "a social worker or other mental health professional could have been dispatched to the scene to speak with Allison to calm her and convince her to seek help. These are all reasonable accommodations." *Id.*

For approximately ninety minutes, Officer Glynn and Sergeant Liadka repeatedly stated to Ms. Lakie, in sum and substance, the following, which was not persuading her to come out of the home and obtain help, and which increased her paranoia, agitated and aggravated her, and caused her condition to worsen: (1) "I think something is wrong with your mom;" (2) "Your mother is 'so upset' and 'very scared;'" (3) "Your mother is 'on the ground;'" (4) "Your mother is 'having trouble breathing;'" (5) "Your mother is in an ambulance 'hooked up to monitors;'" (6) "Your mother 'cannot speak to you;'" (7) "If something happens to your mother, 'it's on you;'" (8) "'If something happens to your mother, you're going to feel awful; you may never see her again;'" (9) "'I am going to tell the ambulance to leave since you're not coming out; ok (pretending to be speaking with the EMTs), you can leave;'" (10) "'Your mother is leaving in an ambulance to go to the hospital;'" (11) "'Your mother is down the street in the ambulance;'" (12) "'Your mother is gone.'" *Id.* at ¶ 35. "Although the officers' statements caused Allison's condition to worsen, she never threatened the officers, verbally or physically. Allison removed some of her clothes, intentionally cut herself, broke some glass, threw something in the kitchen, and, at the end of the encounter, lit a cigarette, which she dropped, or started a flame, that was contained to the kitchen." *Id.* at ¶ 36.

Sergeant Liadka, who was speaking to Ms. Lakie from the front door fo the home, having no training on how to connect to an individual who is suffering from paranoia and delusions and who thought the officers were not really the police and were there to harm her, agitated Ms. Lakie by stating such things as: "What are you worried about?"; "What did you throw?"; "What did you break?"; "Why do you have knives?"; and "We're not leaving." *Id.* at ¶ 37.  The complaint further alleges that one of the officers on the scene also stated out loud that they may have to shoot Ms. Lakie. *See id.* at ¶ 38.

While Ann, Ms. Lakie's mother, was outside, she heard Ms. Lakie tell the officers to "'get out'" and not enter the room she was in (the kitchen), and that she was not coming out.  *See* Dkt. No. 1 at ¶ 39.  Ann tried to get inside to help her daughter but the officers would not allow it.  *See id.*

Approximately an hour and forty-five minutes into the incident, Officer Nicolas ("Nikko") Saralegui-Martin[1] arrived and told Ms. Lakie that he was "'part of the Crisis Response Team,' and Nikko, who was obviously not adequately trained in dealing with the mentally ill, further told Allison that he was 'new to the situation,' that he 'just got there and had no clue what was going on,' and misrepresented that her 'mother was in the hospital.'" *Id.* at ¶ 41.  Officer Nikko further told Ms. Lakie that he observed that she was harming herself and that her wrist was injured.  *See id.*  "Apparently, Allison cut her wrist(s) in a suicide attempt.  Allison's blood was on the floor." *Id.*

---

[1] The complaint purports to bring a claim against an individual described as "Officer Nikko." Dkt. No. 1.  According to Defendants, no such officer exists at the City of Syracuse Police Department, or was present at the incident in question.  *See* Dkt. No. 22-10 at 9 n.1. Defendants claim that "Nikko," however, is the nickname for Officer Nicolas Saralegui-Martin, and the references to "Nikko" in the police body-worn camera footage are references to Officer Saralegui-Martin.  *See id.*

8

At some point, a fire was observed in the home, although it was contained to the kitchen. *See* Dkt. No. 1 at ¶ 42. At the time of the fire, no one was in the home except for Ms. Lakie, and there were numerous firefighters at the scene. *See id.* Despite this, the Police Officer Defendants entered the home with their guns drawn, some with shields, and tased Ms. Lakie repeatedly, and told the firefighters to "hose her" with the fire retardant. *See id.* Ms. Lakie was stunned and disoriented from the actions of the officers and the firefighters. *See id.* at ¶ 43. She did not verbally or physically threaten the officers, the officers were several feet from her, she did not charge at the officers with the knife and was retreating, and one officer stated the fire was "out." *Id.*

According to the complaint, "[a]lthough there was no reasonable fear of death or serious harm to the officers and other first responders on the scene, one of the defendant officers shot Allison. Although Allison was now even less of a threat, four of the defendant officers, Lieutenant David Hart, Sergeant Matthew Liadka, Officer Kenneth Sheehan, and Officer Nicolas Saralegui-Martin, then shot Allison multiple times." *Id.* at ¶ 44. Ms. Lakie was transported to the emergency room at Upstate University Hospital, where her death was pronounced at 4:01 a.m., despite efforts to resuscitate her. *See id.* "The medical examiner determined that the manner of death was homicide." *Id.*

In his complaint, Plaintiff alleges as follows:

> As stated above, the defendant officers agitated Allison and aggravated and exacerbated her disability, would not allow her to speak to her mother who was outside of the home, increased her distress by misrepresenting that her mother was very ill and going to the hospital, blamed her for her mother's condition (*e.g.*, "it's on you"), did not provide Allison with a cooling-off period, failed to respect Allison's comfort zone, elongated the encounter, failed to create a safe perimeter and avoid unnecessary contact with Allison, and, significantly, failed to seek professional resources, which were apparently not available in the City of Syracuse, despite the Mayor,

9

> the Deputy Mayor and the Chief of the SPD being on notice that
> this type of encounter was certain to happen and had happened in
> the past. Moreover, the City of Syracuse, the Mayor, the Deputy
> Mayor and the Chief of the SPD did not train their police officers
> on how to resolve encounters with the mentally ill without agitating
> their condition and using deadly, excessive and/or unnecessary
> force.  Moreover, even if officers received some training, it was
> obviously deficient, and officers who had acted improperly in the
> past were not re-trained, disciplined or terminated. Further, City of
> Syracuse, the Mayor, the Deputy Mayor and the Chief of the SPD
> did not adequately investigate prior incidents between the police
> and the mentally disabled which often ended tragically.

*Id.* at ¶ 45.  Plaintiff claims that instead of providing reasonable accommodations, Defendants'

actions collectively precipitated a deadly confrontation.  *See id.* at ¶ 46.  Ms. Lakie was not only

disabled and had a record of impairment, but Defendants "'regarded' her as disabled, and treated

her as if her life and emotional state had no intrinsic value." *Id.*  Moreover, Plaintiff claims that

the use of deadly force by the officers at the scene was objectively unreasonable under the Fourth

and Fourteenth Amendments as Ms. Lakie did not charge or threaten the officers with a weapon

or knife, firefighters were on the scene who had put out the fire, which was contained to the

kitchen, and numerous officers on the scene had shields and non-lethal weapons.  *See id.* at ¶ 47.

"The officers, upon entering the room, had other reasonable alternatives than to use deadly force

on the stunned and disoriented Allison, who did not post a threat of death or serious injury to any

of the first responders on the scene, and then, after shooting Allison once, proceeding to shoot her

multiple times." *Id.*

### III. DISCUSSION

**A.     Standard of Review**

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) tests the legal

sufficiency of the party's claim for relief.  *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir.

2007) (citation omitted).  In considering the legal sufficiency, a court must accept as true all well-

pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted).  This presumption of truth, however, does not extend to legal conclusions.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citation omitted).  Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading.  *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (citation omitted).  Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of the 'entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the [] complaint must be dismissed[,]" *id.* at 570.

**B.      Consideration of Body Camera Footage**

In support of the pending motions to dismiss, Defendants submitted as exhibits copies of the body-worn camera footage recorded by Sergeant Liadka, Officer Sargent, and Officer Saralegui-Martin. *See* Dkt. Nos. 22-4, 22-5 & 22-6. Defendants contend that, even though this evidence may not be incorporated by "express reference" into the complaint, the Court may still consider this evidence because "(i) plaintiffs had the evidence in their possession or had knowledge of the evidence prior to filing the complaint; and (ii) plaintiff relied on the evidence in drafting the complaint." Dkt. No. 29 at 12 (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)). In response, Plaintiff contends that "Defendants have offered no evidence that the body camera videos, which do not even decide the issues in this case, are 'integral' to the complaint." Dkt. No. 36 at 21. Moreover, Plaintiff contends that when the complaint was drafted, counsel had only viewed three redacted videos on the New York Attorney General's website, rather than the entire, unredacted videos attached as exhibits to Defendants' motions. *See id.* Finally, Plaintiff contends that it has not identified a published opinion within the Second Circuit in which evidence such as video recordings or photographs have been embraced as "integral" to the complaint. *See id.* at 22 (citing *Doe v. N.Y. Univ.*, No. 1:20-cv-1343, 2021 U.S. Dist. LEXIS 62985, *36 n.6 (S.D.N.Y. Mar. 31, 2021)).

In the present matter, the Court declines to consider the body camera footage in deciding Defendants' motions to dismiss. The body camera footage is not attached to, referenced in, or mentioned in the complaint. *See Feliz v. City of New York*, No. 19-cv-6305, 2022 WL 446043, *3 (S.D.N.Y. Feb. 14, 2022) (declining to consider body camera footage in deciding the defendants' motion to dismiss where it was not attached to, referenced in, or otherwise relied on in drafting the complaint) (citations omitted); *see also Benny v. City of Long Beach*, No. 20-cv-1908, 2021

WL 4340789, *8-10 (E.D.N.Y. Sept. 23, 2021) (declining to consider surveillance footage in police-misconduct case even where the complaint mentioned that the footage existed).  Nor is there any indication that Plaintiff or his counsel relied on the unredacted and unabridged footage in drafting the complaint.  Although there are some decisions from various courts in the Second Circuit that have considered such evidence in deciding a motion to dismiss, the vast majority of cases have expressly rejected the invitation to consider such evidence in deciding a motion to dismiss.  *See Feliz*, 2022 WL 446043, at *3 (citation omitted); *see also Santulli v. Moy*, No. 18-cv-122, 2019 WL 3429081, *2 (E.D.N.Y. July 30, 2019) (considering only allegations in the complaint where there was no indication that the plaintiff relied on footage in police-misconduct case).  Moreover, far from being integral to the complaint, the video footage is not even mentioned in it.  *See Santulli*, 2019 WL 3429081, at *2; *see also Ashley v. Gonzalez*, No. 19-CV-6282, 2020 WL 7027501, *2 (S.D.N.Y. Nov. 30, 2020) ("Furthermore, there is no basis to conclude that these videos are integral or essential to the Complaint.  Courts in this district have expressed skepticism at such claims, emphasizing that extraneous videos documenting the events in question are not properly considered on a motion to dismiss unless the plaintiff relied upon the videos when drafting the complaint"); *Gersbacher v. City of New York*, 134 F. Supp. 3d 711, 719-20 (S.D.N.Y. 2015) (collecting cases); *Smith v. City of Greensboro*, No. 1:19-CV-386, 2020 WL 1452114, *3 (M.D.N.C. Mar. 25, 2020) ("The factual allegations contained therein stand independent of the video, and may conceivably be proven without it (for instance, via witness testimony).  Nor is there any indication from Plaintiffs that they actively relied upon the video in crafting the complaint"); *Gonzalez v. City of New York*, No. 14-cv-7721, 2015 WL 6873451, *5 (S.D.N.Y. Nov. 9, 2015) (holding that it would be improper to consider videos attached as exhibits to the defendants' motion to dismiss where the plaintiff did not have access to the videos

before filing his complaint, despite the fact that the videos contradict the plaintiff's factual

allegations in the complaint); *Holmes v. City of New York*, No. 14-cv-5253, 2016 WL 915332, *2-

3 (S.D.N.Y. Mar. 4, 2016) (same); *Mosca v. City of New York*, No. 17-cv-4327, 2018 WL

3151704, *3 n.3 (E.D.N.Y. Apr. 24, 2018) (same); *Leibovitz v. City of New York*, No. 14-cv-7106,

2018 WL 1157872, *6 (E.D.N.Y. Mar. 2, 2018) (declining to consider, among other things, video

evidence that was not integral to allegations made in the complaint); *Short v. City of Rochester*,

No. 6:22-cv-6263, 2022 WL 17990106, *3-4 (W.D.N.Y. Dec. 29, 2022) (declining to consider

video evidence in deciding a motion to dismiss where there were multiple videos of the subject

incident and the plaintiff refused to concede that he viewed any of the subject videos when

drafting the complaint); *but see Moran v. Town of Greenwich*, No. 3:19-cv-722, 2021 WL

3604349, *2 n.1 (D. Conn. Aug. 13, 2021) (holding that it was appropriate to consider a video in

deciding the defendants' motion to dismiss where the plaintiff requested that it be considered, and

where it was "repeatedly referenced" throughout the amended complaint and the amended

complaint contained a link to the exact video in question).

Defendants also contend that the videos at issue were released to the public by the New

York State Attorney General's Office on December 30, 2021, and that Plaintiff's counsel testified

during a 50-h examination to having watched the videos prior to the complaint being filed. *See*

Dkt. No. 22-10 at 18.  However, the videos that were released to the public were "Redacted

According to OAG Policy." https://ag.ny.gov/press-release/2021/attorney-general-james-releases-

footage-investigation-deathallison-lakie.  Defendants also argue that the videos at issue both

contradict statements made in the complaint and that they paint a fuller picture of the incident at

issue and clearly demonstrate the reasonableness of the Defendants' actions. *See* Dkt. No. 22-10

at 16-19.  However, it is no more proper to consider the videos on this motion than any other type

of evidence a defendant might unilaterally proffer from outside the pleadings. "The fact that evidence is inconsistent with a complaint's allegation is not a reason to consider it on a motion to dismiss." *Gonzalez*, 2015 WL 6873451, at *5 (citation omitted); *see also DiFolco v MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) (finding district court erred in considering document that purportedly undermined the plaintiff's breach of contract claim where that document was neither incorporated in nor integral to the complaint).

Under Rule 12(d) of the Federal Rules of Civil Procedure, the Court potentially could convert Defendants' motions to dismiss into a motion for summary judgment and consider the footage in resolving the converted motion. *See* Fed. R. Civ. P. 12(d). But, the "ultimate decision of whether to convert a Rule 12(b)(6) motion into a Rule 56 motion is discretionary." *Fernandez v. Windmill Distib. Co.*, 159 F. Supp. 3d 351, 358 (S.D.N.Y. 2016). Additionally, before converting a motion to dismiss into a motion for summary judgment, a court must "give 'sufficient notice to an opposing party and an opportunity for that party to respond.'" *Hernandez v. Coffey*, 582 F.3d 303, 307 (2d Cir. 2009) (quoting *Groden v. Random House, Inc.*, 61 F.3d 1045, 1052 (2d Cir. 1995)); *see also* Fed. R. Civ. P. 12(d). The Court will decline to convert the motions here. Defendants at no point in their briefing requested the Court to do so. *See Rasmy v. Marriott Int'l, Inc.*, No. 16-cv-4865, 2017 WL 773604, *10 (S.D.N.Y. Feb. 24, 2017). Moreover, Plaintiff otherwise lacked adequate notice to present additional materials extrinsic to the complaint to properly address Defendants' footage. *See Feliz*, 2022 WL 446043, at *4 (citations omitted). Additionally, it would be premature for the Court to consider a motion for summary judgment before affording Plaintiff the opportunity, through discovery, to ensure that he has been provided with all relevant videos. *See Short*, 2022 WL 17990106, at *4.

Accordingly, the Court will evaluate Defendants' arguments without reference to the body camera footage.

## C.      Group Pleading Doctrine

The Police Officer Defendants[2] argue that all claims against them must be dismissed under the group pleading doctrine because none of the pleaded claims identify any of the Police Officer Defendants by name and, therefore, the pleaded claims fail to distinguish among them or attribute any specific actionable conduct to any specific Defendant. *See* Dkt. No. 22-10 at 15. Plaintiff, however, argues that the doctrine is inapplicable because the actions of the Police Officer Defendants are sufficiently set forth in the complaint. *See* Dkt. No. 37 at 22 (citing Dkt. No. 1 at ¶¶ 31-45).

With regard to pleading requirements generally, in cases such as this that involve multiple defendants, a complaint must give each defendant fair notice of the claims being asserted against him. *See Atuahene v. City of Hartford*, 10 Fed. Appx. 33, 34 (2d Cir. 2001) ("Although Fed. R. Civ. P. 8 does not demand that a complaint be a model of clarity or exhaustively present the facts alleged, it requires, at a minimum, that a complaint give each defendant 'fair notice of what the plaintiff's claim is and the ground upon which it rests.' ... By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, Atuahene's complaint failed to satisfy this minimum standard") (internal quotation and other citation omitted). However, context matters in this regard. "For example, in situation involving alleged assault by a group of police officers or corrections officers, courts do not insist that the complaint set forth in detail the actions of each officer where it would be unreasonable to expect the plaintiff to be able

---

[2] The Court will refer to Defendants Hart, Liadka, Sheehan, Saralegui-Martin, Sargent, Francisco, and Glynn, who are all members of the City of Syracuse Police Department, as the "Police Officer Defendants."

to do so." *Bryant v. Monroe Cnty.*, No. 19-cv-6474, 2022 WL 119184, *10 (W.D.N.Y. Jan. 12, 2022).

In the present matter, the Court finds that Plaintiff has sufficiently alleged the acts of each named Defendant, such that they have fair notice of the claim presented against them. Plaintiff has made clear that the claims asserted are being brought against each named Defendant. *See New York Am. Water Co., Inc. v. Dow Chemical Co.*, No. 19-CV-2150, 2020 WL 9427226, *4 (E.D.N.Y. Dec. 11, 2020) (noting that the pleading did group the defendants together, but allowing it to proceed because "plaintiffs make clear that identical claims are [being] asserted against each defendant"); *Rosen v. Prudential Ret. Ins. and Annuity Co.*, No. 15-CV-1839, 2016 WL 7494320, *12 (D. Conn. Dec. 30, 2016) (holding that the plaintiffs had "sufficiently specified which claims are being brought against [the defendants], as well as the basic factual allegations associated with those claims" and allowing the claim to proceed despite defendants' argument that the complaint had impermissibly grouped "two defendants together without distinguishing their conduct"); *Gao v. JPMorgan Chase & Co.*, No. 14-CV-4281, 2015 WL 3606308, *6 (S.D.N.Y. June 9, 2015) (rejecting a "group pleading" argument because the "claims against [the defendant], and the grounds upon which they rest, [were] clear from the complaint").

In light of the specific circumstances of this case, the Court finds that Plaintiff has plausibly alleged the claims against the Police Officer Defendants. *See Folk v. City of New York*, 243 F. Supp. 3d 363, 370 (E.D.N.Y. 2017) ("Viewed in the light most favorable to Plaintiff, the Amended Complaint plausibly alleges that all of the Individual Defendants directly participated in Plaintiff's arrest, or, in the alternative, failed to intervene to prevent it. While Plaintiff must prove the roles the Individual Defendants played in her arrest to prevail on the merits, this Court will not dismiss her claims at this stage solely because her narrative is imprecise as to each

Individual Defendant's role in her arrest") (citations omitted).  Accordingly, the Court denies this aspect of the Police Officer Defendants' motion to dismiss.

### D.    ADA and RA Claims Against the Individual Defendants

The Police Officer Defendants argue that Plaintiff's claims under the ADA and RA must be dismissed against them because claims under the ADA and RA cannot be brought against individuals.  *See* Dkt. No. 22-10 at 15-16.  Defendants Walsh, Buckner, and Owens similarly raise this argument in their motion to dismiss.  *See* Dkt. No. 23-9 at 13-14.  In his responses, Plaintiff acknowledges that the Police Officer Defendants and Defendants Walsh, Buckner, and Owen cannot be sued in their individual capacities for money damages under either the ADA or RA.  *See* Dkt. No. 37 at 23; Dkt. No. 38 at 23.  Because "neither Title II of the ADA nor Section 504 of the Rehabilitation Act provides for individual capacity suits against state officials," *Durr v. Slator*, 558 F. Supp. 3d 1, 33 (N.D.N.Y. 2021) (citation omitted), the Court grants this aspect of these motions to dismiss.  Accordingly to the extent that the complaint alleges claims under the ADA and RA against the Police Officer Defendants and Defendants Walsh, Buckner, and Owens, those claims are dismissed.

### E.    ADA and RA Claims Against the City of Syracuse

"In 1990, Congress enacted the ADA 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities' and 'to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities.'" *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 91 (2d Cir. 2021) (quoting 42 U.S.C. § 12101(b)(1)-(2)).  "'The Act's first three titles prohibit discrimination against individuals with disabilities "in three major areas of public life": employment and hiring (Title I); public services, programs, and activities (Title II); and public accommodations (Title III).'" *Id.* (quoting *Tardif v.*

*City of New York*, 991 F.3d 394, 403 (2d Cir. 2021)); *see also Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004).

"Title II, at issue here, provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Hamilton*, 3 F.4th at 91 (quoting 42 U.S.C. § 12132). Similarly, Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "Because the standards imposed by Title II on public entities are generally equivalent to those of § 504, we 'treat claims under the two statutes identically' in most cases." *Davis v. Shah*, 821 F.3d 231, 259 (2d Cir. 2016) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)).

"To establish a claim under Title II, a plaintiff must demonstrate '(1) that she is a qualified individual with a disability; (2) that she was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to her disability.'" *Tardif*, 991 F.3d at 404 (quoting *Davis v. Shah*, 821 F.3d 231, 259 (2d Cir. 2016)). "A plaintiff may base a Title II claim 'on any of three theories of liability: disparate treatment (intentional discrimination), disparate impact, or failure to make a reasonable accommodation.'" *Hamilton*, 3 F.4th at 91 (quoting *Tardif*, 991 F.3d at 404); *see also Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 186 (2d Cir. 2015).

### 1. Applicability of the ADA and RA

Initially, Defendants contend that interactions between law enforcement and disabled individuals should not be subject to the protections of the ADA and the RA because such interactions are not programs, services, or activities from which a disabled person could be excluded or otherwise denied a benefit. *See* Dkt. No. 29 at 14-16. While Defendants note that neither the Second Circuit nor the Supreme Court has addressed this issue, they acknowledge that this Court, relying on other district court cases, "held affirmatively that such interactions were, in fact, subject to the ADA, concluding that a plaintiff's Title II reasonable accommodation claim was viably pleaded." *Id.* at 14-15 (citing *Durr v. Slator*, 558 F. Supp. 3d 1, 31 (N.D.N.Y. 2021)). Defendants argue, however, that *Durr* is factually distinguishable from the present matter, in that the plaintiff in *Durr* was already in police custody, in handcuffs, when the actionable conduct occurred, whereas here Ms. Lakie was not yet in police custody. *See id.* at 15. Defendants further note that although the Supreme Court was not able to answer this question for procedural reasons, "[s]ome Circuit Courts, however, have already answered this question in the negative." *Id.* at 15-18 (citing *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000); *Roell v. Hamilton Cnty., Ohio/Hamilton Cnty. Bd. of Cnty. Commissioners*, 870 F.3d 471, 488-89 (6th Cir. 2017); *Bates ex rel. Johns v. Chesterfield Cnty., Va.*, 216 F.3d 367, 370-73 (4th Cir. 2000); *Sanders v. Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007)).

The Court disagrees with Defendants. In *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600 (2015), the Supreme Court declined to answer the question of whether Title II "requires law enforcement officers to provide accommodations to an armed, violent, and mentally ill suspect in the course of bringing the suspect into custody." As Defendants note, in *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000), the Fifth Circuit held – consistent with this Court's decision in *Durr* and the Southern District's decision in *Williams v. City of New York*, 121

F. Supp. 3d 354 (S.D.N.Y. 2015) – that Title II does apply to police investigation and custodial activities but that any statutory duty to provide a reasonable accommodation begins only after officers (1) secure the scene, and (2) ensure that there is no threat to human life. *Hainze*, 207 F.3d at 801 ("we hold that Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to life").

In *Roell v. Hamilton Cnty., Ohio/Hamilton Cnty. Bd. of Cnty. Commissioners*, 870 F.3d 471 (6th Cir. 2017), the plaintiff alleged that the police should have used verbal de-escalation techniques – conversing with the plaintiff "in a non-threatening manner," and taking other "steps to calm the situation" – prior to tasing a mentally disabled plaintiff. *See id.* at 488-89. At the time of the use of force, however, the plaintiff had just charged at the officers swinging a hose nozzle as a weapon and had recently committed a series of property crimes. *See id.* at 489. The majority opinion held that, even if the plaintiff's reasonable accommodation claim was cognizable, the defendants were entitled to summary judgment because the officers "unquestionably faced exigent circumstances while attempting to restrain and arrest" the plaintiff. *See id.* The court observed that the deputies had to "make a series of quick, on-the-spot judgments in a continuously evolving environment," which necessarily rendered the requested accommodations unreasonable as a matter of law. *See id.*

In *Bates v. Chesterfield Cnty.*, 216 F.3d 367 (4th Cir. 2000), the Fourth Circuit addressed a claim for violation of a plaintiff's Fourth Amendment right to be free from unreasonable seizure, along with a claim that he was discriminated against on account of his disability in violation of the ADA. In *Bates*, a police officer responded to a 911 call and was told that there was a teenage

21

boy running through the woods, acting crazy, maybe on drugs or alcohol.  *See id.* at 369.  The

officer located the boy, spoke to him, but the boy walked away.  The officer ordered him to return

and the boy then sat on the officer's motorcycle, without permission.  The officer pushed him off

the motorcycle, the boy then pushed the officer and walked away.  The situation escalated with

the boy ultimately scratching, spitting and biting the officer before the officer, with the assistance

of another officer, managed to handcuff the boy.  *See id.*  The officers did not learn until after the

boy was restrained and his parents arrived at the scene that the boy suffered from autism.  *See

id.* at 369-70.

The plaintiff asserted that the officers "should have been aware of his autism" during the

challenged "incident and should have taken this condition into account when interacting with

him." *Id.* at 373.  Had they done so, the plaintiff argued, "he would not have been detained or

arrested and the ensuing scuffle would not have occurred." *Id.*  Having rejected the excessive

force claim, the Fourth Circuit rejected the ADA claim as well, but not on the merits of whether

the claim could be brought in this context.  Rather, the Fourth Circuit held that

> [w]e need not undertake an independent ADA inquiry in this case
> because our Fourth Amendment scrutiny has already accounted for
> all the situation's circumstances.  For in evaluating the validity of an
> investigatory stop, a court must consider the totality of the
> circumstances — the whole picture.  And in examining a claim of
> excessive force a court must ask whether the officers' conduct was
> objectively reasonable in light of the facts and circumstances
> confronting them.  Just like any other relevant personal
> characteristic — height, strength, aggressiveness — a detainee's
> known or evident disability is part of the Fourth Amendment
> circumstantial calculus.

*Id.*  Ultimately, the Fourth Circuit upheld the dismissal of the ADA claim because the evidence

established that the seizure was "not by reason of Bates' disability, but because of Bates'

objectively verifiable misconduct.  Such reasonable police behavior is not discrimination." *Id.*  It was "because of" a legitimate law-enforcement purpose rather than "because of [a] disability." *Id.*

Each of the cases relied upon by Defendants are distinguishable from the present matter. As a preliminary matter, *Hainze*, *Roell*, and *Bates* were all decided at the summary judgment stage, when the Court may not accept a plaintiff's allegations but must examine whether the allegations can withstand evidence the defendant presents.  Accordingly, in each of these cases, the court was presented with a more robust record when assessing the reasonableness of the defendants' actions.

Second, the cases that Defendants cite involved situations in which the individuals harmed posed clear and immediate threats to police officers.  Here, however, the complaint does not establish that Ms. Lakie posed a similar threat to the officers.  As alleged in the complaint, "[a]t no time did Allison tell the officers that she was going to hurt them.  She simply told the officers to leave, repeatedly, and kept calling out for her mother, stating 'Mom, mom.'" Dkt. No. 1 at ¶ 34. As set forth in more detail above, the facts alleged in the complaint do not present the sort of exigent circumstances that were present in the cases Defendants relied upon.

At this stage, the Court refuses to find, as urged by Defendants, that Plaintiff could assert no Title II claim under the circumstances present here.  *See* Dkt. No. 29 at 16 (citing *Hainze*, 207 F.3d at 801).  The vast majority of courts throughout the country have not held that a pre-custody/arrest individual can never bring a Title II claim.  Rather, those cases have focused on the specific facts of the case in determining whether the officers acted reasonably under the circumstances, paying particular attention to any exigent circumstances that the officers may have faced.  *See Waller v. City of Danville*, 212 Fed. Appx. 162, 172-73 (4th Cir. 2006) (distinguishing *Bates* because there were disputed issues of fact regarding the plaintiff's encounter with police

and whether the officers were presented with exigent circumstances); *Kew v. Town of Northfield*, ___ F. Supp. 3d ___, 2023 WL 4172741, *10-11 (D. Vt. Apr. 17, 2023) (rejecting the exigent circumstances defense to the plaintiff's reasonable accommodation claim at the motion to dismiss stage); *Butchino v. City of Plattsburg*, No. 8:20-cv-796, 2022 WL 137721, *10 (N.D.N.Y. Jan. 14, 2022); *Durr v. Slator*, 558 F. Supp. 3d 1, 31 (N.D.N.Y. 2021); *Sage v. City of Winooski*, No. 2:16-cv-116, 2017 WL 1100882, *1, 3 (D. Vt. Mar. 22, 2017) (following the majority position in denying the defendant's motion to dismiss, holding that the ADA generally applies to arrest, "'but the reasonableness of the accommodation required must be assessed in light fo the totality of the circumstances of a particular case'") (quotation and other citations omitted).

Accordingly, the Court denies this aspect of the City's motion to dismiss.

### 2. Claims are Plausibly Alleged

In their motion, Defendants contend that, even assuming that the ADA and the Rehabilitation Act is applicable to the present matter, Plaintiff has failed to plausibly allege a claim. *See* Dkt. No. 29 at 18-21. In making this argument, Defendants rely exclusively on the body-worn camera footage submitted with their motion. *See id.* Plaintiff opposes Defendants' motion, arguing that he has plausibly alleged claims under all of the three possible theories. *See* Dkt. No. 36 at 23-26. Additionally, Plaintiff contends that it is improper to consider the body-worn camera footage in considering Defendants' motion. *See id.* at 26-28. As discussed above, the Court declines to consider the body-worn camera footage in deciding the pending motions and, as discussed below, finds that the complaint plausibly alleges claims under the ADA and Rehabilitation Act.

As to the first theory (disparate treatment), because Plaintiff is suing a non-state governmental entity, the less demanding "deliberate indifference" standard applies, rather than the

"intentional or willful" standard applicable to state entities.  *See Felix v. City of New York*, 344 F. Supp. 3d 644, 665 (S.D.N.Y. 2018) (citation omitted).  As set forth in the complaint, the City of Syracuse was aware that police encounters with mentally ill individuals would often end tragically.  Although the City of Syracuse stated that they were going to take remedial action, they had no procedure in place to have a mental health provider speak to Ms. Lakie during the incident.  Moreover, the complaint alleges that the officers on the scene were not trained on diffusing a crisis with a mentally ill individual and at times lied to Ms. Lakie about her mother's health and taunted Ms. Lakie, worsening the crisis.  In short, Plaintiff has alleged that the City was aware of the alleged discrimination and that it could have, but failed to institute corrective measures in response.  *See Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 276 (2d Cir. 2009) (holding that deliberate indifference means a "deliberate choice, rather than negligence or bureaucratic inaction" or that "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond") (internal quotation marks omitted).  These allegations are sufficient, albeit barely, to plausibly allege a disparate treatment claim.[3]

---

[3] Because Defendants' motion relies exclusively on the body-worn camera footage, they have not addressed whether the complaint, on its face, sufficiently alleges a claim under either of the three theories of liability for ADA and Rehabilitation Act claims.  In their reply, Defendants argue for the first time that Plaintiff has failed to plausibly allege deliberate indifference.  *See* Dkt. No. 43 at 7.  Specifically, Defendants note that the complaint identifies that the City does have a policy associated with accommodating disability during police encounters by training its police officers "'to recognize the symptoms of mental health issues and how to provide initial help and access the assistance of those trained in the field in order to guide a person towards appropriate professional help.'" Dkt. No. 43 at 7 (quoting Dkt. No. 1 at ¶ 23).  Defendants further note that the complaint "also acknowledges that members of the Police Department's 'Crisis Response Team' were present during the incident and interacting with Ms. Lakie prior to the use of force.'" *Id.* (quoting Dkt. No. 1 at ¶ 41).  The Court declines to consider this argument because

(continued...)

"To establish a prima facie case under a disparate impact theory, plaintiff must demonstrate '(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices.'" *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) (quotation omitted).  At the summary judgment stage, a plaintiff may be "required to include statistical evidence to show disparity in outcome between groups." *Id.*  At the pleadings stage, however, "'it is reasonable to expect that plaintiffs pleading disparate impact claims must [only] include at least one allegation that raises an inference of such disparity – one sufficient to put the defendants on notice regarding the basis for [the] plaintiffs' belief in a disparate effect.'" *Williams v. Barometre*, No. 20-cv-7644, 2022 WL 903068, *17 (S.D.N.Y. Mar. 28, 2022) (quoting *Doherty v. Bice*, No. 18-cv-10898, 2020 WL 5548790, *7 (S.D.N.Y. Sept. 16, 2020)); *see also L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 402 (S.D.N.Y. 2013).

In the present matter, Plaintiff cited in the complaint public documents in which the City and high ranking officials acknowledged that its police officers often made encounters with the mentally ill worse and used unnecessary force or unnecessary deadly force.  As such, in not treating the mentally disabled like Ms. Lakie appropriately, and training its police officers on proper techniques, Plaintiff has plausibly alleged that the City's policies and practices had a disparate impact on individuals like Ms. Lakie.  Accordingly, the Court finds that Plaintiff has plausibly alleged a disparate impact claim.

---

[3](...continued)

it was first raised in Defendants' reply.  *See Mullins v. City of New York*, 653 F.3d 104, 118 n.2 (2d Cir. 2011) (declining to consider argument raised for the first time in a reply brief) (citing *Castro v. Holder*, 597 F.3d 93, 95-96 n.2 (2d Cir. 2010)); *see also Douyon v. N.Y. Medical Health Care, P.C.*, 894 F. Supp. 2d 245, 263-64 (E.D.N.Y. 2012) (citations omitted).

As to the third theory,"[t]he ADA mandates reasonable accommodation of people with disabilities in order to put them on an even playing field with the non-disabled." *Felix v. New York City Transit Auth.*, 324 F.3d 102, 107 (2d Cir. 2003).  A reasonable accommodation "gives the otherwise qualified plaintiff with disabilities 'meaningful access' to the program or services sought." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 282 (2d Cir. 2003) (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985)).  "[T]he question of what constitutes a reasonable accommodation under the ADA 'requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to meet the program's standards.'" *Mary Jo C. v. New York State & Local Ret. Sys.*, 707 F.3d 144, 165 (2d Cir. 2013) (quoting *McGary v. City of Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004)).  "'Title II of the ADA requires police officers to provide reasonable accommodations to arrestees and that any threatening or exigent circumstances should be considered when determining the reasonableness of the proposed accommodation.'" *Butchino v. City of Plattsburg*, No. 8:20-cv-796, 2022 WL 137721, *10 (N.D.N.Y. Jan. 14, 2022) (quoting *Durr v. Slator*, No. 5:20-CV-00662, 2021 WL 3930704, *17 (N.D.N.Y. Sept. 2, 2021)).

Here, Plaintiff has plausibly alleged that the City failed to provide Ms. Lakie with a reasonable accommodation, many of which are listed in the complaint.  For example, the complaint alleges that Officer Glynn and Sergeant Liadka should have called another officer or a mental health professional trained in dealing with someone in Ms. Lakie's state, yet failed to do so.  *See* Dkt. No. 1 at ¶ 33.  Further, the complaint alleges that the officers should have permitted Ms. Lakie's mother to continue speaking with her in the home or afforded Ms. Lakie a cooling-off period during which a social worker or other mental health professional could have been dispatched to the scene to speak with Ms. Lakie to calm her and convince her to seek help.  *See*

*id.* at ¶ 34.  Instead, the complaint contends that Defendants escalated the situation and further

exacerbated Ms. Lakie's mental health crisis through their actions.  These allegations, as set forth

in more detail above, are sufficient to plausibly allege a failure to make a reasonable

accommodation claim.  *See Vos v. City of Newport Beach*, 892 F.3d 1024, 1037 (9th Cir. 2018)

(finding that the officers' "pre-shooting conduct" in responding to a call about a man behaving

erratically arguably demonstrated that "further accommodation was possible" including "de-

escalation, communication, or [providing] specialized help"); *Butchino*, 2022 WL 137721, at *11

("In *Durr*, this Court denied a motion to dismiss for a similar Title II ADA claim. ... There, the

plaintiff alleged that he was 'clearly exhibiting signs of an emotionally disturbed person when

Defendants Slator and Silverman arrived on the scene.' ... 'Instead of placing Plaintiff in

handcuffs, informing him that he was under arrest, and subsequently kicking him in the knee,' the

complaint alleged, 'Defendants Silverman and Slator should have used de-escalation techniques.'

... Despite the plaintiff 'yelling in the roadway,' 'obstructing traffic,' and 'spitting toward

[d]efendant Slator,' the Court nonetheless found that a reasonable accommodation may exist,

notwithstanding any exigent circumstance posed by the plaintiff") (quoting *Durr*, 558 F. Supp. 3d

at 17, 32-33); *Sage*, 2017 WL 1100882, at *4 (holding that the plaintiff's "violent behavior could

arguably have been avoided if the officers had acknowledged and accommodated Mr. Sage's

mental illness.  Moreover, the pleadings suggest a potential question of fact as to whether, and to

what extent, Mr. Sage presented a danger to the officers at the time of the shooting"); *Durr*, 558

F. Supp. 3d at 33 (holding that while the plaintiff bore the initial burden of producing evidence of

the existence of a reasonable accommodation, he met his burden at the motion to dismiss stage by

asserting that the officers should have respected his comfort zone, engaged in non-threatening

communications, and used the passage of time to defuse the situation rather than precipitating a

deadly confrontation) (citation omitted); *Kew v. Town of Northfield*, ___ F. Supp. 3d ___, 2023 WL 4172741, *10-11 (D. Vt. Apr. 17, 2023) (rejecting the exigent circumstances defense to the plaintiff's reasonable accommodation claim at the motion to dismiss stage).

As noted above, the reasonableness of an accommodation is a fact-specific inquiry that must be assessed in light of the totality of the circumstances. Although Defendants may be able to establish at summary judgment that exigent circumstances existed that would have made the proposed accommodations unreasonable, at this stage, the Court finds that Plaintiff has plausibly alleged a reasonable accommodation claim under the ADA and Rehabilitation Act. Accordingly, the Court denies this aspect of the City's motion to dismiss.

### 3. Vicarious Liability

Defendants further contend that the City may not be held vicariously liable for money damages under Title II. *See* Dkt. No. 29 at 21-22. In making this argument, Defendants rely on decisions from the First, Sixth, and Eleventh Circuits that have held that vicariously liability is not available under Title II. *See id.* (citing *Gray v. Cummings*, 917 F.3d 1, 17 (1st Cir. 2019); *Jones v. City of Detroit*, 20 F.4th 1117, 1121 (6th Cir. 2021); *Ingram v. Kubik*, 30 F.4th 1241, 1257 (11th Cir. 2022)). Defendants note that, while the Second Circuit has not yet addressed this issue, the Fourth, Fifth, and Ninth Circuits have found that vicarious liability is available under Title II of the ADA. *See id.* at 22 (citing *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001); *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 574-75 (5th Cir. 2002); *Rosen v. Montgomery Cnty.*, 121 F.3d 154, 157 n.3 (4th Cir. 1997)).

At this stage, the Court agrees with those courts that have held that vicarious liability is available under Title II of the ADA and the Rehabilitation Act. *See Duvall*, 260 F.3d at 1141; *Delano-Pyle*, 302 F.3d at 574-75; *Rosen*, 121 F.3d at 157 n.3. Although the issue has not been

directly addressed by the Second Circuit, the vast majority of district courts in the Second Circuit to have addressed the issue have found that vicarious liability is available under the ADA and Rehabilitation Act.  *See, e.g.*, *Thomas v. Town of Lloyd*, No. 1:21-cv-1358, 2022 WL 174650, *10 (N.D.N.Y. May 31, 2022); *Bowen v. Rubin*, 385 F. Supp. 2d 168, 180 (E.D.N.Y. 2005) (holding that vicarious liability applies to the plaintiff's claims under the ADA and Rehabilitation Act and that the defendant employer could be held liable for the employee's actions if the conduct at issue was undertaken with the scope of her employment and were "(1) the kinds of acts she was supposed to perform; (2) occurred substantially within authorized time and space limits; and (3) were actuated, at least in part, by a purpose to serve her master"); *Lalonde v. City of Ogdensburg*, ___ F. Supp. 3d ___, 2023 WL 2537626, *23 (N.D.N.Y. Mar. 16, 2023) (holding that "it is well-settled that vicarious liability principles apply under the ADA") (citations omitted); *Morales v. City of New York*, No. 13-CV-7667, 2016 WL 4718189, *7 (S.D.N.Y. Sept. 7, 2016) ("[T]he law is clear that municipalities may be held vicariously liable for violations of Title II of the ADA and Section 504 of the Rehabilitation Act committed by their agents"); *Doe v. Deer Mountain Day Camp, Inc.*, 682 F. Supp. 2d 324, 348 (S.D.N.Y. 2010) (same); *Palmer v. City of Yonkers*, 22 F. Supp. 2d 283, 287 (S.D.N.Y. 1998) ("[G]eneral vicarious liability principles apply under the ADA").  These decisions are consistent with the broad, remedial purposes of these statutes.

Accordingly, the Court denies this aspect of the City's motion to dismiss.

**F.    Section 1983 Claims**

*1. Qualified Immunity*

"Section 1983 establishes a private right of action for money damages against state officials, acting 'under color' of law, who violate a constitutional or statutory right." *Edrei v. Maguire*, 892 F.3d 525, 532 (2d Cir. 2018) (quoting 42 U.S.C. § 1983).  "This 'deter[s]

governmental abuse and remed[ies] unlawful governmental transgressions.'" *Id.* (quotation omitted).  "At the same time, 'permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).  "To balance the need for accountability and the potential chilling effect, 'the Supreme Court established qualified immunity as an affirmative defense to § 1983 claims.'" *Id.* (quotation omitted).  "This defense is designed to 'reduce[ ] the general costs of subjecting officials to the risks of trial' by immunizing them from monetary liability 'based on unsettled rights.'" *Id.* (quoting *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir. 1998)).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  A court may determine whether a defendant is entitled to qualified immunity without determining whether there was a deprivation of a constitutional right.  *See id.* at 236.  "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  "[I]f officers of reasonable competence could disagree on [whether the conduct is constitutional], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

As "'existing precedent must have placed the statutory or constitutional question beyond debate[,]' ... '[qualified] immunity protects all but the plainly incompetent or those who knowingly violate the law.'" *Kisela v. Hughes*, ___U.S. ___, 138 S. Ct. 1148, 1152 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).  Thus, an officer is entitled to qualified immunity unless "existing

precedent 'squarely governs' the specific facts at issue." *Id.* at 1153 (citing *Mullenix v. Luna*, 577 U.S. 7, 13 (2015)). As the Supreme Court has emphasized, clearly established law should not be defined at a high level of generality. *See id.* at 1152. Rather, "the general rules set forth in *Garner* and *Graham* do not by themselves create clearly established law outside an 'obvious case.'" *Id.* at 1153 (quoting *White*, 580 U.S. at 80). "Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness." *Id.*

A defendant asserting a qualified immunity defense on a motion to dismiss like this one "'faces a formidable hurdle ... and is usually not successful.'" *Barnett v. Mount Vernon Police Dept.*, 523 Fed. Appx. 811, 813 (2d Cir. 2013) (quoting *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 191-92 (2d Cir. 2006)). "The defense will succeed only where entitlement to qualified immunity can be established 'based [solely] on facts appearing on the face of the complaint.'" *Id.* (quoting *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)). "For these reasons, a motion to dismiss 'is a mismatch for immunity and almost always a bad ground for dismissal.'" *Id.* (quotation omitted). "Defendants moving to dismiss a suit by reason of qualified immunity would in almost all cases be well advised to move for summary judgment, rather than for dismissal under Rule 12(b)(6) or 12(c)." *Id.*

### 2. Excessive Force (Claim 3)[4]

---

[4] In the following sections, the Court will address Plaintiff's Section 1983 claims (excessive force, deliberate indifference, and failure to intervene) as they relate to the Police Officers Defendants and will separately address these claims as they relate to the City and the Supervisory Defendants.

In the third claim, Plaintiff alleges that all Defendants subjected Ms. Lakie to excessive

force in violation of the Fourth and Fourteenth Amendments. *See* Dkt. No. 1 at ¶¶ 69-74.

Under the Fourth Amendment, an officer is entitled to use such force as is objectively

reasonable under the circumstances. *See Callahan v. County of Suffolk*, 602 F. Supp. 3d 399, 407

(E.D.N.Y. 2022) (citing *O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29, 36 (2d Cir. 2003));

*see also Callahan v. Wilson*, 863 F.3d 144, 148 (2d Cir. 2017). "'It is not objectively reasonable

for an officer to use deadly force to apprehend a suspect unless the officer has probable cause to

believe that the suspect poses a significant threat of death or serious physical injury to the officer

or others.'" *Id.* (quoting *O'Bert*, 331 F.3d at 36) (other citation omitted); *see also Tennessee v.*

*Garner*, 471 U.S. 1 (1985). "[T]he question [of] whether an officer has used excessive force

'requires careful attention to the facts and circumstances of each particular case, including the

severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the

officers or others, and whether he is actively resisting arrest or attempting to evade arrest by

flight.'" *Kisela v. Hughes*, ___ U.S. ___, 138 S. Ct. 1148, 1152 (2018) (quoting *Graham v.*

*Connor*, 490 U.S. 386, 396 (1989)). "The 'reasonableness' of a particular use of force must be

judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision

of hindsight." *Id.* (quoting *Graham*, 490 U.S. at 396). The objective reasonableness inquiry

"depends only upon the officer's knowledge of circumstances immediately prior to and at the

moment that he made the split-second decision to employ deadly force[.]" *O'Bert*, 331 F.3d at 37

(quoting *Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996)). Finally, "'[t]he calculus of

reasonableness must embody allowance for the fact that police officers are often forced to make

split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving —

about the amount of force that is necessary in a particular situation.'" *Kisela*, 138 S. Ct. at 1152 (quoting *Graham*, 490 U.S. at 396-97).

In their motion to dismiss, the Police Officer Defendants rely almost exclusively on the body-worn camera footage in arguing that this claim must be dismissed on qualified immunity grounds. *See* Dkt. No. 22-10 at 16-28. Defendants do not specifically address the allegations in the complaint itself. *See id.*

In the present matter, the Court finds that Plaintiff has plausibly alleged an excessive force claim against the Police Officer Defendants. As alleged in the complaint, "[a]t no time did Allison tell the officers that she was going to hurt them. She simply told the officers to leave, repeatedly, and kept calling out for her mother, stating 'Mom, mom.' At first, the officers allowed Ms. Lakie's mother, Ann, to consult with her," but she was subsequently not permitted in the home, despite the fact that Ms. Lakie kept calling out for her. Although Allison repeatedly told the officers to leave, they repeatedly told her that they were not leaving. Dkt. No. 1 at ¶ 34. The officers repeatedly stated that they were not leaving and one of the officers on the scene also stated that they may have to shoot Ms. Lakie. *See id.* at ¶¶ 37-38.

Once the fire was started in the home, which was contained in the kitchen, the Police Officer Defendants "entered the home with their guns drawn, some with shields, and tased Allison repeatedly, and told the firefights to 'hose her' with the fire retardant." *Id.* at ¶ 42. The complaint further alleges that Ms. Lakie was stunned and disoriented from the Defendants' actions and that she "did not verbally or physically threaten the officers, the officers were several feet from her, she did not charge at the officers with the knife and was retreated, and one officer stated the fire was 'out.'" *Id.* at ¶ 43. The complaint continues that, "[a]lthough there was no reasonable fear of death or serious harm to the officers and the other first responders on the scene, one of the

defendant officers shot Allison.  Although Allison was now even less of a threat, four of the defendant officers, Lieutenant David Hart, Sergeant Matthew Liadka, Officer Kenneth Sheehan and Officer Nicolas Saralegui-Martin then shot Allison multiple times." *Id.* at ¶ 44.

Based on these facts, the Court finds that Plaintiff has plausibly alleged an excessive force claim against the Police Officer Defendants and that the Police Officer Defendants are not entitled to qualified immunity at this time.[5]

### 3. Deliberate Indifference to Medical Needs (Claim Four)

In the complaint, Plaintiff alleges that the Police Officer Defendants violated the Fourteenth Amendment by "providing inadequate treatment, intentionally denying or delaying [Ms. Lakie] access to medical care, or intentionally interfering with [her] treatment." Dkt. No. 1 at ¶ 76.  The two specific allegations are that (1) the officers should have provided Ms. Lakie with treatment instead of using force against her; and (2) that the officers delayed in providing her treatment by continuing to fire at her instead of providing medical care immediately.  *See id.* at ¶ 77.  In their motion to dismiss, the Police Officer Defendants argue that the first claim must be rejected on qualified immunity grounds "because there is no clearly established law establishing a duty to treat rather defend when officers are faced with a threat of serious physical injury from a disabled individual." Dkt. No. 22-10 at 28.  As to the second claim, the Police Officer Defendants contend that "the case law establishes that there can be no 'delay in treatment' constitutional claim here" because the officers acted objectively reasonable under the circumstances.  *See id.* at 29.  The Police Officer Defendants note that the body-worn camera video establishes that "multiple

---

[5] Because "assault and battery claims under New York law and Fourth Amendment excessive force claims are evaluated pursuant to the same standard," *Phillips v. City of Middletown*, No. 17-cv-5307, 2021 WL 4462721, *12 (S.D.N.Y. Sept. 29, 2021) (citing cases), the Court denies the Police Officer Defendants motion to dismiss as to Plaintiff's assault and battery claims.

officers began calling for EMS within 20 seconds after the firing stopped and *less than three seconds* after Ms. Lakie had been disarmed." *Id.*  In response, Plaintiff argues as follows: "the police officer defendants were personally involved in the Fourth and Fourteenth Amendment violations because they participated in the acts and failed to act, failed to obtain mental health services for Allison, exhibited deliberate indifference to Allison's mental health needs, and used excessive and unnecessary deadly force." Dkt. No. 37 at 23.

Deliberate indifference to serious medical needs claims brought by pretrial detainees or arrestees against state actors under Section 1983 are analyzed under the Fourteenth Amendment's Due Process Clause.  *See Darnell v. Pineiro*, 849 F.3d 17, 33 n.9 (2d Cir. 2017).  To establish a claim for deliberate indifference to serious medical needs, a plaintiff must satisfy a two-prong test, comprising an objective prong and a *mens rea* prong.  *See id.* at 29.  Namely, a plaintiff must establish that "the challenged conditions were sufficiently serious," and that the defendants "acted with at least deliberate indifference to the challenged conditions." *Id.*

For the objective prong, a plaintiff must establish the challenged conditions "'either alone or in combination, pose[d] an unreasonable risk of serious damage to his health.'" *Id.* at 30 (quoting *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013)).  "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.'" *Id.* (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995)).

To satisfy the *mens rea* prong, a pretrial detainee must sufficiently show defendants "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the [defendants] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.  The *mens rea* prong "is

defined objectively" and "can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee [or arrestee] to a substantial risk of harm." *Id.*

"A delay in providing necessary medical care may in some cases constitute deliberate indifference." *Maldonado v. Town of Greenburgh*, 460 F. Supp. 3d 382, 396 (S.D.N.Y. 2020). And "delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for the delay." *Id.* at 396-97.

As to the first aspect of Plaintiff's claim – *i.e.*, that the officers should have provided Ms. Lakie with treatment instead of using force against her – the Court finds that this claim must be dismissed. This dismissal is appropriate because this aspect of the deliberate indifference claim is duplicative of, or subsumed by, the excessive force claim. This is appropriate because the excessive force analysis provides the most specific constitutional protection against the improper use of force and can provide complete relied for any injury Ms. Lakie suffered as a result of that conduct. *See Hagopian v. Joseph*, No. 16-cv-602, 2019 WL 2511541, *5 (S.D. Ill. June 18, 2019) (dismissing the plaintiff's deliberate indifference to safety claim as duplicative of his excessive force claim, where both claims arose under the Fourteenth Amendment); *see also Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that a substantive due process claim is not available where a more specific constitutional right protects against the conduct alleged).

As to the second aspect of Plaintiff's claim – *i.e.*, that the officers delayed in providing her treatment by continuing to fire at her instead of providing medical care immediately – the Court finds that Plaintiff has plausibly (albeit barely) alleged this aspect of the claim. According to the complaint, the Police Officer Defendants shot "Allison multiple times, after she was completely

harmless from being shot once, rather than providing her with medical treatment[.]" Dkt. No. 1 at ¶ 77. This allegation is sufficient to support this aspect of the claim.[6]

In their motion, the Police Officer Defendants rely on *Ridgeway v. City of Syracuse*, No. 5:16-cv-618, 2019 WL 416148, *12 (N.D.N.Y. Feb. 1, 2019) and *Peters v. Dep't of Corr. of New York City*, No. 11-cv-4628, 2015 WL 506754, *4 (S.D.N.Y. Feb. 5, 2015) in support of their argument that the Police Officer Defendants acted reasonably in the present matter because they called for EMS within twenty seconds after the firing stopped and less than three second after Ms. Lakie had been disarmed. *See* Dkt. No. 22-10 at 29. Moreover, the Police Officer Defendants note that Defendant Hart started CPR on Ms. Lakie fourteen second after she had been disarmed. *See id.* First, *Ridgeway* and *Peters* were decided on motions for summary judgment, which is appropriate given the fact-intensive nature of this claim. Second, *Peters* was decided using a subjective *mens rea* that is no longer appropriate for claims under the Fourteenth Amendment. *See Darnell*, 849 F.3d at 29-35. Finally, the facts that the Police Officer Defendants rely on in support of this argument are taken from the body-worn camera videos and are not otherwise found in the complaint. While the Police Officer Defendants may succeed on this argument at summary judgment, at this stage the Court finds that Plaintiff has plausibly alleged this aspect of her deliberate indifference claim.

---

[6] As noted above, the Court is not considering the body-worn camera video in deciding the pending motions to dismiss. The Court has, however, reviewed these videos and notes that Plaintiff's counsel has drafted the complaint in this matter that is clearly purposefully vague so as to avoid outright dismissal of all or most of this action at this early stage. For example, the complaint makes no mention of how quickly multiple shots were fired at Ms. Lakie when she can be clearly seen charging at one of the officers with a knife in her hand. Moreover, the complaint is silent on the fact that within seconds of Ms. Lakie falling to the ground the Police Officer Defendants and other emergency personnel are both calling for an ambulance and providing her with emergency first aid care. When this evidence is properly before the Court, Plaintiff will be facing a significant hurdle in surviving a properly supported motion for summary judgment.

Accordingly, this aspect of the Police Officer Defendants' motion to dismiss is granted in part and denied in part.

### 4. Failure to Intervene (Claim Five)

In the fifth claim, Plaintiff alleges that "Defendants, acting in concert and under color of state law, had a reasonable opportunity to prevent the violations of Allison Lakie's constitutional rights under the Fourth and Fourteenth Amendments[.]" Dkt. No. 1 at ¶ 81. In their motion to dismiss, the Police Officer Defendants primarily argue that because of all of the shots were fired in rapid succession, they did not have a reasonable opportunity to intervene. *See* Dkt. No. 22-10 at 29-30.

"'A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers.'" *Durr*, 558 F. Supp. 3d at 25-26 (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988)). "'An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, ... (2) that a citizen has been unjustifiably arrested, ... or (3) that any constitutional violation has been committed by a law enforcement official.'" *Id.* at 26 (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)) (other citations omitted). "In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Anderson*, 17 F.3d at 557 (citing *O'Neill*, 839 F.2d at 11-12). "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Id.* (citing *O'Neill*, 839 F.2d at 11-12).

Here, the Court finds that Plaintiff has plausibly alleged a failure to intervene claim. In the Police Officer Defendants' motion, they again rely on facts outside of the complaint, which are not properly before the Court. While this position may be successful in a properly supported motion for summary judgment, the argument is premature at this time.

Accordingly, the Court denies this aspect of the Police Officer Defendants' motion to dismiss.

### 5. *The Supervisory Defendants*

In their motion to dismiss, the Supervisory Defendants argue that the complaint only mentions them "in the context of local police reform efforts and an alleged failure to train, supervise, and discipline individual officers. Plaintiff does not allege Defendants were present or otherwise involved in the use of deadly force on October 21, 2021." Dkt. No. 23-9 at 14. As such, "in the absence of some tangible connection between [the Supervisory] Defendants and the alleged use of force, deliberate indifference to serious medical needs, or the failure to intervene, the third, fourth, and fifth claims must be dismissed against Mayor Walsh, Chief Buckner, and Deputy Mayor Owens." *Id.* at 14-15 (citing *Animashaun v. Toohill*, No. 9:21-cv-372, 2021 WL 4521060, *5 (N.D.N.Y. Oct. 4, 2021)). In response to the Supervisory Defendants' motion, Plaintiff contends in an entirely conclusory fashion as follows: "Defendants Walsh, Owens and Buckner were personally involved in the Fourth and Fourteenth Amendment violations because they participated in the acts and failed to act, failed to act regarding the training of officers and providing mental health services after recognizing the problems in Syracuse, exhibited deliberate indifference, and made other omissions that led to Allison's tragic death, as explained in the Complaint." Dkt. No. 38 at 24 (citing *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020); *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001)).

It has long been established that there is no *respondeat superior* or vicarious liability in suits under Section 1983.  *See, e.g.*, *Littlejohn v. City of New York*, 795 F.3d 297, 314-15 (2d Cir. 2015).  Rather, the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006).

Previously, courts in this circuit applied a five-factor test set forth in *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), for determining whether a supervisory official was personally involved in a constitutional violation.  *See, e.g.*, *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014); *Briglin v. Morley*, No. 19-CV-6927, 2020 WL 4059110, *2 (W.D.N.Y. July 20, 2020).  In *Tangreti v. Bachmann*, 983 F.3d. 609, 620 (2d Cir. 2020), however, the Second Circuit held that "[f]ollowing *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), courts may not apply a special rule for supervisory liability.  Rather, the plaintiff must directly plead and prove that 'each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti*, 983 F.3d at 612 (quoting *Iqbal*, 556 U.S. at 676).  The Second Circuit explained that "'[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary," *id.* at 618 (quoting *Iqbal*, 556 U.S. at 676), but stated that "[t]he violation must be established against the supervisory official directly." *Id.*

In the present matter, the Court finds that Plaintiff's excessive force, deliberate indifference, and failure to intervene claims against the Supervisory Defendants must be dismissed.  Even prior to *Tangreti*, district courts in the Second Circuit regularly dismissed Section 1983 claims against supervisory officials based on conclusory allegations that they failed to provide training to their subordinates.  *See Milner v. City of Bristol*, No. 18-cv-1104, 2019 WL

3945525, *3 (D. Conn. Aug. 21, 2019); *Ryan v. Moss*, No. 11-cv-6015, 2013 WL 956722, *17 (W.D.N.Y. Mar. 12, 2013).  "But *Tangreti* did raise the bar" still higher for pleading Section 1983 claims against supervisory officials.  *See Kistner v. City of Buffalo*, No. 21-cv-526, 2023 WL 144915, *14 (W.D.N.Y. Jan. 10, 2023).

Plaintiff argues that the Supervisory Defendants "acted collectively in learning of the problem of police encounters with the mentally ill and were charged with correcting the problem, as pled in the complaint." Dkt. No. 38 at 22.[7]  However, this allegation is entirely conclusory, with no facts to substantiate Plaintiff's opposition to the Supervisory Defendants' motion. Moreover, as to both the excessive force and deliberate indifference claims, Plaintiff states that "the failure to train and deliberate indifference by the City of Syracuse and its policymakers, including the Mayor, Deputy Mayor and Chief of SPD, were the proximate cause of the death of Allison[.]" Dkt. No. 1 at ¶¶ 73, 78.  However, there are no allegations in the complaint that Mayor Walsh had any responsibility for training, or that Chief Buckner was himself a policymaker, and the reason for Deputy Mayor Owens inclusion on these claims is a complete mystery.

The Supervisory Defendants are mentioned in the complaint only in the context of local police reform efforts and an alleged failure to train, supervise, and discipline individual officers. Plaintiff does not allege that the Supervisory Defendants were present or otherwise involved in the use of deadly force on October 21, 2021.  Accordingly, in the absence of some tangible connection between Defendants and the alleged used of excessive force, deliberate indifference to serious medical needs, or the failure to intervene, these claims against the Supervisory Defendants

---

[7] The Court notes that Plaintiff's response to the Supervisory Defendants' motion to dismiss consists of nineteen pages of language that was copied directly from the complaint, followed by six paragraphs on less than two pages that contain the only substantive arguments in opposition to the motion.  *See* Dkt. No. 38.

must be dismissed.  *See Animashaun v. Toohill*, No. 21-cv-372, 2021 WL 4521060, *5 (N.D.N.Y.

Oct. 4, 2021); *Johnson v. State of Vermont*, No. 22-cv-29, 2023 WL 3548801, *23 (D. Vt. May

18, 2023) ("Other than in a conclusory manner, the [complaint] neither explains how Dr. Fisher's

alleged failure to train and supervise Centurion's employees led to Mr. Johnson's death, nor

describes the training and supervision needed"); *Britt v. Doe*, No. 22-cv-692, 2022 WL

165792907, *8 (N.D.N.Y. Oct. 13, 2022) ("Plaintiff's sparse allegations ... that Defendant Harder

failed to adequately train, enforce training, or supervise his officers on how to properly resolve

domestic dispute incidents ... are insufficient to plausibly suggest the personal involvement of

Defendant Harder"); *Robinson v. Graham*, No. 20-cv-1610, 2021 WL 2358415, *3 (N.D.N.Y.

June 9, 2021) (dismissing claim against supervisor for failure to train and manage staff as

"reminiscent of a 'supervisor liability' theory of liability for Section 1983 claims that is no longer

available" after *Tangreti*); *Boyd v. Larregui*, No. 19-cv-579, 2020 WL 5820491, *7 (D. Conn.

Sept. 30, 2020) (dismissing claim for failure to train subordinates where the plaintiff failed to

establish personal involvement of supervisory defendant or "provide particular relevant

deficiencies in the training program"); *James v. City of Rochester*, No. 23-cv-6057, 2023 WL

4413972, *3 (W.D.N.Y. July 10, 2023) (dismissing the plaintiff's claim against the supervisory

defendant where the plaintiff alleged that the task force members who attempted to execute the

warrant for the decedent's arrest should have had some unspecified "safer plan" for doing so and

that because the supervisory defendant allegedly trained the task force officers about how to

execute warrants, "the task force's failure to come up with and use a 'safer plan' must have been

the result of inadequate training.  Such speculative inferences are unwarranted and do not give

rise to a plausible claim").

Accordingly, the Court grants the Supervisory Defendants' motion to dismiss as to Plaintiff's Section 1983 claims.

### 6. *Monell Liability*

In the complaint, Plaintiff alleges that the City is liable for the constitutional violations because of its failure to train its employees and by demonstrating deliberate indifference. *See* Dkt. No. 1 at ¶¶ 73 & 78.

A municipality "may not be held liable under Section 1983 unless the challenged action was performed pursuant to a municipal policy or custom." *Powers v. Gipson*, No. 04-cv-6338, 2004 WL 2123490, *2 (W.D.N.Y. Sept. 14, 2004) (citing *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978)). This is because "[m]unicipalities are not subject to Section 1983 liability solely on the basis of a *respondeat superior* theory." *Id.* at *2. As a result, to demonstrate *Monell* liability, a plaintiff must allege a violation of constitutional rights by employees of the municipality and "(1) 'the existence of a municipal policy or custom ... that caused his injuries beyond merely employing the misbehaving officer[s]'; and (2) 'a causal connection — an "affirmative link" — between the policy and the deprivation of his constitutional rights.'" *Harper v. City of New York*, 424 Fed. Appx. 36, 38 (2d Cir. 2011) (quoting *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)).

"'A plaintiff may plead a municipal policy or custom by alleging: (1) a formal policy, promulgated or adopted by the entity; or (2) that an official with policymaking authority took action or made a specific decision which caused the alleged violation of constitutional rights; or (3) the existence of an unlawful practice by subordinate officials that was so permanent or well settled so as to constitute a "custom or usage," and that the practice was so widespread as to imply

the constructive acquiescence of policymaking officials.'" *Durr*, 558 F. Supp. 3d at 35 (quotations omitted).

With respect to the first element – an official policy or custom – the "municipal policy may be pronounced or tacit and reflected in either action or inaction." *Cash v. Cnty. of Erie*, 654 F.3d 324, 333-34 (2d Cir. 2011).  A claim that is predicated on municipal inaction, however, is "narrow" and the exception to the rule that municipal liability requires affirmative conduct.  *See Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 394-95 (1989)).  As a result, a party attempting to prove that municipal inaction constitutes a policy for purposes of *Monell* faces a steep, uphill battle as acquiescence or deliberate indifference is a "'stringent standard of fault, requirement proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quotation omitted); *see also Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 419 (1997) (describing deliberate indifference in the context of a policymaker's inaction).

In his response to the City's motion to dismiss, Plaintiff clarifies that his *Monell* claim is based on the alleged failure to train.  *See* Dkt. No. 36 at 29-30.  A "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61; *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822 (1985) (noting that if federal courts engage "in an endless exercise of second-guessing municipal employee-training programs" it would "implicate serious questions of federalism").  As the Supreme Court has observed, "plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." *Harris*, 489 U.S. at 391; *see also Hernandez v. United States*, 939 F.3d 191, 207 (2d Cir. 2019) ("Allegations

that the injury could have been avoided with 'better or more training' are not sufficient") (quotation omitted); *Reynolds*, 506 F.3d at 193 ("A training program must be quite deficient in order for the deliberate indifference standard to be met; the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing").

At the motion to dismiss stage, "[w]hile it may be true that § 1983 plaintiffs cannot be expected to know the details of a municipality's training programs prior to discovery, this does not relieve them of their obligation under *Iqbal* to plead a facially plausible claim." *Simms v. City of New York*, 480 Fed. Appx. 627, 631 n.4 (2d Cir. 2012); *see also Smith v. Collins*, No. 15-cv-216, 2016 WL 817473, *2 (S.D.N.Y. Feb. 26, 2016) ("Following *Iqbal* and *Twombly*, ... the Second Circuit has indicated that some non-conclusory allegation as to deficient training programs is necessary at the pleading stage").  Thus, plaintiffs can meet their pleading obligations "by alleging facts indicating '[a] pattern of similar constitutional violations by untrained [municipal] employees.'" *Simms*, 480 Fed. Appx. at 631 n.4; *see also Durr*, 558 F. Supp. 3d at 36 (holding that, "[i]n order for Plaintiff to succeed on his failure to train and failure to discipline theories, there must be a pattern of similar misconduct").  At bottom, "without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62.

Here, despite the length of the complaint, Plaintiff has failed to plead a facially plausible failure-to-train claim.  As the City notes, while the complaint is heavy on its legal conclusions and threadbare recitals, it is exceedingly light on plausible factual allegations.

First, Plaintiff has failed to plead any specific training deficiency in the City's policy.  This is an independently sufficient reason to warrant dismissal of this claim.  *See Isaac v. City of New*

*York*, No. 16-cv-4729, 2018 WL 5020173, *18 (E.D.N.Y. Aug. 6, 2018) ("In any event, plaintiff has failed to allege any 'specific deficiency in the city's training program'"); *Johnson v. City of New York*, No. 06-cv-9426, 2011 WL 666161, *4 (S.D.N.Y. Feb. 15, 2011) (holding that a complaint that "contain[ed] only an unsupported conclusory allegation that the City failed to train the individual Defendants" could not withstand a motion to dismiss because the plaintiff did not plead any facts that "plausibly allege[d] a specific deficiency in the training or supervision program").

Although Plaintiff sets forth allegations with respect to his belief about what should have been done by the Individual Defendants, "showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability." *Connick*, 563 U.S. at 68. Similarly, although Plaintiff self-servingly alleges that the City did not begin training officers "in earnest" until after the incident involving Ms. Lakie,[8] *see* Dkt. No. 1 at ¶ 56, that does not salvage the claim. Even assuming that the City's training was somehow deficient, such that additional training was required following this incident, "an acknowledgment that the existing training program is something less than perfect[ ] does not, without more, give rise to a plausible inference of deliberate indifference on the part of the City." *Boddie v. City of New York*, No. 1:15-cv-4274, 2016 WL 1466555, *5 (S.D.N.Y. Apr. 13, 2016) (citations omitted). Thus, a commitment to improve an existing training program does not, without more, give rise to a plausible inference of deliberate indifference on the part of the City. *See Reynolds*, 506 F.3d at 193 ("'[A] training program must be quite deficient in order for the deliberate indifference

---

[8] As the City notes, Plaintiff has cherry-picked news articles in the complaint, ignoring any other pre-incident news coverage of officer training in response to mental health issues. *See, e.g.*, *Syracuse Police to Host Week-Long Mental Health Crisis Training*, available at https://cnycentral.com/news/local/syracuse-police-to-host-week-long-mental-health-crisis training (dated Apr. 14, 2021).

standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing'") (quoting *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 27 (1st Cir. 2005)).  The City should be encouraged to critically examine its training programs, "and, absent a known patters of constitutional violations, the law does not punish it with unexpected liability when it seeks to improve itself." *Boddie*, 2016 WL 1466555, at *5.

Second, even assuming Plaintiff did identify a specific training deficiency, there are no plausible allegations that the City was on actual or constructive notice that its training was allegedly lacking at the time of the underlying incident.  Plaintiff has not provided any non-conclusory factual detail regarding a pattern of similar misconduct.  *See Pluma v. City of New York*, No. 13-cv-2017, 2015 WL 1623828, *12 (S.D.N.Y. Mar. 31, 2015) (holding that a "handful of dissimilar incidents occurring over the course of more than a decade is too sparse to put the City on notice that the NYPD's training program produces officers who are likely to commit constitutional violations").  Although Plaintiff alleges that this type of encounter "had happened in the past," this allegation is made without factual support, without reference to any of the alleged similar past incidents.  Courts routinely find that such bald assertions do not suffice.  *See, e.g.*, *Strong v. City of Syracuse*, No. 16-cv-1054, 2020 WL 137250, *3 (N.D.N.Y. Jan. 13, 2020) ("While Plaintiff claims there are 'frequent' and 'widespread' instances of excessive force by SPD, such bald allegations, without more, are insufficient") (citation omitted); *Walker v. City of New York*, No. 14-cv-0808, 2015 WL 4254026, *5-11 (S.D.N.Y. July 14, 2015) (finding that the plaintiff's conclusory allegations of similar misconduct in the past did not create a plausible inference of deliberate indifference and noting that the plaintiff did "not allege any specific facts as to the contents of the complaints, how many were filed, and when they were filed").  In the

absence of any further factual enhancement, the complaint has, at best, alleged "a single incident of errant behavior[, which] is an insufficient basis for finding that a municipal policy caused [P]laintiff's injury." *Kelly v. Ulster Cnty., N.Y.*, No. 1:12-cv-1344, 2013 WL 3863929, *4 (N.D.N.Y. July 24, 2013); *see also Harris*, 489 U.S. at 390-91 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. ... It may be ... that an otherwise sound program has occasionally been negligently administered").[9]

In sum, Plaintiff's conclusory allegations are insufficient to plausibly infer a custom or policy to support municipal liability. Therefore, Plaintiff's *Monell* claim must be dismissed. *See Arrindel-Martin v. City of Syracuse*, No. 18-cv-780, 2018 WL 6622193, *5-8 (N.D.N.Y. Dec. 18, 2018) (granting the defendants' motion to dismiss where the plaintiff failed to allege instances of misconduct from which a pattern of unconstitutional conduct could be inferred, or that the defendants were deliberately indifferent to the alleged conduct); *Isaac v. City of New York*, No. 16-cv-4729, 2018 WL 5020173, *16-19 (E.D.N.Y. Aug. 6, 2018) (same).

## G.  Compliance with Syracuse City Charter § 8-115(3)

The City contends that Plaintiff's claims against the City arising under New York Civil Rights Law § 28 (claim five) and the New York Human Rights Law (claim six) must be dismissed because Plaintiff failed to comply with the City's notice of claim provision. *See* Dkt. No. 29 at 29-31. In response, Plaintiff contends that he "timely filed a notice of claim and the

---

[9] In his response to the City's motion, Plaintiff does not directly address the substantive arguments raised by the City and, instead, save for some minor edits, Plaintiff merely copies-and-pastes paragraphs 48 through 52 to its response and cites to cases discussing *Monell* liability in general. *See* Dkt. No. 36 at 28-30. By merely reproducing his complaint in his response, Plaintiff makes no effort to discuss, distinguish, or undermine any of the arguments raised or cases cited by the City.

City of Syracuse conducted two 50-h interviews of Allison's mother and the administrator of the estate." Dkt. No. 36 at 30.  Plaintiff notes that "[t]he notice of claim: (1) addresses police treatment of the mentally ill and the lack of training in dealing with the mentally disabled, putting the City on notice of the claim; (2) a notice of claim need not spell out the titles of causes of action, ... and a notice of claim can be buttressed by 50-h testimony." *Id.* (citing *Rentas v. Ruffin*, 816 F.3d 214, 227 (2d Cir. 2016); *Boles v. City of New York*, 36 Misc. 3d 1241(A), 960 N.Y.S.2d 48 (Sup. Ct. N.Y. Cnty. 2012)).  In its reply, the City argues that Plaintiff misconstrues its argument and contends that the language of the City Charter is significantly broader in scope and encompasses claims under the Human Rights Law.  *See* Dkt. No. 43 at 10.  Moreover, the City argues that, contrary to Plaintiff's position, he was required to provide more than simply notice of the occurrence, and instead was required to provide the exact nature of the claims being asserted. *See id.* (citing *Horton v. Vill. of Camden*, No. 99-cv-276, 2001 WL 36647348, *2 (N.D.N.Y. Feb. 1, 2001); *Clark v. New York City Hous. Auth.*, 514 F. Supp. 3d 607, 611 (S.D.N.Y. 2021)).

The general rule in federal court is that "state notice-of-claim statutes apply to state-law claims." *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999) (citing *Felder v. Casey*, 487 U.S. 131, 151 (1988)).  A notice-of-claim statute generally provides that no action may be brought on or maintained against certain government entities without first providing written notice of the claim.  *See Cooper Crouse-Hinds, LLC v. City of Syracuse*, No. 16-cv-1201, 2018 WL 840056, *8 (N.D.N.Y. Feb. 12, 2018).  New York's notice-of-claim statute requires a plaintiff to serve a notice of claim "within ninety days after the claim arises," N.Y. Gen. Mun. Law § 50-e(1)(a), and that notice must state the nature of the claim, as well as "the time when, the place where and the manner in which the claim arose," *id.* § 50-e(2).

"Service of a notice of claim ... is a condition precedent to commencing an action...."

*Maxwell v. City of New York*, 29 A.D.3d 540, 541 (2d Dep't 2006).  "New York's law requires a

plaintiff to plead in the complaint that: (1) the plaintiff has served the notice of claim; (2) at least

thirty days have elapsed since the notice was filed (and before the complaint was filed); and (3) in

that time the defendant has neglected to or refused to adjust or to satisfy the claim." *Hardy*, 164

F.3d at 793.  "Notice of claim requirements 'are construed strictly by New York state courts,'" and

the "[f]ailure to comply with these requirement ordinarily requires a dismissal for failure to state a

cause of action." *Id.* at 793-94 (quoting *Murray v. LeRoy Cent. Sch. Dist.*, 67 N.Y.2d 775, 775

(1986)).

Although one source requiring a notice of claim is the New York General Municipal Law,

a separate source can be found in the provisions of city charters, which "are a valid exercise of

legislative authority." *Amabile v. City of Buffalo*, 93 N.Y. 2d 471, 473 (1999).  Relevant here, the

City's Charter contains legislative preconditions to bring suit against the City and provides as

follows:

> No action or special proceeding, for any cause whatever, except as
> hereinafter provided, relating to city property or involving the rights
> or interests of the city shall be prosecuted or maintained against the
> city unless it shall appear by and as an allegation in the complaint
> or necessary moving papers that a written verified claim upon
> which such action or special proceeding is founded was served on
> the city, in the same manner as a summons under the CPLR, within
> three (3) months after the accrual of such claim.  The provisions of
> this section shall not apply to an action or special proceeding
> founded upon tort which shall be governed by the provision of
> sections 50-i and 50-e of the General Municipal Law.

Dkt. No. 25-3 at 79 (emphasis added).  Section 8-115(3) has been applied to a broad range of

state claims – both common law and statutory.  *See Cooper Crouse-Hinds, LLC*, 2018 WL

840056, at *9; *Blackmon v. City of Syracuse*, 185 A.D.3d 1505, 1507 (4th Dep't 2020) (holding

that although the notice of claim provisions of General Municipal Law §§ 50-e and 50-i are inapplicable to state claims under the Human Rights Law, § 8-115(3) of the Syracuse City Charter contains broader language that applies to claims under the Human Rights Law) (citations omitted).

It does not matter that the new theory arose from the same incident described in a notice of claim.  Rather, "the nature of the claim and the theory of liability are determinative." *Demosthene v. City of New York*, No. 18-cv-1358, 2019 WL 8165003, *2 (E.D.N.Y. Feb. 8, 2019) (quotation omitted).

In the present matter, Plaintiff's notice of claim does not assert claims arising under New York Civil Rights Law § 28 (claim five) or the New York Human Rights Law (claim six).  *See* Dkt. No. 25-2 at 2-4.[10]  Rather, Plaintiff's notice of claim states that "[t]hese claims include, but are not limited to: wrongful death; pre-death conscious pain and suffering; assault; battery; excessive force[;] negligence; negligent hiring, training, supervision, retention and discipline of incompetent and/or poorly trained police officers; deprivation of constitutional, civil and common law rights; and respondeat superior liability." *Id.* at 2.  Neither of Plaintiff's New York State statutory claims is fairly inferable from the claims Plaintiff did allege.

In his response, Plaintiff contends that the notice of claim filed in this matter was sufficient because it "addresses police treatment of the mentally ill and the lack of training in dealing with the mentally disabled, putting the City on notice of the claim" and argues that "a notice of claim need not spell out the titles of causes of action." Dkt. No. 36 at 30 (citing *Rentas v. Ruffin*, 816 F.3d 214, 227 (2d Cir. 2016)).  Plaintiff further argues that "a notice of claim can be

---

[10] *Beauchine v. City of Syracuse*, No. 5:21-cv-845, 2022 WL 561548, *6 (N.D.N.Y. Feb. 24, 2022) (noting that the court may properly consider the plaintiff's notice of claim in deciding the pending motion to dismiss because it was referenced in the complaint) (citations omitted).

buttressed by 50-h testimony." *Id.* (citing *Boles v. City of New York*, 36 Misc. 3d 1241(A), 960 N.Y.S.2d 48 (Sup. Ct. N.Y. Cnty. 2012)).

Initially, the Court notes that although Plaintiff contends that "a notice of claim can be buttressed by 50-h testimony," he fails to cite to any particular 50-h testimony that supposedly buttresses his position. It is not the Court's responsibility to scour the record for evidence to support Plaintiff's position.

Second, the Court finds that the allegations in Plaintiff's notice of claim were not sufficiently similar to the claims brought pursuant to New York Civil Rights Law § 28 (claim five) and the New York Human Rights Law to find that the notice of claim provided notice of these claims. Plaintiff's notice of claim specifically states that the claims include "wrongful death; pre-death conscious pain and suffering; assault; battery; excessive force[;] negligence; negligent hiring, training, supervision, retention and discipline of incompetent and/or poorly trained police officers; deprivation of constitutional, civil and common law rights; and respondeat superior liability." Dkt. No. 25-2 at 2. Although the notice of claim does mention the fact that Ms. Lakie "was emotionally disturbed" and "mentally ill," the legal theories referenced in the notice of claim do not encompass Plaintiff's claims brought pursuant to the New York Civil Rights Law or Human Rights Law. *See Estate of D.B. by Briggs v. Thousand Islands Sch. Dist.*, 169 F. Supp. 3d 320, 331-32 (N.D.N.Y. 2016) (holding that the plaintiff's proposed claims under New York Civil Rights Law of estate of deceased student, who had committed suicide, could not have survived motion to dismiss, and, therefore, amendment was futile where the proposed claims were not included in either the original or amended notice of claim served on the school district and various officials, and the court lacked the power to allow estate to serve a new notice of claim), *abrogated on other grounds by Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195 (2d Cir.

2017).  Plaintiff's notice of claim fails to mention disability discrimination or any other language that would have reasonably placed Defendants on notice that Plaintiff intended to pursue such a claim.  *See Horton*, 2001 WL 36647348, at *2; *Clark*, 514 F. Supp. 3d at 611 ("'Causes of action for which a notice of claim is required which are not listed in the plaintiff's original notice of claim may not be interposed ... the nature of the claim and the theory of liability are determinative'") (quoting *Mazzilli v. City of New York*, 154 A.D.2d 355, 357 (2d Dep't 1989)); *Canete v. Metro. Transp. Auth.*, No. 17-cv-3961, 2018 WL 4538897, *9 (S.D.N.Y. Sept. 20, 2018) ("The fact that these alleged causes of action arose out of the same incident is not pivotal; rather, the nature of the claim and the theory of liability are determinative").

Accordingly, the Court grants this aspect of Defendants' motions to dismiss.[11]

## H.     Remaining State-Law Claims

### 1. Assault and Battery (Claims Seven and Eight)

In their motion to dismiss, the Police Officer Defendants argue that, because assault and battery claims under New York law and Fourth Amendment excessive force claims are evaluated

---

[11] Alternatively, courts have held that the Human Rights Law does not apply to police-citizen encounters because a police officer's discharge of his duties "is neither a service, nor an accommodation, nor any other act covered by the NYHRL." *D.H. v. City of New York*, 309 F. Supp. 3d 52, 81 (S.D.N.Y. 2018); *see also Donovan v. Norwich City Sch. Dist.*, No. 3:19-cv-1638, 2022 WL 623904, *19 (N.D.N.Y. Mar. 3, 2022); *Letray v. N.Y.S. Div. of Hum. Rts.*, 181 A.D.3d 1296, 1297 (4th Dep't 2020) (noting that it "defies logic to suggest that law enforcement is providing 'conveniences' or 'services'" under the Human Rights Law).  Additionally, by its very terms, Civil Rights Law § 28 does not apply to the situation alleged in the complaint.  Specifically, Section 28 provides that "[w]hen a person is under arrest or otherwise in the custody of a police officer, peace officer or other law enforcement representative or entity, such officer, representative or entity shall have a duty to provide attention to the medical and mental health needs of such person, and obtain assistance and treatment of such needs for such person, which are reasonable and provided in good faith under the circumstances." N.Y. Civ. Rts. Law § 28.  By its very terms, Section 28 does not apply to pre-arrest/pre-detention conduct, but rather creates a duty once the person "is under arrest or otherwise in the custody of a police officer[.]" Ms. Lakie was neither under arrest or otherwise in Defendants' custody during the incident in question.  Accordingly, these claims are dismissed on this alternative basis.

pursuant to the same standard, dismissal of the Fourth Amendment excessive force claim warrants dismissal of these state-law claims. *See* Dkt. No. 22-10 at 34. Next, the Police Officer Defendants argue that the Court should decline to exercise supplemental jurisdiction over these claims. *See id.* at 34-35.

As the Police Officer Defendants note, "'[a]ssault and battery claims under New York law and Fourth Amendment excessive force claims are evaluated pursuant to the same standard[.]'" *Phillips v. City of Middletown*, No. 17-cv-5307, 2021 WL 4462821, *11 (S.D.N.Y. Sept. 29, 2021) (quotation and other citation omitted). Having already determined that Plaintiff has plausibly stated a claim for excessive force under the Fourth Amendment, the Court denies Defendants' motions to dismiss Plaintiff's state-law assault and battery causes of action.[12]

### 2. Negligence (Claim Nine)

The Police Officer Defendants argue that Plaintiff's negligence claim must be dismissed because (1) the complaint fails to state a claim because it contains no specific, non-conclusory allegations identifying the purported negligent acts of each of the Police Officer Defendants; (2) the actions taken leading up to and including the shooting cannot serve as a basis for a negligence claim because, "[u]nder New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution;" and (3) Plaintiff's negligence claim is premised upon Defendants' allegedly intentional misconduct, precluding a negligence claim. *See*

---

[12] Unlike a claim pursuant to Section 1983, a municipality may be vicariously liable on a state-law assault and battery claim for torts committed by a police officer under a theory of *respondeat superior*. *See Graham v. City of New York*, 928 F. Supp. 2d 610, 626 (E.D.N.Y. 2013) (citing cases). Because Plaintiff has plausibly alleged assault and battery claims against the Police Officer Defendants, Plaintiff's assault and battery claims against the City also survive. *See id.*

Dkt. No. 22-10 at 35-36 (citations omitted).  The City similarly alleges that this claim must be dismissed because Plaintiff has failed to allege a "special duty" and because the claim is based on intentional conduct.  *See* Dkt. No. 29 at 35-36.

"The elements of a negligence claim under New York law are: '(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach.'" *Pasternack v. Lap. Corp. of Am. Holdings*, 807 F.3d 14, 19 (2d Cir. 2015) (quotation omitted).  "Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution." *Codrington v. City of New York*, No. 12-cv-1650, 2015 WL 893567, *14 (E.D.N.Y. Mar. 2, 2015); *see also Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994).

In the present matter, the Court finds that New York law does not permit a claim for ordinary negligence against police officers as alleged in this case.  *See Strobridge v. City of Elmira*, No. 20-cv-1125, 2022 WL 597464, *11 (W.D.N.Y. Feb. 28, 2022) (citations omitted).  Moreover, since the alleged conduct underlying Plaintiff's excessive force and assault and battery claims also serve as the basis for the negligence claim, it is subject to dismissal.  *See Ortiz v. City of New York*, No. 15-cv-2206, 2016 WL 7009059, *3 (S.D.N.Y. Nov. 30, 2016) (holding that, although a plaintiff may allege alternative or inconsistent claims in a pleading pursuant to Rule 8(d), "when the conduct alleged, if true, may only give rise to liability for an intentional act, a claim of negligence may be dismissed").

Accordingly, the Court grants Defendants' motions to dismiss as to Plaintiff's negligence claim.

### 3. Wrongful Death and Conscious Pain and Suffering (Claims Ten and Eleven)

Plaintiff tenth claim alleges "wrongful death" under Section 5-4.1 of the New York Estates Powers and Trust Law ("EPTL").  *See* Dkt. No. 1 at ¶¶ 104-06.  The eleventh claim alleges a claim for conscious pain and suffering under the New York survival statute at EPTL § 11.32 (a "survival claim").  *See id.* at ¶¶ 107-10.  Defendants contend that "[s]ince there is no actionable negligence, assault, or battery, ... there can be no wrongful death claim or survival claim premised on those alleged torts." Dkt. No. 22-10 at 36.

A wrongful death and a survival claim under the EPTL provide procedural vehicles for providing certain derivative remedies in the even of death, and do not create a different liability standard.  *See Mann v. United States*, 300 F. Supp. 3d 411, 419 (N.D.N.Y. 2018) (holding that "'no action may be maintained by the representative unless the decedent, at the time of his death, could have maintained an action for the underlying tort'") (quotation and other citation omitted).

Here, the Court has found that Plaintiff has plausibly alleged claims for assault and battery.  As such, these portions of Defendants' motions to dismiss must be denied.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the reasons set forth above, the Court hereby

**ORDERS** that the Police Officer Defendants' motion to dismiss (Dkt. No. 22) is **GRANTED in part and DENIED in part**; and the Court further

**ORDERS** that the Supervisory Defendants' motion to dismiss (Dkt. No. 23) is **GRANTED in part and DENIED in part**; and the Court further

ORDERS that the City's motion to dismiss (Dkt. No. 25) is **GRANTED in part and**

**DENIED in part;**[13] and the Court further

ORDERS that Defendants' letter motion seeking oral argument on the pending motions

(Dkt. No. 44) is **DENIED** as moot; and the Court further

ORDERS that the Clerk of the Court shall serve a copy of this Memorandum-Decision

and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 18, 2023
        Albany, New York

**Mae A. D'Agostino**
**U.S. District Judge**

---

[13] As a result of this Memorandum-Decision and Order, the following claims have been dismissed: (1) Plaintiff's claims under the ADA and Rehabilitation Act brought against the Police Officer Defendants and the Supervisory Defendants; (2) Plaintiff's Human Rights Law and Civil Rights Law § 28 against all Defendants; (3) Plaintiff's Section 1983 claims against the Supervisory Defendants; (4) Plaintiff's *Monell* claim against the City; (5) Plaintiff's deliberate indifference claim against the Police Officer Defendants insofar as the complaint alleges that the officers should have provided Ms. Lakie with treatment instead of using force against her; and (6) the negligence claim against all Defendants.  Conversely, Plaintiff's surviving claims include the following: (1) the ADA and Rehabilitation Act claims against the City; (2) the excessive force claim against the Police Officer Defendants; (3) the deliberate indifference claim against the Police Officer Defendants insofar as the complaint alleges that the officers delayed in providing her treatment by continuing to fire at her instead of providing immediate medical care; (4) the failure to intervene claim against the Police Officer Defendants; (5) the state law assault and battery claims against all Defendants; and (6) the wrongful death and conscious pain and suffering claim against all Defendants.