**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**PETER O'BRIEN** *as Administrator of Estate*
*of Allison Marie Lake,*

                              **Plaintiff,**

        **vs.**                                    **5:22-CV-948**
                                                   **(MAD/TWD)**

**THE CITY OF SYRACUSE, BEN WALSH,**
**KENTON BUCKNER, SHARON OWENS,**
**DAVID HART, MATTHEW LIADKA, KENNETH**
**SHEEHAN, NICOLAS SARALEGUI-MARTIN,**
**MACKENZIE GLYNN, ONONDAGA COUNTY,**
**ERIC GERACE, DANIEL FLANAGAN, EVAN**
**FRANCISCO, CHRISTOPHER SARGENT,**
**and THOMAS HILL,**

                              **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**RICHARD CARDINALE**                      **RICHARD CARDINALE, ESQ.**
26 Court Street - Suite 1504
Brooklyn, New York 11242
Attorney for Plaintiff

**MOSKOWITZ COLSON GINSBERG**              **EYLAN SCHULMAN, ESQ.**
**& SCHULMANN LLP**
80 Broad Street - 19th Floor
New York, New York 10004
Attorney for Plaintiff

**MICHAEL HUESTON, ATTORNEY**              **MICHAEL HUESTON, ESQ.**
**AT LAW**
26 Court Street, Suite 1504
Brooklyn, New York 11242
Attorney for Plaintiff

**HANCOCK ESTABROOK, LLP**                 **JOHN G. POWERS, ESQ.**
1800 AXA Tower I                           **MARY L. D'AGOSTINO, ESQ.**
100 Madison Street                         **RYAN M. POPLAWSKI, ESQ.**
Syracuse, New York 13202

Attorneys for City of Syracuse Defendants

**CITY OF SYRACUSE OFFICE OF**      **DANIELLE PIRES, ESQ.**
**the CORPORATION COUNSEL**      **TODD M. LONG, ESQ.**
City Hall Room 300
233 East Washington Street
Syracuse, New York 13202
Attorneys for City of Syracuse Defendants

**ONONDAGA COUNTY ATTORNEY'S**      **JOHN A. SICKINGER, ESQ.**
**OFFICE**      **ERIN M. WELCH FAIR, ESQ.**
421 Montgomery Street - 10th Floor
Syracuse, New York 13202
Attorneys for Onondaga County

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff Peter O'Brien, as Administrator of the Estate of Allison Marie Lakie, initiated this action by filing a complaint on September 12, 2022, alleging violations of Title II of the Americans with Disabilities, Section 504 of the Rehabilitation Act, the Fourth and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983, and New York state laws for the shooting of Ms. Lakie, an allegedly mentally disabled woman, which resulted in her death in the City of Syracuse on October 20, 2021. *See* Dkt. No. 1. Plaintiff names as Defendants the City of Syracuse (the "City" or "Syracuse"), Onondaga County (the "County"), Syracuse Mayor Ben Walsh, Syracuse Deputy Mayor Sharon Owens, Syracuse Police Department ("SPD") Chief Kenton Buckner, SPD Lieutenant David Hart, Sergeant Matthew Liadka, Sergeant Eric Gerace, and SPD Officers Daniel Flanagan, Kenneth Sheehan, Nicolas Saralegui-Martin, Christopher Sargent, Evan Francisco, Makenzie Glynn and Thomas Hill. *See* Dkt. No. 121.

Presently before the Court is the County's motion to dismiss Plaintiff's amended complaint, *see* Dkt. No. 141, the individual officer and supervisor Defendants' and Syracuse's motion to dismiss Plaintiff's amended complaint (the "Syracuse Defendants"), *see* Dkt. No. 142, Plaintiff's response in opposition and cross-motion to amend his first amended complaint, *see* Dkt. Nos. 150, 151, 153, and Defendants' replies. *See* Dkt. Nos. 165, 166.

For the following reasons the motions to dismiss are granted in part and denied in part. Plaintiff's motion to amend is denied.

## II. BACKGROUND

### A.    Procedural history

Plaintiff filed his original complaint on September 12, 2022. *See* Dkt. No. 1. Plaintiff did not name the County as a Defendant. *See id.* The Syracuse Defendants filed a motion to dismiss on January 20, 2023. *See* Dkt. Nos. 21-23, 25. Plaintiff responded in opposition to the motion on February 2, 2023. *See* Dkt. Nos. 36-38. On September 18, 2023, the Court granted in part and denied in part the motion to dismiss. *See* Dkt. No. 48.

In the Court's decision, it dismissed Plaintiff's ADA and RA claims against the individual officer Defendants because police officers "cannot be sued in their individual capacities for money damages under either the ADA or RA." *Id.* at 18 (citations omitted). The Court concluded that Plaintiff sufficiently alleged disparate treatment, disparate impact, and reasonable accommodation claims. *See id.* at 21-29. However, the Court explained that the Syracuse Defendants' motion to dismiss did not address the sufficiency of Plaintiff's ADA and RA claims beyond challenging the consideration of body-worn camera footage. *See id.* at 25 n.3.[1]

---

[1] The Syracuse Defendants provided copies of body-worn camera footage recorded by Sergeant Liadka, Officer Sargent, and Officer Saralegui-Martin. *See* Dkt. No. 48 at 12. The Court

As to Plaintiff's § 1983 claims, the Court declined to apply qualified immunity to the individual Defendants' conduct given the early stage of the case. *See id.* at 32. It held that Plaintiff sufficiently alleged deliberate indifference to medical needs, excessive force, and failure to intervene claims. *See id.* at 32-40. The Court dismissed the (1) supervisory liability claims against Defendants Walsh, Buckner, and Owens (the "Supervisory Defendants"); (2) *Monell* claim against Syracuse for failure to plausibly allege a custom or practice of failing to train; (3) New York Civil Rights Law and New York Human Rights Law claims for failing to comply with notice of claim requirements; and (4) negligence claim because such claims are not cognizable against police officers under New York law. *See id.* at 44, 49, 54, 56-57. The Court allowed the assault and battery and wrongful death claims to proceed. *See id.* at 56-57.

On September 18, 2023, Plaintiff moved for reconsideration. *See* Dkt. Nos. 49-50. On October 2, 2023, the Syracuse Defendants also moved for reconsideration and filed their answer to the complaint. *See* Dkt. Nos. 51-52. Between October 13, 2023, and April 3, 2024, the parties filed twenty-two letters, responses, and/or status reports. *See* Dkt. Nos. 56-92. The Court issued a Text Order on April 5, 2024, informing the parties that no further filings would be accepted concerning the motions for reconsideration. *See* Dkt. No. 93. Thereafter, Plaintiff filed a motion to amend the complaint and join additional parties. *See* Dkt. No. 110.

On September 20, 2024, the Court granted Plaintiff's motion to amend the complaint and denied the motions for reconsideration. *See* Dkt. No. 120. As part of its decision, the Court noted that the Syracuse Defendants did not have a complete opportunity to respond in opposition to Plaintiff's motion to amend because briefing on the motion to amend was stayed pending the

---

thoroughly analyzed the issue and concluded that it could not consider the footage at the motion to dismiss stage. *See id.* at 12-16.

Court's resolution of the motions for reconsideration. *See id.* at 7 n.2. Therefore, the Court stated that the Syracuse Defendants would "be free to raise any arguments regarding the substance of the claims in the amended complaint in a properly filed motion to dismiss or for judgment on the pleadings." *Id.*

Plaintiff filed an amended complaint the next day, on September 21, 2024, naming additional police officers and the County as Defendants. *See* Dkt. No. 121. On September 27 and 28, 2024, Defendants filed pre-motion letters seeking to file motions to dismiss. *See* Dkt. Nos. 126-27. The Court permitted Defendants to file the requested motions but noted that the case had been "pending for two years with little accomplished." Dkt. No. 134. The Court instructed that "[n]o further motions to dismiss or other substantive motions will be allowed, assuming the case is not dismissed, until such time as discovery is completed." *Id.*

Defendants' currently pending motions were filed on November 7 and 8, 2024. *See* Dkt. Nos. 141-42.

**B.    Factual Background**

The following factual background is derived from Plaintiff's first amended complaint. *See* Dkt. No. 121.[2] In his response in opposition to Defendants' motions, Plaintiff requested leave to file a proposed second amended complaint. *See* Dkt. No. 150 at 55.[3] The same day, Plaintiff filed a "cross-motion to amend/correct amended complaint, and join parties." Dkt. No. 151. Plaintiff seeks to "join additional parties once disclosed by defendant County of Onondaga . . . and add the additional allegations set forth in the accompanying memorandum of law at pages 2,

---

[2] "It is well settled that an amended pleading ordinarily supersedes the original and renders it of no legal effect." *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 162 (2d Cir. 2000) (citing *Harris v. City of New York*, 186 F.3d 243, 249 (2d Cir. 1999)).

[3] Citations are to the pagination generated by CM/ECF in the pages' headers.

9-11." *Id.*; *see also* Dkt. No. 150 at 7, 14-16. Plaintiff requests to amend his first amended complaint "after [D]efendants' motions are decided and the County discloses the names of personally involved County officials . . . ." Dkt. No. 151.

The Northern District of New York's Local Rules mandate that a party moving to amend a pleading "attach an unsigned copy of the proposed amended pleading to its motion papers." N.D.N.Y. L.R. 15.1(a). "The motion must set forth specifically the proposed insertions and deletions of language and identify the amendments in the proposed pleading, either through the submission of a redline/strikeout version of the pleading sought to be amended or through other equivalent means." *Id.* Plaintiff did not submit an unsigned copy of his proposed second amended complaint. *See* Dkt. Nos. 150, 151. Nevertheless, because Plaintiff stated the allegations he seeks to add to his pleading in his memorandum of law in opposition to Defendants' motions, *see* Dkt. No. 150 at 7, 14-16, the Court will consider those allegations when reviewing the motions.

### 1. City of Syracuse and Onondaga County's Policies and Public Commentary

On June 12, 2020, then-Governor Andrew Cuomo issued an Executive Order regarding police reform in the State of New York. *See* Dkt. No. 121 at ¶ 18. To comply with the Order, Defendant Walsh, as the Syracuse Mayor, issued an Executive Order on June 19, 2020, concerning SPD. *See id.* One of the focuses identified in the Executive Order was updating SPD's use-of-force policy. *See id.* at ¶ 19. Defendant Walsh placed the ultimate responsibility for implementing the Executive Order on Defendant Chief Buckner. *See id.* at ¶ 20. In July 2020, Defendant Walsh responded to public concerns, affirming the use of research and reallocation of funds to develop "community-based strategies for responding to non-criminal calls." *Id.* at ¶ 22.

6

In March 2021, Syracuse issued a Police Reform and Reinvention Plan which stated that "[t]he Syracuse Police Department is the first to acknowledge that not all dispatched calls require the presence of a sworn officer." *Id.* at ¶ 24. The report explained "it's understood that while police officers are not trained professional mental health clinicians, it is important that they are trained to recognize the symptoms of mental health issues and how to provide initial help and access the assistance of those trained in the field in order to guide a person towards appropriate professional help." *Id.* The report also discussed research concerning police interactions, noting that "'[t]he American Journal of Preventive Medicine estimated that 20% to 50% of fatal encounters with law enforcement involved an individual with mental illness . . .; [and] individuals in physical, mental health or substance abuse induced crisis require the intervention of those who have made the care of these individuals their professional career . . . ." *Id.* at ¶ 25 (quotations omitted). As part of the Plan, the SPD established a Police Reform & Reinvention Plan Oversight Committee. *See id.* at ¶ 27.

Additionally, an Onondaga County District Attorney's Office Plan from March 9, 2021, concerned "Alternatives to Police Response Sub-Committee." Dkt. No. 150 at 15. The report explained that "[r]esearch has shown that a large percentage of non-criminal calls to Police are related to mental health and substance abuse. Other communities in New York and nationally have developed programs to address this fact. Our committee has looked at these programs as well as exploring services currently available in Onondaga County." *Id.* The Plan stated that "County and State governments are responsible for funding mental health and addiction services," "[t]he County is responsible for the coordination and delivery of such services" and "[d]uring our County's public comment meetings, area citizens commented on their concerns about the intersection of individuals with mental illness and police, as well as police response time to

criminal calls." *Id.*  The Plan further explained that "[i]n Onondaga County, several mobile mental health/substance use crisis teams already exist and operate out of different agencies.  This January, Liberty Resources, Inc. Regional Mobile Crisis Team launched a Countywide 24/7 response team.  They have a number of Memorandums of Understanding (MOU) with area Police, homeless shelters and a specific one to serve the City of Syracuse." *Id.*  The Committee was "recommending a program be developed that will coordinate these various mobile teams, perhaps even considering a unified MOU which includes all County and Local Police Departments, and which utilizes our County Emergency Communications Department (911)." *Id.*

The District Attorney's Office Committee also recommended "that it [r]ecognize Onondaga County as responsible for the coordination of a collaborative plan to enhance the relationships and communication between Police Departments and mobile mental health crisis teams.'" *Id.* at 16 (quotation omitted).  The Plan noted that "[a] committee associated with County Mental Health Services would be responsible for overseeing the transition to this model of diversion services" which would "include, at a minimum, a representative from law enforcement, a licensed mental health professional, a substance use professional, a medical professional, and a public representative." *Id.*

The Oversight Committee began meeting in May 2021.  *See* Dkt. No. 121 at ¶ 27.  "By April 2021, 15 SPD officers received Crisis Intervention Training or 'CIT,' and 12 more were trained in CIT in April 2022." *Id.*  Syracuse also "entered into a contract with Liberty Resources in 2021 in which mental health providers or social workers were required to provide services to individuals suffering from a mental health crisis at the scene . . . ." *Id.* at ¶ 30 (the "Liberty Resources contract").  The contract between Syracuse and Liberty Resources notes that "[e]ach county has a designated team of trained providers, who are on-call and committed to provide

rapid response and assist local law enforcement, community providers and individuals involved in a mental health crisis.  Mobile Crisis services are delivered in accordance with each county's specific crisis plan."  Dkt. No. 150 at 15.  Plaintiff alleges that the County oversees mental health services provided by Syracuse.  *See* Dkt. No. 121 at ¶ 31.

Plaintiff contends that the Liberty Resources contract was inadequate because "the mental health providers were not required to engage the disabled individual until she was disarmed, at which point it was frequently too late as the police would use force, including deadly force, to disarm the individual" it "did not require the providers to engage an armed mentally ill individual by speaking to her from a 'safe' distance, with a loudspeaker or police radio if necessary, or telephoning the individual," and "[t]he contract . . . did not require Liberty Resources personnel to observe and advise the police officers during an encounter."  *Id.* at ¶ 30.

SPD's use of force policy states as follows:

> **300.3 DUTY TO INTERVENE AND REPORT**
>
> Any officer on the scene, who is in possession of all necessary facts, who observes another officer or supervisor using force that is not objectively reasonable shall intervene when safe and feasible. Any intervention by an officer must be reported to a supervisor, who must initiate an immediate investigation.
>
> **300.11 MEDICAL TREATMENT/EVALUATION**
>
> Once it is reasonably safe to do so, officers shall immediately request medical assistance for any person who exhibits signs of physical or mental distress, has sustained visible injury, expresses a complaint of injury or continuing pain, or was rendered unconscious.
>
> An officer should take steps to obtain medical attention for a person who reasonably appears to be mentally ill and is behaving in a manner that is likely to result in serious harm to the person or to others.

> Any individual exhibiting signs of physical or mental distress after
> an encounter should be continuously monitored until the individual
> can be medically assessed.

Dkt. No. 121 at ¶ 67 (emphasis omitted).

A New York Attorney General's report concerning its investigation into Ms. Lakie's death,

dated September 23, 2022, explained as follows:

> Liberty Resources, who said that while the Mobile Crisis team does
> respond to scenes where an individual in crisis is armed, they
> remain on 'stand-by' and 'stage' somewhere in the area, unless and
> until the police agency is able to disarm the individual and deems
> the scene safe for the unarmed Mobile Crisis members to approach
> and engage with them.

*Id.* at ¶ 30 (quotation and emphasis omitted).  During a video presentation on May 23, 2022, eight

months after the underlying incident, the following statements were made by Defendant Walsh or

the SPD Oversight Committee:

> a. "So, to understand mobile [crisis response teams], the
> diversionary response, the government oversight of mental health
> services in our city and in our extended county is Onondaga
> County.  And so, they have very much been a partner with us in
> really looking at the services, again, as Kimon mentioned, pre-
> response, during the incident response, and post, which is most
> important."
>
> b. "What I can provide to the public, that Liberty Resources
> presented to the council, they have a slide deck of the services that
> they provide, not only for the City. . . ., but Onondaga County,
> because that's what I asked them for.  So, that's what they pulled
> together.  I can upload that on the site to make sure that you are
> aware of the services that they are providing."
>
> c. Deputy Mayor Owens stated that New York State Executive
> Order no. 203 is a "requirement."

Dkt. No. 150 at 15 (quotations omitted); *see also* Dkt. No. 121 at ¶ 27.  Three years after the

underlying incident, "on October 1, 2024, Mayor Walsh stated, [t]he need for this crisis

intervention is tragically high in Syracuse and in communities around New York and the nation . . . ."  Dkt. No. 150 at 7 (quotation and quotation marks omitted).

### 2. Details of the Incident Underlying this Case

Ms. Lakie was an individual with mental disabilities, including bipolar disorder, depression, and suicidal ideation which was "exacerbated by substance and alcohol abuse."  Dkt. No. 121 at ¶ 33.  Plaintiff alleges "[u]pon information and belief," that Ms. Lakie also "suffered from other obvious and apparent mental health conditions, including paranoia, paranoid schizophrenia and delusions."  *Id.*

On October 20, 2021, Ms. Lakie was residing at her grandmother's home in Syracuse along with her mother, Ann MacBain, and her mother's husband, Anthony Lisi.  *See id.* at ¶ 35.  Around 1:15 a.m. Ms. Lakie told Ms. MacBain, "I'm in trouble.  They are going to kill me."  *Id.* (quotation marks omitted).  Around 1:30 a.m., Ms. MacBain called an ambulance because Ms. Lakie was having a mental health crisis and going through "alcohol withdrawal."  *Id.* at ¶ 36.  An incident report indicates that Ms. MacBain told dispatch that at 1:25 a.m., Ms. Lakie was "acting like someone is following her/states she will not be viol [sic] with responders."  *Id.* at ¶ 62.  Dispatch asked Ms. MacBain if she needed police officers and she said no.  *See id.*  Emergency Medical Technicians ("EMTs") arrived approximately ten minutes later.  *See id.* at ¶ 36.  Upon their arrival, Ms. Lakie thought the EMTs were imposters and were going to harm her.  *See id.*  Ms. Lakie was holding a knife, and she asked for the police.  *See id.*  The EMTs contacted 911.  *See id.* at ¶ 37.

At approximately 1:36 a.m., a dispatcher requested a police response to the home because "[a]pparently there's a party on scene with a knife."  *Id.* (quotation marks omitted).  Defendant

"Liadka asked for more details about the incident, and the dispatcher said he knew only that [emergency medical services] had initially responded to assist a 'female going through alcohol withdrawals,' and was unsure who had the knife." *Id.* Defendant "Liadka asked the dispatcher to obtain more information; after doing so, the dispatcher said that the woman [medical services] responded to assist was the same woman who reportedly had 'an eight-inch knife,' and was 'mentally unstable.'" *Id.* No one contacted Liberty Resources at this time. *See id.* Ms. Lakie told Ms. MacBain "they were 'coming to hurt us,'" and Ms. MacBain convinced Ms. Lakie to sit on the knife. *Id.* at ¶ 38.

Around 1:43 a.m., SPD officers began to arrive at the house. *See id.* at ¶ 39. Defendants Liadka, Glynn, Sargent, Francisco, Hill arrived first, and they walked up to the house and knocked on the front door. *See id.* Ms. Lakie informed the SPD officers she thought they were imposters. *See id.* at ¶ 40. Plaintiff alleges that "[f]rom [Ms. Lakie's] behavior and statements, it was obvious to the defendant police officers above, and any layperson, that [Ms. Lakie] was suffering from a serious mental illness and was delusional and paranoid." *Id.* Ms. MacBain told the officers that they "have to help" Ms. Lakie. *Id.* Ms. Lakie asked the officers if they were carrying firearms and told them, "If you want to kill me, just shoot me then." *Id.*

For the next ninety minutes-to-two hours, the officers made numerous statements to Ms. Lakie in an attempt to get her to come out of the home, such as:

> (a) "I think something is wrong with your mom";
>
> (b) Your mother is "so upset" and "very scared";
>
> (c) Your mother is "on the ground";
>
> (d) Your mother is "having trouble breathing";

(e) Your mother is in an ambulance "hooked up to monitors";

(f) Your mother "cannot speak to you";

(g) If something happens to your mother, "it's on you";

(h) "If something happens to your mother, you're going to feel awful; you may never see her again";

(i) "I am going to tell the ambulance to leave since you're not coming out; 'ok (pretending to be speaking with the EMTs), you can leave'";

(j) "Your mother is leaving in an ambulance to go to the hospital";

(k) "Your mother is down the street in the ambulance"; [and]

(l) "Your mother is gone."

*Id.* at ¶ 42 (quotation omitted).

Plaintiff alleges that these statements made Ms. Lakie's condition worse such that she removed some of her clothes, intentionally cut herself, broke glass, threw something in the kitchen, and lit a cigarette and dropped it causing a flame to ignite in the kitchen. *See id.* at ¶ 43. Plaintiff avers that Ms. Lakie did not threaten the officers with serious harm or death. *See id.*

Defendant Liadka made statements to Ms. Lakie such as "What are you worried about?" "What did you throw?" "What did you break?" "Why do you have knives?" and "We're not leaving." *Id.* at ¶ 44. One of the officers "stated out loud that they may have to shoot" Ms. Lakie. *Id.* at ¶ 45. Ms. MacBain heard Ms. Lakie tell the officers to "get out," not to enter the kitchen, and that she was not coming out of the house. *Id.* at ¶ 46. Ms. MacBain tried to get into the house to help her daughter, but the officers would not allow it. *See id.* At 2:06 a.m., Defendant Hart called Defendant Liadka and Defendant Liadka stated as follows:

> We have a young lady who's going through withdrawals, who's in
> the kitchen with two knives in her hands, we have a mom here.
> She's refusing to come out so we got two people inside of the house,
> myself and Glynn in the house, and Sheehan, so we have a Taser,
> and a shield.' . . . 'Oh yeah, no, we are definitely taking our time
> here, hopefully we can get her to come out.'

*Id.* at ¶ 48.

As indicated in an SPD Crisis Response Unit Post-Incident Summary Report, "the unidentified writer" informed Defendant Hart to request CRU negotiators Saralegui and Flanagan. *See id.* at ¶ 50. The author contacted Flanagan who informed the author that Ms. Lakie "started a small fire of papers in the kitchen where she was located." *Id.* The author informed Flanagan "that, if there was an active fire in the residence, no negotiations could take place." *Id.* Defendant Saralegui arrived and told Ms. Lakie "that he was 'part of the Crisis Response Team,' . . . he was 'new' to the situation, that he 'just got there and had no clue what was going on,' and misrepresented to her that her 'mother was in the hospital.'" *Id.* at ¶ 49. He noted that he saw Ms. Lakie harming herself and that she was injured. *See id.*

The author of the report arrived at the scene and entered the home. *See id.* He observed six officers, including Saralegui and Flanagan, standing in the kitchen entryway with Ms. Lakie sitting in the corner of the kitchen with two knives in her hand. *See id.* The author "created a contact team consisting of a ballistics shield, less-lethal in the form of Taser, and lethal cover." *Id.* The author explained that "[m]oments later, Lakie started a floor mat on fire, which quickly spread to the cabinets. I then ordered officers to tase Lakie and approach her to remove her from the growing flames. Multiple taser attempts proved to be ineffective, thus rendering us unable to approach Lakie." *Id.* (quotation and emphasis omitted). "As the flames grew, a Syracuse firefighter entered the kitchen entryway with a water canister and extinguished the fire.

14

Immediately thereafter, the area became dark with smoke and Lakie charged at officers with both knives.  Multiple officers fired their duty weapons then immediately began CPR."  *Id.*

Plaintiff alleges that "Liberty Resources and supervising police officers did not arrive until after 3:00 [a.m.]."  *Id.* at ¶ 53.  An incident report reflects that Liberty Resources was requested at 3:36 a.m..  *See id.* at ¶ 62.  When Defendant Hart arrived, he asked Defendant Liadka if the Mobile Crisis Unit had been contacted, but Defendant Liadka stated it was not called because "he did not know if they would respond since Ms. Lakie was armed."  *Id.* at ¶ 53.

The Incident report indicates "Liberty Resources NTFD" at 3:40 a.m., "fires out" at 3:42 a.m., and "shots fired" at 3:42 a.m.  *Id.* at ¶ 62.  Ms. Lakie was transported to Upstate Hospital and pronounced dead at 4:01 a.m.  *See id.* at ¶ 50.  At 9:55 a.m., the SPD obtained a search warrant for the home based on purported probable cause to investigate the crimes of assault, menacing, arson, offenses relating to theft, and General Municipal Law 204D (Duties of Fire Chief).  *See id.* at ¶ 52.

Plaintiff alleges that "[i]t was obvious to all of the [D]efendant[s]" that Ms. Lakie "was mentally ill and in the throes of a mental health crisis."  *Id.* at ¶ 54.  "When Liberty Resources' social workers or mental health providers arrived, they did not engage, and it does not appear that any officer asked the providers for advice or to engage [Ms. Lakie] from a safe distance or by telephone."  *Id.* at ¶ 55.  Ms. Lakie continuously called out for her mother and told the officers to leave.  *See id.* at ¶ 56.  At one point, she told the officers "that she would 'fuck you assholes up.'"  *Id.*  However, Plaintiff alleges that Ms. Lakie did not threaten the officers or charge at them with a knife.  *See id.* at ¶¶ 57-58.

The Attorney General's investigation revealed as follows:

> Based on the Onondaga County Emergency 911 dispatch notes, at
> approximately 3:36 a.m., Lt. Hart made a request for Liberty
> Resources to respond to 216 Ulster St.; during OSI's conversation
> with members of Liberty Resources, they confirmed that the Mobile
> Crisis team was dispatched to the scene, but, for safety reasons,
> their responding members 'staged' at another location and did not
> make any contact with Ms. Lakie.

*Id.* at ¶ 30. Plaintiff alleges that additional training on de-escalation techniques occurred months after Ms. Lakie's death. *See id.* at ¶ 71. A news article reported that one of the primary goals of the training was to teach offices about how to interact with individuals with mental disabilities. *See id.*

### III. DISCUSSION

**A.    Legal Standards**

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," FED. R. CIV. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks

for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed[,]" *id.* at 570.

In deciding a motion to dismiss, the court may consider "documents attached to, or incorporated by reference in the Complaint, and matters of which judicial notice may be taken[.]" *Thomas v. Westchester Cty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (citing *Leonard F. v. Israel Discount Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999)) (other citation omitted).  "Documents that are integral to plaintiff's claims may also be considered, despite plaintiff's failure to attach them to the complaint." *Id.* (citing *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 46-48 (2d Cir. 1991)).  "Judicial notice of public records is appropriate—and does not convert a motion to dismiss into a motion for summary judgment—because the facts noticed are not subject to reasonable dispute and are capable of being verified by sources whose accuracy cannot be reasonably questioned." *Bentley v. Dennison*, 852 F. Supp. 2d 379, 382 n.5 (S.D.N.Y. 2012).

Finally, pursuant to Rule 15 of the Federal Rules of Civil Procedure, when unable to amend as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2).  Leave will only be granted absent "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously

allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). An amendment of a pleading is considered "futile" when the proposed new claim would not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991); *see also Vasile v. Dean Witter Reynolds Inc.*, 20 F. Supp. 2d 465, 468 (E.D.N.Y. 1998), *aff'd*, 205 F.3d 1327 (2d Cir. 2000).

**B.  Motions to Dismiss**

*1. ADA and RA Claims*

*a. Legal Framework*

"Title II, at issue here, provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 91 (2d Cir. 2021) (quoting 42 U.S.C. § 12132)). Similarly, Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "Because the standards imposed by Title II on public entities are generally equivalent to those of § 504, [courts] 'treat claims under the two statutes identically' in most cases." *Davis v. Shah*, 821 F.3d 231, 259 (2d Cir. 2016) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)).

"To establish a claim under Title II, a plaintiff must demonstrate '(1) that she is a qualified individual with a disability; (2) that she was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3)

that such exclusion or discrimination was due to her disability.'" *Tardif v. City of New York*, 991 F.3d 394, 404 (2d Cir. 2021) (quoting *Davis*, 821 F.3d at 259). "A plaintiff may base a Title II claim 'on any of three theories of liability: disparate treatment (intentional discrimination), disparate impact, or failure to make a reasonable accommodation.'" *Hamilton*, 3 F.4th at 91 (quoting *Tardif*, 991 F.3d at 404); *see also Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 186 (2d Cir. 2015).

At this stage, neither party disputes that Ms. Lakie has a qualifying disability. *See* Dkt. No. 141-4 at 14; Dkt. No. 142-6 at 22. Syracuse also assumes *arguendo* that the individual police officers knew of Ms. Lakie's disability status. *See* Dkt. No. 142-6 at 22. The County argues it did not have notice of Ms. Lakie's disability and all Defendants argue that Plaintiff has not sufficiently alleged discriminatory conduct. *See* Dkt. No. 141-4 at 9-21; Dkt. No. 142-6 at 22-32.

### b. Claims Against Onondaga County

The County argues that (1) it was not on notice of Ms. Lakie's disability; (2) it was not in control of any service or program that was allegedly denied to Ms. Lakie; and (3) even if it were responsible for the alleged mental health services, Plaintiff is challenging the adequacy of those services, which is not a cognizable disability discrimination claim. *See* Dkt. No. 141-4 at 9.

Plaintiff contends that the first amended complaint "and the additional allegations that are to be added show that the County was on notice of the problem, involved in the required police reform at issue and in charge of mental health services provided to the public in Syracuse." Dkt. No. 150 at 36. Plaintiff argues that "contrary to the arguments of the Syracuse defendants, the SPD officers and supervisors on the scene were on notice of plaintiff's disability." *Id.* at 46. As the County asserts in its reply, Plaintiff does not state as such in relation to the County. *See id.*; *see also* Dkt. No. 165 at 5.

In his first amended complaint, Plaintiff alleges "[t]he County of Onondaga oversees mental health services provided by the City of Syracuse." Dkt. No. 121 at ¶ 31. Plaintiff quotes from a report titled "Onondaga County and the City of Syracuse Speaks: Public Comments on Reforming and Reinventing Police," dated February 8, 2021, which states that the County and Syracuse were undertaking initiatives to respond to the calls for police reform. *Id.* at ¶ 21. In a March 2021 report, it was also noted that "[t]he Onondaga County CIT Working Group has identified three pillars that should guide all law enforcement protocols that seek to improve interactions with community members who have mental health issues." *Id.* at ¶ 24.[4]

"[A] plaintiff need not allege that they told the officers of their disability to make out a failure to accommodate claim." *Durr v. Slator*, No. 5:20-CV-00662, 2023 WL 8277960, *11 (N.D.N.Y. Nov. 30, 2023), *appeal dismissed sub nom. Durr v. Madison Cnty., New York*, No. 24-CV-43, 2025 WL 1276110 (2d Cir. May 2, 2025). "'[A]t the pleading stage, [p]laintiffs are merely required to plausibly plead disparate impact; they are not required to prove causation or disparate impact through statistical evidence at the pleading stage.'" *Hous. Rts. Initiative v. Compass, Inc.*, No. 21-CV-2221, 2023 WL 1993696, *24 (S.D.N.Y. Feb. 14, 2023) (quoting *Washington v. United States Dep't of Hous. & Urb. Dev.*, No. 16-CV-3948, 2019 WL 5694102, *21 (E.D.N.Y. July 29, 2019)). "'[I]t is reasonable to expect that plaintiffs pleading disparate impact claims must include at least one allegation that raises an inference of such disparity—one sufficient to put the defendants on notice regarding the basis for plaintiffs' belief in a disparate

---

[4] Plaintiff included additional information that he learned through discovery in his memorandum of law concerning the County's knowledge. *See* Dkt. No. 150 at 15. Those additional allegations do not alter the Court's conclusions that Plaintiff has failed to allege that the County intentionally discriminated against Ms. Lakie or created a policy that had a disparate impact on individuals with mental disabilities. Therefore, the information does not support Plaintiff's request to amend his first amended complaint but may certainly be raised on a motion for summary judgment.

effect[.]'" *Id.* (quoting *L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 402 (S.D.N.Y. 2013)).

However, courts frequently dismiss disparate treatment claims where "'no allegations support the

belief that Defendants acted with Plaintiff's alleged disability in mind[.]'" *Williams v. Barometre*,

No. 20-CV-7644, 2022 WL 903068, *17 (S.D.N.Y. Mar. 28, 2022) (quoting *Doherty v. Bice*, No.

18-CV-10898, 2020 WL 5548790, *7 (S.D.N.Y. Sept. 16, 2020)).

  This court has denied a motion to dismiss disability discrimination claims by a County

where the county's Sheriff's Deputy was a named defendant and had been at the scene and

participated in the alleged use of force. *See Johnson v. New York State Police*, 659 F. Supp. 3d

237, 245 (N.D.N.Y. 2023). The county argued that the "plaintiffs' factual allegations are

insufficient to demonstrate that [the] Deputy [] had any prior knowledge of decedent's seizure

disorder and therefore any discrimination was unintentional." *Id.* at 259. The plaintiff alleged

that "prior to the arrival of any of the individual defendants, [the decedent's father's girlfriend] got

back online with the 911 dispatcher and informed the dispatcher that [the decedent] was

experiencing a seizure" and "[a] review of the dispatch log indicates that the dispatcher updated

the police department with this information." *Id.* (quotation omitted). The plaintiffs also

"allege[d] more generally that the County failed to accommodate decedent's seizure disorder by

not providing 'adequate training, resources, supervision, or discipline to law enforcement

regarding the appropriate way of responding to individuals who exhibit the signs and symptoms

of seizure disorders, including by failing to instruct officers not to restrain someone having a

seizure and to keep them on the side of their body.'" *Id.* (quotation omitted).

  The court held that the "allegations, which are assumed true for the purpose of a motion to

dismiss, are sufficient to plausibly allege that the County's alleged conduct was intentional and

that [the] Deputy [] was on notice of decedent's seizure disorder." *Id.* The court also noted that

"'courts in this circuit have found that plaintiffs provided sufficient evidence of deliberate indifference when they could point to training deficiencies of which municipal entities were aware and which existed with respect to populations police would necessarily encounter as they did their duties.'" *Id.* at 259-60 (quoting *Felix v. City of N.Y.*, 344 F. Supp. 3d 644, 666 (S.D.N.Y. 2018)) (additional citation omitted).

There is one key difference between the *Johnson* case and this case: a county employee was present for the use-of-force incident in *Johnson*, whereas there are no allegations that an Onondaga County employee was on the scene in Plaintiff's case. In his first amended complaint, Plaintiff alleges the County was on notice and had knowledge of similar incidents between police and individuals with mental health disorders. *See* Dkt. No. 121 at ¶¶ 23, 29. He does not allege that anyone from the County was at the scene or was directly informed of Ms. Lakie's disabilities prior to her death. Therefore, Plaintiff cannot state a disparate treatment claim. *See Williams*, 2022 WL 903068, at *17.

Despite there being no County employee at the scene, "courts in this circuit have found that plaintiffs provided sufficient evidence of deliberate indifference when they could point to training deficiencies of which municipal entities were aware and which existed with respect to populations police would necessarily encounter as they did their duties." *Johnson*, 659 F. Supp. 3d at 260 (quotation omitted); *see also Butchino v. City of Plattsburg*, No. 8:20-CV-796, 2022 WL 137721, *13 (N.D.N.Y. Jan. 14, 2022) (denying summary judgment motion where a defendant "testified that they have no departmental policy concerning compliance with the ADA and that he could not recall any ADA-specific training. . . . Indeed, there are no departmental policies regarding the use of force during a mental health incident. . . . Moreover, such a training

deficiency relates to a population that police would necessarily encounter as they did their duties, those with a mental disability").

Plaintiff alleges that the County knew of training deficiencies concerning police interactions with individuals with disabilities because, as reported in the Syracuse Police Reform and Reinvention Plan, "[t]he Onondaga County CIT Working Group has identified three pillars that should guide all law enforcement protocols that seek to improve interactions with community members who have mental health issues." Dkt. No. 121 at ¶ 24. Plaintiff also alleges that the County was "address[ing] police reform pursuant to Executive Order No. 203, signed by Governor Andrew M. Cuomo on June 12, 2020." *Id.* at ¶ 21. Plaintiff contends that despite the County's awareness of the problem, on October 20, 2021, the policies and training were not implemented, which resulted in Ms. Lakie being killed. *See id.* at ¶¶ 77, 82.

These allegations are sufficient to state disparate impact and reasonable accommodation claims against the County because "a 'municipality can be liable for failing to train its employees where it acts with deliberate indifference in disregarding the risk that its employees will unconstitutionally apply its policies without more training.'" *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 305 (S.D.N.Y. 2015) (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004)) (additional citation omitted).

As to Plaintiff's disparate impact claim, the Court previously concluded in relation to Syracuse that Plaintiff sufficiently alleged such a claim because "Plaintiff cited in the complaint public documents in which the City and high ranking officials acknowledged that its police officers often made encounters with the mentally ill worse and used unnecessary force or unnecessary deadly force." Dkt. No. 48 at 26. "As such, in not treating the mentally disabled like Ms. Lakie appropriately, and training its police officers on proper techniques, Plaintiff has

plausibly alleged that the City's policies and practices had a disparate impact on individuals like Ms. Lakie." *Id.* The Court now concludes the same as to the County. Plaintiff's amended complaint cites public documents and includes allegations concerning the County's knowledge of police interactions with individuals with mental health disorders. *See* Dkt. No. 121 at ¶¶ 21, 24, 26, 28-29.

Plaintiff alleges enough facts at this stage to state a disparity between how the County's policies impact individuals with disabilities such that the County's arguments regarding a lack of notice results in the dismissal of only the disparate treatment claim. Plaintiff's reasonable accommodation and disparate impact claims shall proceed.[5]

### 3. Claims Against the City of Syracuse

Syracuse argues that Plaintiff cannot state ADA and RA claims because Plaintiff has not identified the service, program, or activity that is available to non-disabled individuals and which excluded Ms. Lakie. *See* Dkt. No. 142-6 at 23. Syracuse also contends that the police officers did accommodate Ms. Lakie because "[t]hey did not immediately arrest her for having criminal[ly] menaced the EMTs[,]" they spoke with her for two-hours, and they had "mental health professionals (Liberty Resources) on site to provide treatment to her once she was disarmed and it was safe to do so." *Id.* at 24 (emphasis omitted). As to Plaintiff's disparate treatment claim, Syracuse argues that Plaintiff has not pled discriminatory animus. *See id.* at 29. Syracuse asserts that Plaintiff's disparate impact claim fails because Plaintiff did not plead any "'outwardly neutral practice' that significantly impacts disabled over non-disabled." *Id.* at 30. Syracuse argues that Plaintiff has failed to allege that it was deliberately indifferent to her medical needs. *See id.* at 31.

---

[5] The Court will address the County's argument regarding adequacy of mental health services later in this Memorandum-Decision and Order because Syracuse raises a similar contention.

Plaintiff argues that this Court has already ruled that he sufficiently stated ADA and RA claims in its decision on the Syracuse Defendants' first motion to dismiss. *See* Dkt. No. 150 at 35. Plaintiff contends that "[t]he same allegations that led the Court to sustain these claims are still contained in the [first amended complaint], along with additional allegations that make the claims even stronger." *Id.* Plaintiff quotes numerous paragraphs from this Court's September 2023 decision. *See id.* at 37-39. Syracuse disagrees. It contends that all of the arguments espoused in the present "motion are new or have not been previously addressed or decided by the court." Dkt. No. 166-2 at 7.

The law of the case doctrines governs the Court's decision making on a subsequent motion to dismiss if the Plaintiff re-alleges the same claims and the defendant was previously given a full and fair opportunity to challenge the allegations. *See Jennings v. City of New York*, No. 22-CV-1885, 2023 WL 8462739, *4 (S.D.N.Y. Nov. 22, 2023) (explaining that the defendant "had a full and fair opportunity to litigate the sufficiency of the Surviving Claims, and law of the case prevents them from relitigating these same issues once more") (collecting cases); *see also Neary v. Wu*, 753 Fed. Appx. 82, 83-84 (2d Cir. 2019) ("The district court was correct to reject Dr. Wu's second motion to dismiss that raised substantially the same arguments as the first") (citing, *inter alia*, *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) ("[W]here litigants have once battled for the court's decision, they should not be required, nor without good reason permitted, to battle for it again")). "However, to the extent [a p]laintiff has offered new claims or factual allegations that arguably address the deficiencies the Court previously identified, the Court will consider those claims anew." *Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 316 (S.D.N.Y.), *aff'd*, 626 Fed. Appx. 20 (2d Cir. 2015)

Syracuse argues that Plaintiff has failed to identify a "service, program or activity" as defined under Title II of the ADA.  *See* Dkt. No. 166-2 at 8; *see also* Dkt. No. 142-6 at 23. Syracuse states that Plaintiff has not identified a service that treated Ms. Lakie differently than able-bodied individuals.  *See* Dkt. No. 142-6 at 24.  It argues that Plaintiff cannot state an ADA discrimination claim based on inadequate services provided only to disabled individuals.  *See id.* In its reply, Syracuse explains that "the services claimed to have been 'denied' to Ms. Lakie—i.e., better CIT training and more interactive mental health professionals—were not being provided to anyone in the City of Syracuse.  As a result, these allegations cannot form the basis of a Title II discrimination claim."  *Id.*

In its September 2023 decision, this Court specifically analyzed the argument "that interactions between law enforcement and disabled individuals should not be subject to the protections of the ADA and the RA because such interactions are not programs, services, or activities from which a disabled person could be excluded or otherwise denied a benefit."  Dkt. No. 48 at 20.  This Court concluded that "[a]t this stage, the Court refuses to find, as urged by Defendants, that Plaintiff could assert no Title II claim under the circumstances present here. . . . The vast majority of courts throughout the country have not held that a precustody/arrest individual can never bring a Title II claim."  Dkt. No. 48 at 23.

The stage of the case has not changed.  The case continues to sit in the discovery phase; therefore, the Court will not dismiss Plaintiff's ADA and RA claims insofar as Syracuse argues that Plaintiff has not identified the service, program, or activity that Ms. Lakie was denied.  See Dkt. No. 142-6 at 23.  Plaintiff has alleged that Syracuse and its officers engaged in the use-of-force incident with Ms. Lakie differently because of her mental disability.  *See* Dkt. No. 121 at ¶

77. The Court previously concluded that such allegations are sufficient at this stage to state ADA and RA claims and the Court will not reconsider that decision.

However, the Court did not consider whether Plaintiff sufficiently stated discrimination claims based on a theory of inadequate services. Syracuse argues that Plaintiff has not alleged a service, program, or activity that is available to both disabled and non-disabled individuals; rather, Syracuse contends Plaintiff's claims concern services provided only to disabled individuals. *See id.* at 23-24. This issue was not previously before the Court because the Liberty Resources contract and the purported deficiencies in that contract were not alleged in Plaintiff's original complaint. *See* Dkt. No. 1. Therefore, the Court will analyze the merits of Syracuse and the County's arguments regarding adequacy of the mental health services. This is not violative of the law of the case doctrine.

The County argues that it "was not a party to the contract/[memorandum of understanding] between the Syracuse Police Department and Liberty Resources." Dkt. No. 141-4 at 17. The County provides a copy of a memorandum of understanding ("MOU") with its motion and a declaration from the Chief Deputy County Attorney with the Onondaga County Department of Law. *See* Dkt. Nos. 141-1, 141-2. The County argues that under contract law, "[a]s is clear from a review of the MOU, the only parties to this agreement are the Syracuse Police Department and Liberty Resources. Any evidence suggesting, erroneously, that the County was a party to this contract is impermissible extrinsic evidence and is belied by the clear language of the document." Dkt. No. 141-4 at 18.

It is well settled that "'the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'" *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am.*

*Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).  "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Id.* at 153 (quoting *Int'l Audiotext*, 62 F.3d at 72).  "[A] plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Id.*

Plaintiff relies on the Liberty Resources contract throughout his first amended complaint, relating the terms of the contract and asserting that the contract and its execution were deficient. Dkt. No. 121 at ¶¶ 30-32, 55, 64.  Therefore, the Court is permitted to consider the document attached to the County's motion in ruling on the motions to dismiss.

The Court's consideration of the document does not support the County's argument that it had nothing to do with the provision of mental health services by Syracuse and SPD.  *See* Dkt. No. 141-4 at 18.  The County is correct that the document is titled "Memorandum of Understanding between Syracuse Police Department and Liberty Resources, Inc."  Dkt. No. 141-2 at 1.  However, the document notes that Liberty Resources, Inc. Mobile Crisis Team "is committed to providing crisis intervention services to adults, youth and families in . . . Onondaga [County].  Each county has a designated team of trained providers who are on-call and committed to provide rapid response and assist local law enforcement, community providers and individuals involved in a mental health crisis." *Id.*  Plaintiff quotes this portion of the contract in his response to Defendants' motions.  *See* Dkt. No. 150 at 15.  Therefore, although the MOU is between SPD and Liberty Resources, it does not negate Plaintiff's allegations that the County was also involved in providing mental health services to community members.  Plaintiff also included additional allegations of the County's involvement in his first amended complaint such that the County's

argument that it was not responsible in any way for providing mental health services is rejected. *See* Dkt. No. 121 at ¶¶ 21, 23-24, 28-32.

The Court, therefore, turns to Syracuse and the County's argument that Plaintiff has failed to state discrimination claims because he challenges the adequacy of services that are provided solely to individuals with disabilities.

Syracuse and the County are correct that "[n]either the ADA nor the RA 'applies to claims regarding the adequacy or substance of services provided by correctional departments or provides a remedy for medical malpractice.'" *Jordan v. Dep't of Corr.*, No. 3:24-CV-227, 2024 WL 5112001, *9 (D. Conn. Dec. 13, 2024) (quoting *Reese v. Breton*, No. 3:18-CV-01465, 2020 WL 998732, *5 (D. Conn. Mar. 2, 2020)). "Thus, '[c]ourts routinely dismiss ADA suits by disabled [individuals] that allege inadequate medical treatment, but do not allege that the inmate was treated differently because of his or her disability.'" *Id.* (quoting *Elbert v. New York State Dep't of Corr. Servs.*, 751 F. Supp. 2d 590, 595 (S.D.N.Y. 2010)); *see also Freudenberg v. Cnty. of Orange*, No. 23-CV-847, 2024 WL 4307176, *8 (S.D.N.Y. Sept. 25, 2024) (collecting cases); *Greene v. City of New York*, 725 F. Supp. 3d 400, 425 (S.D.N.Y. 2024).

Syracuse heavily relies on *Greene v. City of New York*. *See* Dkt. No. 142-6 at 10. In *Greene*, the plaintiffs brought a class action challenging two New York City policies regarding "police officers as first responders to mental health crises." *Greene*, 725 F. Supp. 3d at 409. The Southern District of New York dismissed the intentional discrimination ADA and RA claims because the "[p]laintiffs cannot claim they were denied a service, because the program they challenge provides a service—transport to a hospital for mental health care—exclusively to the mentally disabled. [The p]laintiffs' claim is squarely that the service the City provides—§ 9.41, as implemented by the [Emotionally Disturbed Persons] and Involuntary Removal Policy—is

inadequate because it is carried out by police and not mental health workers." *Id.* at 425. The court noted that "[t]his program may be flawed, as [the p]laintiffs allege, but that does not render it discriminatory. If [the p]laintiffs claimed that they had a medical emergency, like a heart attack, but were denied an ambulance because of their mental disability, their claim would come closer to stating actionable discrimination under the ADA." *Id.* at 426. "But this is not their claim, which concerns only the adequacy of the services provided exclusively for the mentally disabled. Courts in this Circuit are clear that the ADA and Rehabilitation Act cognize no such claim." *Id.* at 426; *see also Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999).

Here, Plaintiff's complaint repeatedly alleges inadequacies in (1) the training individual officers received regarding their interactions with individuals with mental disabilities; and (2) in the execution of the Liberty Resources contract. *See* Dkt. No. 121 at ¶¶ 30-68. Plaintiff states that the services under the Liberty contract were made exclusively available "to individuals suffering from a mental health crisis at the scene in order to avoid having the police use unnecessary force." *Id.* at ¶ 30. These allegations cannot state a discrimination claim because "[a] program which provides services exclusively to the mentally disabled cannot discriminate against the mentally disabled within the meaning of the ADA and Rehabilitation Act." *Greene*, 725 F. Supp. 3d at 425.

In his response, Plaintiff attempts to distinguish *Greene*, stating that the case "is unsupportive because like the plaintiff here, the plaintiffs in *Greene* alleged a 'failure to accommodate their disabilities,' which is a viable claim." Dkt. No. 150 at 42 (quotation omitted). Plaintiff is correct that the court in *Greene* permitted a reasonable accommodation to proceed, but Plaintiff ignores the portion of the *Greene* decision that dismissed the plaintiffs' intentional discrimination claims. *See Greene*, 725 F. Supp. 3d at 426, 432.

Courts have repeatedly concluded that the ADA and RA do not permit discrimination claims based on an alleged inadequacy of services provided exclusively to individuals with disabilities. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 276 (2d Cir. 2003) (collecting cases to support the statement "that the ADA and Rehabilitation Act are addressed to 'rules . . . that hurt [people with disabilities] by reason of their handicap, rather than that hurt them solely by virtue of what they have in common with other people'") (quotation omitted); *see also Brown v. Reis*, No. 3:24-CV-00950, 2024 WL 4723333, *9 (D. Conn. Nov. 8, 2024); *Luxenberg as next friend of Doe v. Vermont Dep't of Disabilities, Aging & Indep. Living*, No. 2:22-CV-00188, 2023 WL 7211305, *12 (D. Vt. Nov. 2, 2023); *Elbert v. New York State Dep't of Corr. Servs.*, 751 F. Supp. 2d 590, 595 (S.D.N.Y. 2010). Accordingly, Plaintiff's ADA and RA discrimination claims against Syracuse and the County must be dismissed to the extent Plaintiff alleges that they inadequately executed the Liberty Resources contract which was intended to "provide services to individuals suffering from a mental health crisis." Dkt. No. 121 at ¶ 30.

To the extent Plaintiff repeatedly relies on this Court's decision on the Syracuse Defendants' first motion to dismiss, that reliance does not save his claims. In the September 2023 decision and in discussing the plausibility of Plaintiff's disparate treatment claim, the Court explained as follows:

As set forth in the complaint, the City of

> Syracuse was aware that police encounters with mentally ill individuals would often end tragically. Although the City of Syracuse stated that they were going to take remedial action, they had no procedure in place to have a mental health provider speak to Ms. Lakie during the incident. Moreover, the complaint alleges that the officers on the scene were not trained on diffusing a crisis with a mentally ill individual and at times lied to Ms. Lakie about her mother's health and taunted Ms. Lakie, worsening the crisis. In short, Plaintiff has alleged that the City was

aware of the alleged discrimination and that it could have, but failed
to institute corrective measures in response.

Dkt. No. 48 at 25.

Plaintiff's first amended complaint does allege a "procedure . . . to have a mental health
provider speak to Ms. Lakie during the incident" and that officers were "trained on diffusing a
crisis with a mentally ill individual." *Id.* Plaintiff alleges that pursuant to the Liberty Resources
contract "mental health providers or social workers were required to provide services to
individuals suffering from a mental health crisis at the scene in order to avoid having the police
use unnecessary force." Dkt. No. 121 at ¶ 30. Plaintiff asserts, "[h]owever, this contract was
patently inadequate as the mental health providers were not required to engage the disabled
individual until she was disarmed, at which point it was frequently too late as the police would
use force, including deadly force, to disarm the individual." *Id.* Plaintiff also acknowledges that
in April 2021, fifteen SPD officers received crisis intervention training. *See id.* at ¶ 27. Plaintiff
contends that the Liberty contract and officer training was insufficient because, for example, the
officers were not trained to contact Liberty Resources "at the inception of the incident" and the
training "lacked drills or mock exercises as part of the training." *Id.* at ¶¶ 32, 41.

Plaintiff does not state that Ms. Lakie was treated differently than individuals without
disabilities because the officers lacked any training to prepare them to interact with individuals
with mental disabilities or substance abuse disorders. Plaintiff does not allege a neutral policy.
Rather, Plaintiff alleges that Syracuse and the County attempted to train SPD officers and utilize a
contract that employed mental health workers to assist individuals experiencing mental health

crises, but they failed to do so, effectively.[6]  Those allegations are insufficient to state disparate

treatment or impact claims.  *See Henrietta D.*, 331 F.3d at 276; *Greene*, 725 F. Supp. 3d at 426.

However, to the extent Plaintiff alleges that the officers "could have stepped back, created

a perimeter around the house, and afforded [Ms. Lakie] a cooling-off period," Dkt. No. 121 at ¶

56, "the failure to provide reasonable accommodation to a service or benefit—a cooling off period

for an individual with PTSD—is a quintessential failure to accommodate disability claim."

*Butchino*, 2022 WL 137721, at *12; *see also Henrietta D.*, 331 F.3d at 276 ("[T]he demonstration

that a disability makes it difficult for a plaintiff to access benefits that are available to both those

with and without disabilities is sufficient to sustain a claim for a reasonable accommodation").

As Plaintiff states, courts applying the Second Circuit's decision in *Tardif v. City of New York*,

991 F.3d 394, 404-05 (2d Cir. 2021), have permitted reasonable accommodation claims to

proceed based on theory that the "[d]efendant officers should have considered [the plaintiff's]

impairment, i.e., accommodated for it by engaging in" specific response tactics.  *Lalonde v. City

of Ogdensburg*, 662 F. Supp. 3d 289, 332 (N.D.N.Y. 2023)*; see also* Dkt. No. 150 at 43.  As such,

the Court will permit Plaintiff's ADA and RA claims to proceed under that theory.  *See Thomas v.

Town of Lloyd*, 711 F. Supp. 3d 122, 139 (N.D.N.Y. 2024) ("Courts have found two factual

scenarios that give rise to ADA and Rehabilitation Act liability during an arrest: (1) when police

arrest an individual because they misinterpret their disability to be criminal activity; and (2) when

the police fail to reasonably accommodate an individual's disability during an arrest").

---

[6] A search of Plaintiff's amended complaint using the "control-F" function for the word "lack"
shows that Plaintiff never alleges that the SPD officers lacked training.  Plaintiff alleges only that
they lacked "adequate" training, drills, and/or mock exercises.  Dkt. No. 121 at ¶¶ 29, 41, 43.

Based on the foregoing, Plaintiff's ADA and RA disparate treatment and impact claims are dismissed.[7]  The failure to accommodate claim shall proceed.

### c. Municipal Liability

Syracuse argues Plaintiff fails to establish a *Monell*[8] claim for municipal liability based on the City's purported failure to train because "the Amended Complaint does not identify the *specific* training deficiency and instead offers mere conclusory statements that the City did not adequately train its officers."  Dkt. No. 142-6 at 34.  Syracuse also contends that Plaintiff has not "allege[d] sufficiently similar instances of prior misconduct."  *Id.* at 35.  The County argues that Plaintiff has failed to allege a *Monell* claim against it because Plaintiff's complaint refers to "final policy makers," including "the Mayor, Deputy Mayor and SPD Chief"—none of which are County employees.  Dkt. No. 141-4 at 23 (quoting Dkt. No. 121 at ¶ 89).

Plaintiff maintains he sufficiently alleged municipal liability because the City and County's "final policymakers entered into a defective contract with Liberty Resources, which they knew was not going to solve a problem for which they were on notice" and "the City, County, Mayor Walsh, Deputy Mayor Owens, SPD Chief Buckner and unidentified County officials" failed to train SPD officers.  Dkt. No. 150 at 39-40.

"'*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's

---

[7] Syracuse argues that Plaintiff has not alleged discriminatory animus or deliberate indifference. *See* Dkt. No. 142-6 at 28-32.  The Court has concluded that Plaintiff's ADA and RA disparate treatment and impact claims cannot proceed; therefore, the Court need not address the discriminatory animus argument.  The Court again recognizes that in reviewing Plaintiff's original complaint, it permitted disparate treatment and impact claims to proceed.  *See* Dkt. No. 48 at 25-26.  However, the arguments made by the County and Syracuse concerning the adequacy of services—which support dismissal—were not previously considered by the Court.

[8] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.'" *Anilao v. Spota*, 27 F.4th 855, 873-74 (2d Cir. 2022) (quoting *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006)). "In other words, a *Monell* claim cannot succeed without an independent constitutional violation." *Id.* at 874 (citation omitted). "'[I]nherent in the principle that a municipality can be liable under § 1983 only where its policies are the moving force [behind] the constitutional violation, is the concept that the plaintiff must show a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" *Id.* (quoting *Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018)). "'[I]f the challenged action is directed by an official with final policymaking authority, . . . the municipality may be liable even in the absence of a broader policy.'" *Id.* (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003)).

"Municipal liability may also be premised on a failure to train employees when inadequate training 'reflects deliberate indifference to . . . constitutional rights.'" O*kin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)). To prove deliberate indifference, courts have required the plaintiff to show the following:

> (1) [T]hat a policymaker knows to a moral certainty that her employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and (3) that the wrong choice by the . . . employee will frequently cause the deprivation of a citizen's constitutional rights.

*Id.* (quoting *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992)) (quotation marks omitted); *see also Jenkins v. City of N.Y.*, 478 F.3d 76, 94 (2d Cir. 2007).

"[T]he Supreme Court emphasized in *City of Canton* that plaintiffs must establish that "the officer's shortcomings . . . resulted from . . . a faulty training program" rather than from the negligent administration of a sound program or other unrelated circumstances." *Amnesty Am.*, 361 F.3d at 129-30 (citing *City of Canton*, 489 U.S. at 391). As such, "[i]t is impossible to prevail on a claim that the [] training program was inadequate without any evidence as to . . . how the training was conducted, how better or different training could have prevented the challenged conduct, or how 'a hypothetically well-trained officer would have acted under the circumstances' to remove passively resisting protesters." *Id.* (quoting *City of Canton*, 489 U.S. at 391).

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Board of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). However, "[p]olicymakers' 'continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference"—necessary to trigger municipal liability.'" *Id.* (quotation omitted). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*; *see also RDK NY Inc. v. City of New York*, No. 21-CV-01529, 2024 WL 4333704, *12 (E.D.N.Y. Sept. 28, 2024).

"[S]uch inadequacy must [also] reflect a deliberate choice among various alternatives, rather than negligence or bureaucratic inaction." *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007) (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 483-84 (1986)). "Plaintiffs must prove in the end that the state defendants' inadequate supervision actually caused or was the moving force behind the alleged violations." *Id.* (citing *Polk County v. Dodson*, 454 U.S. 312, 326 (1981)).

First, as to Plaintiff's failure to train theory, as this Court previously explained, "[a] 'municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.'" Dkt. No. 48 at 45 (quoting *Connick*, 563 U.S. at 61). Therefore, "[a]t the motion to dismiss stage, '[w]hile it may be true that § 1983 plaintiffs cannot be expected to know the details of a municipality's training programs prior to discovery, this does not relieve them of their obligation under *Iqbal* to plead a facially plausible claim.'" *Id.* at 46 (quoting *Simms v. Cityof New York*, 480 Fed. Appx. 627, 631 n.4 (2d Cir. 2012)). "Thus, plaintiffs can meet their pleading obligations by alleging facts indicating [a] pattern of similar constitutional violations by untrained [municipal] employees." *Id.* (quotations and quotation marks omitted) (alterations in original); *see also Doe 1 v. Cnty. of Rockland*, No. 21-CV-6751, 2025 WL 945873, *18 (S.D.N.Y. Mar. 28, 2025); *Seward v. Antonini*, No. 20-CV-9251, 2023 WL 6387180, *26 (S.D.N.Y. Sept. 29, 2023).

In its motion, Syracuse argues that Plaintiff's amended complaint lacks identification of any "*specific* training deficiency and instead offers mere conclusory statements that the City did not adequately train its officers." Dkt. No. 142-6 at 34. The Court agrees.

In Plaintiff's amended complaint, he states that "[b]y April 2021, 15 SPD officers received Crisis Intervention Training or 'CIT' and 12 more were trained in CIT in April 2022." Dkt. No. 121 a ¶ 27. He contends that "armed police officers . . . lack adequate training in dealing with individuals who are in the throes of a mental health crisis, [and] are not best equipped to deal with these situations[.]" *Id.* at ¶ 29. Plaintiff asserts that "the defendant officers on the scene did not contact Liberty Resources, or were not trained to contact them, at the inception of the incident, but much later, shortly before [Ms. Lakie] was shot." *Id.* at ¶ 32. Likewise, "the 911 operator for the City did not contact Liberty Resources when the incident was first called in. Apparently, the

City and/or County did not train the 911 operators to do this although the City, County, Mayor Walsh, Deputy Mayor Owens, and Chief Buckner were put on notice that mental health professionals should respond immediately." *Id.*

Plaintiff alleges that "[a]ny training they received in dealing with the mentally ill appears to have been superficial, brief, lacked drills or mock exercises as part of the training, not enforced by their superiors, and did not develop into a skill set." *Id.* at ¶ 41. He asserts that "[i]f the defendant officers were thoroughly trained, they never would have treated [Ms. Lakie] the way they did, as detailed below, and they would have realized the obvious: that they were making things worse over the course of 2 hours." *Id.* Plaintiff proclaims that "[n]o adequately trained officer would make [certain] statements, let alone over a lengthy period of time." *Id.* at ¶ 43. "Moreover, even if the officers received some training, it was deficient as evidenced by their conduct, their failure to recognize that their efforts were futile and exacerbated the situation, and their failure to tell supervisors and Liberty Resources to come to the scene promptly." *Id.* at ¶ 64. Plaintiff alleges that Liberty "Resources were not required to respond to the scene immediately, and officers were not adequately trained to recognize when their actions were making matters worse and to summon help promptly." *Id.* at ¶ 68.

Plaintiff's allegations are not sufficiently specific to impose municipal liability for a failure to train. Plaintiff assumes that Syracuse and the County "did not adequately train SPD police officers and supervising officers, such as Hart, Gerace and Liadka, to contact Liberty Resources immediately, to seek advice from them, to have them engage [Ms. Lakie] from a safe place, and to not taunt, lie to, and agitate [Ms. Lakie]." Dkt. No. 150 at 40. Plaintiff does not "allege[] facts indicating '[a] pattern of similar constitutional violations by untrained [municipal] employees,'" *Simms*, 480 Fed. Appx. at 631 (quotation omitted), nor has he alleged "unconstitutional

consequences of failing to train [that were] so patently obvious" as to hold to the City or County liable. *Connick*, 563 U.S. at 64. As explained in the Court's September 2023 decision, Plaintiff's references to "prior similar incidents" and "prior incidents," Dkt. No. 121 at ¶¶ 11, 27, are "made without factual support" and "are insufficient to plausibly infer a custom or policy to support municipal liability." Dkt. No. 48 at 48-49. As such, Plaintiff's *Monell* claim based on a failure to train theory must be dismissed.

Plaintiff raises an alternative route to establish *Monell* liability: final policy makers action. *See* Dkt. No. 150 at 39. Plaintiff argues that "there is *Monell* liability for Syracuse and the County because its final policymakers entered into a defective contract with Liberty Resources, which they knew was not going to solve a problem for which they were on notice." *Id.* This claim also fails.

"A policy or custom may exist where there is a 'practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware' or where there is a 'failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.'" *Plaintiffs #1-21 v. Cnty. of Suffolk*, No. 15-CV-2431, 2021 WL 11629176, *7 (E.D.N.Y. Aug. 5, 2021) (quotation omitted). "Where a municipality has a constitutionally valid stated policy, but fails to implement it, the municipality may be liable for failure to train or supervise." *Id.* (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 127 n.7 (2d Cir. 2004)). "[A] plaintiff must also establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury." *Murphy v. Spaulding*, No. 20-CV-9013, 2022 WL 294552, *9 (S.D.N.Y. Feb. 1, 2022) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 n.8 (1985)).

Assuming *arguendo* that "Mayor Walsh, Deputy Mayor Owens, SPD Chief Buckner and unidentified County officials" were all final policy makers at the time of the incident, Dkt. No. 150 at 40, Plaintiff has not alleged that any of them were aware that the contract with Liberty Resources or the CIT training was deficient. Plaintiff did not allege a single example of another instance where the contract and/or training resulted in a constitutional violation that any of the alleged final policy makers ignored. *See* Dkt. No. 121. Plaintiff's conclusory allegations of "other incidents" are insufficient to state a claim of an unconstitutional municipal policy or custom based on a final policymaker's actions.

Accordingly, Syracuse and the County's motions are granted on this issue and Plaintiff's *Monell* claims are dismissed.

### 4. Claims Against the Individual Officers

#### a. Use of Deadly Force and Failure to Intervene Claims

As to the Defendant officers that were at the scene on October 20, 2021, they argue that six of the ten officers were not personally involved in the use of deadly force and therefore cannot be held liable for it. *See* Dkt. No. 142-6 at 39. Specifically, they aver that "[n]owhere in the Amended Complaint does Plaintiff allege that the remaining six officers, i.e., Sgt. Gerace, Officer Flanagan, Officer Sargent, Officer Francisco, Officer Glynn, and Officer Hill, fired their weapons." *Id.* The officers argue that Plaintiff's excessive force, assault and battery, wrongful death, and conscious pain and suffering claims must be limited to the four officers that are alleged to have used deadly force—Lt. Hart, Sgt. Liadka, Officer Sheehan, and Officer Saralegui-Martin. *See id.* at 40. As to those four officers, they assert an entitlement to qualified immunity. *See id.* The six other officers argue that they did not have a realistic opportunity to intervene in "the

seconds that the deadly force was rapidly deployed," Dkt. No. 166-2 at 19, and that they are

entitled to qualified immunity. *See* Dkt. No. 142-6 at 45.

Plaintiff argues that the Defendant officers are not entitled to qualified immunity and the

individuals who did not discharge their firearms are liable for their failure to intervene in the use

of force "by allowing and/or accompanying a group of officers to enter the location and create

another tragic situation where a mentally ill person was shot and killed, rather than being

provided with mental health services." Dkt. No. 150 at 50. Plaintiff states that the additional

"officers did not consult the mental health providers on the scene and did not call them until the

end of the encounter, and the officers agitated [Ms. Lakie], or allowed other officers to agitate

[Ms. Lakie], and to elongate the encounter, which exacerbated [Ms. Lakie's] paranoia and other

mental health conditions." *Id.* at 50-51. Additionally, Plaintiff contends "[t]he officers did not

verbalize to their fellow officers and supervisors any objection to the unlawful conduct or suggest

alternatives, and the supervisors also failed to act." *Id.* at 51.

Plaintiff's amended complaint is not a model of specificity. He names "all Police Officer

Defendants" as liable for excessive force, failure to intervene, assault and battery, wrongful death,

and conscious pain and suffering. *See* Dkt. No. 121 at ¶¶ 85-116. However, in his response to the

motions, Plaintiff appears to concede, through his silence on the matter, that the six officers who

did not discharge their weapons are not liable for the use of deadly force. *See* Dkt. No. 150; *see*

*also Pileggi v. Mathias*, No. 3:22-CV-1315, 2023 WL 5435915, *2 (D. Conn. Aug. 23, 2023)

(collecting cases to support dismissal of a claim where the plaintiff did not respond to the

arguments raised in a motion to dismiss). Plaintiff argues only that "[t]he officers and supervising

officers who did not shoot [Ms. Lakie] are liable on a failure to intervene theory . . . ." Dkt. No.

150 at 50.

"'A police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force, and may be held liable for his failure to do so if he observes the use of force and has sufficient time to act to prevent it.'" *Smith v. Sawyer*, 435 F. Supp. 3d 417, 438 (N.D.N.Y. 2020) (quoting *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016)) (additional citation omitted). "Liability attaches on the theory that the officer, by failing to intervene, becomes a 'tacit collaborator' in the illegality." *Id.* (quotations omitted). "For [p]laintiffs to succeed on their failure to intervene claim, there must 'have been a realistic opportunity to intervene to prevent the harm from occurring.'" *Id.* (quoting *Felix v. City of New York*, 408 F. Supp. 3d 304, 312 (S.D.N.Y. 2019)).

"Whether the officer had a 'realistic opportunity' to intervene is normally a question for the jury, unless, 'considering all the evidence, a reasonable jury could not possibly conclude otherwise.'" *Figueroa*, 825 F.3d at 107-08 (quoting *Terebesi v. Torreso*, 764 F.3d 217, 244 (2d Cir. 2014) (affirming denial of motion to dismiss because "[w]hether some of the defendants were in fact unable to intercede in particular uses of force, either because they were not involved in the planning process, or because of the manner, place, and timing of their deployment in the raid itself, is properly a question for a jury")). "Failure-to-intervene claims can arise out of a limitless variety of factual circumstances." *Id.* "In each case, the question whether a defendant had a realistic chance to intercede will turn on such factors as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations." *Id.* "Among these considerations, of course, the assault's duration will always be relevant and will frequently assume great importance." *Id.* (citation omitted). "The essential inquiry is whether, under the circumstances actually presented, an officer's failure to intervene permits a reasonable conclusion that he became a 'tacit collaborator' in the unlawful

conduct of another." *Id.* at 107-08 (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988)).

Based solely on the allegations set forth in Plaintiff's amended complaint, he has sufficiently stated a failure to intervene claim against the six additional officers present at the scene who did not discharge their weapons. Plaintiff alleges that the officers did not intervene in the use of force, *see* Dkt. No. 121 at ¶¶ 60, 66, 67, and whether there was a reasonable opportunity to do so is often a question for the jury. *See Figueroa*, 825 F.3d at 107-08.[9] Syracuse argues in its motion that "[t]he act of pulling a trigger in succession is not an act that another officer can reasonably be expected to prevent even when he or she is nearby" and "[w]hile Plaintiff's counsel is aware that the use of deadly force occurred over the span of several seconds, this was a detail that was intentionally and strategically omitted to avoid dismissal." Dkt. No. 142-6 at 44-45. This Court previously explained that the lack of a reasonable opportunity to intervene in a seconds-long use of force "may be successful in a properly supported motion for summary judgment, [but] the argument is premature at this time." Dkt. No. 48 at 40. For that same reason, the Court concludes that Plaintiff's first amended complaint sufficiently states a failure to intervene claim.[10]

---

[9] At this stage, the Court is not permitted to consider information outside of the pleadings and, like with his original complaint, Plaintiff does not mention the body camera footage in his amended complaint. *See* Dkt. No. 48 at 12-16 (collecting cases and explaining the Court's inability to consider the video footage at the motion to dismiss stage because "far from being integral to the complaint, the video footage is not even mentioned in it"). If Plaintiff did mention the video footage in his complaint, he would be forced to acknowledge that from the time an individual said "fire is out" to the time Ms. Lakie was on the ground, approximately seven seconds lapsed.

[10] Plaintiff has not alleged any facts concerning the six officers who did not discharge their weapons related to his excessive force, assault and battery, wrongful death, and conscious pain and suffering claims. As such, those claims are limited to the four officers that are alleged to have used deadly force—Lt. Hart, Sgt. Liadka, Officer Sheehan, and Officer Saralegui-Martin.

### i. Qualified immunity

"'The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vega-Colon v. Eulizier*, No. 23-CV-1211, 2024 WL 3320433, *3 (2d Cir. July 8, 2024), *cert. denied*, 220 L. Ed. 2d 423 (Jan. 21, 2025) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  There is a two-step framework, articulated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), which states as follows:

> "[W]hen a defendant official invokes qualified immunity as a defense in order to support a motion for summary judgment, a court must consider two questions: (1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation."

*Id.* (quoting *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010)).  "A right is clearly established if it would have been 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  *Id.* (quoting *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020)).  "'[Courts] do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'"  *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)); *see also Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so").  "The focus is on 'whether the officer had fair notice that [his or] her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.'"  *Lopez v. Wolensky*, No. 20-CV-7798, 2024 WL 4123524, *14 (S.D.N.Y. Sept. 9, 2024) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)) (additional quotation omitted).

As qualified immunity relates to the use of deadly force, "'[c]aselaw . . . has not clearly established that it violates the Constitution for a police officer to shoot someone who is behaving erratically, advancing toward the police officer with a knife in his hand, and disregarding a command to get back.'" *Id.* (quoting *Shepherd on behalf of Est. of Shepherd v. City of Shreveport*, 920 F.3d 278, 285 (5th Cir. 2019)); *see also City of Tahlequah v. Bond*, 595 U.S. 9, 10-12 (2021) (concluding that officers "plainly did not violate any clearly established law" in using deadly force where the decedent had been intoxicated, would not leave the garage, had a hammer, and "then raised the hammer higher back behind his head and took a stance as if he was about to throw the hammer or charge at the officers"); *Est. of Jaquez by Pub. Adm'r of Bronx Cnty. v. City of New York*, 706 Fed. Appx. 709, 714 (2d Cir. 2017) ("Even assuming [the suspect] did not have the knife in his hand when he walked down the hallway, the officers testified that they could not see [the suspect's] hand in that moment and they could not determine that he was unarmed when they deployed the Taser. Thus, in the moments that Jaquez was walking down the hallway 'officers of reasonable competence could disagree' as to whether Jaquez was a threat because the officers knew Jaquez had easy access to a fillet knife, was acting erratically, and was refusing to obey the officers' commands").

However, "'[i]t is not objectively reasonable for an officer to use deadly force to apprehend a suspect unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Taylor v. Pillai*, No. 3:21-CV-623, 2024 WL 1050235, *5 (D. Conn. Mar. 11, 2024) (quoting *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 36 (2d Cir. 2003)); *see also Hemphill v. Schott*, 141 F.3d 412, 417-18 (2d Cir. 1998) (reversing grant of qualified immunity because there were factual disputes as to movements made by the plaintiff prior to the use of deadly force).

Plaintiff alleges that Ms. Lakie did not threaten the officers or did not charge at them with a knife, and one police officer or firefighter stated that the fire was "out" before Ms. Lakie was shot. *See* Dkt. No. 121 at ¶ 58. Accepting Plaintiff's allegations as true, and as this Court previously concluded, the defense cannot succeed in its qualified immunity arguments "based [solely] on facts appearing on the face of the complaint." Dkt. No. 48 at 32 (quoting *Barnett v. Mount Vernon Police Dept.*, 523 Fed. Appx. 811, 813 (2d Cir. 2013)) (additional quotation omitted) (alteration in original). If it is true that Ms. Lakie did not threaten the officers or lunge at them, and the fire was extinguished such that it was no longer a cause for concern, then there would be a lack of probable cause to support the use of deadly force. As such, the Court denies the Syracuse Defendants' motion to dismiss the use of force and failure to intervene claims on qualified immunity grounds as to the officers who discharged their weapons and those who did not, respectively.[11]

### b. Deliberate Indifference Claims: Custody, Negligence, and the Number of Shots Fired

Plaintiff's Fourteenth Amendment deliberate indifference claims raise two theories of liability: (1) the officers were deliberately indifferent to Ms. Lakie's medical needs by using deadly force "rather than providing [her] with mental health intervention and services on the scene"; and (2) the officers were deliberately indifferent because they "delayed providing [Ms.

---

[11] The Court finds it prudent to reiterate statements it made in its 2023 decision. Despite being omitted from the drafting of Plaintiff's amended complaint, the body-worn video camera footage reveals that the shots fired at Ms. Lakie were in immediate succession and police officers rendered emergency first aid as soon as she fell to the ground. The shots were fired only after Ms. Lakie exited the room that was just aflame with knives still in her hands. Also, as acknowledged by Plaintiff in his complaint, police officers used non-lethal force, first, in the form of a taser, which was ineffective in subduing Ms. Lakie. *See* Dkt. No. 121 at ¶¶ 50, 57. These facts will likely present hurdles in Plaintiff's way of surviving a motion for summary judgment.

Lakie] with treatment by continuing to fire at her instead of providing medical care immediately after the first shot." Dkt. No. 121 at ¶¶ 93, 95.

The County argues that both theories of liability require dismissal "because no County employees or officers were at the scene of the shooting and no County employee or officer used any force against Ms. Lakie and none shot her, nor has the plaintiff pled anything that disputes this." Dkt. No. 141-4 at 25.

The Syracuse Defendants assert that "[t]o the extent the case law has recognized a Fourteenth Amendment protection regarding the provision of medical treatment by law enforcement, the scope of that right applies only to 'pre-trial detainees,' and, thus, a plaintiff must be in custody before that right is triggered." Dkt. No. 142-6 at 46 (quoting *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996)). They argue that Ms. Lakie was not in custody during the use-of-force incident. *See id.* The Syracuse Defendants also contend that "even if Ms. Lakie were subject to the Fourteenth Amendment, Plaintiff's 'mere disagreement over the proper treatment does not create a constitutional claim[,]'" and "there is no indication the U.S. Constitution requires police officers to first provide a particular mental health treatment before responding to a threat." *Id.* at 47-48 (quoting *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)). Finally, the Syracuse Defendants argue that Plaintiff's theory of liability regarding deliberate indifference to Ms. Lakie's medical needs based on the number of shots fired cannot form the basis of a Fourteenth Amendment claim. *See id.* at 48.

Plaintiff argues that Ms. Lakie "was in custody because a reasonable person in her position would feel she was not free to leave." Dkt. No. 150 at 52. Plaintiff also contends that although this "Court previously held that the deliberate indifference claim is duplicative of the deadly force claim,"the Fourteenth and Fourth Amendment claims are distinct "because they are based on

different conduct and separate constitutional amendments[.]"  *Id.*  Plaintiff does not dispute that

negligence is insufficient to establish a constitutional violation.  *See generally* Dkt. No. 150.

Plaintiff asserts that in this Court's previous decision, it "held that that the officers' delay in

providing [Ms. Lakie] with medical treatment by continuing to fire at her instead of providing

care immediately after the first shot was sufficiently pled."  Dkt. No. 150 at 53.  Plaintiff quotes

this Court's decision in his first amended complaint.  *See* Dkt. No. 121 at ¶ 95 (quotation omitted).

    Plaintiff is correct that this Court has already analyzed this issue because it was previously

argued by the Syracuse Defendants.  *See* Dkt. No. 48 at 37-38.  The Court stated as follows:

> As to the second aspect of Plaintiff's [deliberate indifference] claim
> – *i.e.*, that the officers delayed in providing her treatment by
> continuing to fire at her instead of providing medical care
> immediately – the Court finds that Plaintiff has plausibly (albeit
> barely) alleged this aspect of the claim.  According to the
> complaint, the Police Officer Defendants shot "[Ms. Lakie] multiple
> times, after she was completely harmless from being shot once,
> rather than providing her with medical treatment[.]" . . .  This
> allegation is sufficient to support this aspect of the claim.

*Id.* (quotation and footnote omitted).

    The Syracuse Defendants have not explained why the Court should come to a different

conclusion on their present motion.  *See* Dkt. No. 142-6 at 48-49.  "The law of the case doctrine

commands that when a court has ruled on an issue, that decision should generally be adhered to

by that court in subsequent stages in the same case unless cogent and compelling reasons militate

otherwise."  *City of Philadelphia v. Bank of Am. Corp.*, 609 F. Supp. 3d 269, 282 (S.D.N.Y. 2022)

(quoting *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009)) (additional quotation and quotation

marks omitted).  The Court previously considered whether Plaintiff stated a deliberate

indifference claim based on the officers repeatedly firing their weapons, "instead of providing

medical care immediately."  Dkt. No. 48 at 37.  As there are no new facts in the amended

complaint and no new arguments presented by the Syracuse Defendants, the Court will not alter its previous conclusion as to the claims against the Syracuse Defendants. *See Boyd v. J.E. Robert Co.*, No. 05-CV-2455, 2010 WL 5772892, *16 (E.D.N.Y. Mar. 31, 2010) (holding that because the defendants "appear merely to reprise arguments offered in support of prior motions to dismiss that were ultimately rejected by this Court, the doctrine of the law of the case mandates that these arguments be rejected").[12]

Nevertheless, Plaintiff's claim cannot survive application of the doctrine of qualified immunity. Plaintiff does not respond to the Syracuse Defendants' argument that "there is no authority—let alone clearly established authority—. . . that requires officers to abruptly truncate a legitimate use of deadly force on a shot-by-shot basis." Dkt. No. 142-6 at 48. Plaintiff's entire argument is that "the Court has held that that the officers' delay in providing [Ms. Lakie] with medical treatment by continuing to fire at her instead of providing care immediately after the first shot was sufficiently pled. . . . Plaintiff is not claiming that [Ms. Lakie] was not provided with immediate medical care after she was repeatedly shot." Dkt. No. 150 at 53.

The Court is mindful that "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). "Not only must the facts supporting the defense appear on the face of the complaint, . . . but, as with all

---

[12] In their motion, the Syracuse Defendants contend that this theory of liability "will be subject to a forthcoming Rule 11 motion as Plaintiff's counsel is aware that first aid was rendered immediately." Dkt. No. 142-6 at 45 n.19. The Court notes that although "Rule 11 targets situations where it is patently clear that a claim has absolutely no chance of success," *Healey v. Chelsea Resources, Ltd.*, 947 F.2d 611, 626 (2d Cir. 1991), this Court expressly permitted Plaintiff's claim to proceed in response to the Syracuse Defendants' first motion to dismiss. *See* Dkt. No. 48 at 37. Therefore, the Court notes that it would take serious pause before admonishing Plaintiff for reasserting a claim the Court allowed to proceed.

49

Rule 12(b)(6) motions, the motion may be granted only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief'" *Id.* (quoting *Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1494 (2d Cir. 1992)) (internal citation omitted). "Thus, the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Id.*

It appears beyond doubt that Plaintiff cannot prove any set of facts in support of a Fourteenth Amendment deliberate indifference claim based on a theory that after firing one shot at Ms. Lakie, the officers who continued to fire their weapons instead of rendering first aid violated her constitutional rights. In Plaintiff's amended complaint, he quotes an incident report which states that "[a]s the flames grew, a Syracuse firefighter entered the kitchen entryway with a water canister and extinguished the fire. Immediately thereafter, the area became dark with smoke and Lakie charged at officers with both knives. Multiple officers fired their duty weapons then immediately began CPR." Dkt. No. 121 at ¶ 50 (quotation, quotation marks, and emphasis omitted). In his response to Defendants' motions, Plaintiff agrees that he "is not claiming that [Ms. Lakie] was not provided with immediate medical care after she was repeatedly shot." Dkt. No. 150 at 53.

"[P]olice officers are immune if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Guan v. City of New York*, 37 F.4th 797, 806 (2d Cir. 2022) (quotations omitted). "A right is 'clearly established' when 'the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011) (additional quotation omitted). "Moreover, if reasonable officers could

disagree 'on the legality of the action at issue in its particular factual context,' the officer is entitled to qualified immunity." *Id.* (quoting *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007)).

It is not clearly established that when an officer fires a single shot from his or her service weapon at an individual, then that officer and surrounding officers cannot discharge their weapons in immediate succession because they must instead render medical aid. The Court has been unable to find a single federal case that concludes otherwise.

Courts across the country have concluded that a plaintiff fails to state a deliberate indifference claim based on allegations that "police policy requires an officer to 'immediately . . . determine the physical conditions of any injured person and render first aid.'" *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 279 (5th Cir. 2015) (quotation omitted) (concluding that the defendant's "decision to place the dog, which had been attacking [the plaintiff], in the police car, and to defer to other officers to attend to [the plaintiff], cannot fairly be described as showing 'a wanton disregard for [the plaintiff's] serious medical needs'"); *see also Batyukova v. Doege*, 994 F.3d 717, 732 (5th Cir. 2021) (affirming dismissal of deliberate indifference claim because "even though Deputy Doege did not personally render medical treatment to Batyukova, he immediately informed emergency dispatch that shots had been fired, that Batyukova was injured, and that she needed assistance. We cannot say he ignored Batyukova, refused to treat her, or displayed wanton disregard for her medical needs"); *Estrada v. Cook*, 166 F. Supp. 3d 1230, 1245 (D.N.M. 2015) (dismissing deliberate indifference claim because "[w]ithin minutes of the officers' ['shots fired'] call, paramedics with the City Fire Department had arrived at a staging area, where other officers had taken Estrada"); *Sullivan v. Warminster Twp.*, 765 F. Supp. 2d 687, 703 (E.D. Pa. 2011) ("[T]here is no triable issue of fact as to whether Defendants exhibited deliberate indifference to Sean's medical needs under these circumstances. There is no dispute that

Defendants had expedited an ambulance to Sean's location within one minute of the shooting
[which caused Sean to be shot six times]. The ambulance arrived within eight minutes of the
shooting. Defendants attempted to render first aid to Sean in the meantime. No reasonable jury
could find that Defendants exhibited deliberate indifference to Sean's medical needs").

A judge out of the Sixth Circuit has expressly stated that "[w]hen an officer injures a
suspect during an active scene, he need not immediately render aid." *Robinson v. City of
Knoxville, Tennessee*, No. 24-5159, 2025 WL 621451, *13 (6th Cir. Feb. 26, 2025) (Nalbandian,
J., concurrence in part) (citing *Thomas v. City of Columbus*, 854 F.3d 361, 367 (6th Cir. 2017));
*see also Houston v. Galluzzi*, No. 6:18-CV-708, 2019 WL 2492113, *4 (M.D. Fla. June 14, 2019)
("Houston does not explain exactly when the Defendants should have summoned medical help,
but in any event they did so around three minutes after the shooting. . . . The steps allegedly
taken by the officers prior to calling for an ambulance – searching the vehicle, and Houston's
person – are facially reasonable, and Houston cites no case law, department policy or anything of
that nature suggesting otherwise"); *Est. of Green v. City of Annapolis*, 696 F. Supp. 3d 130, 168
(D. Md. 2023) (granting motion to dismiss where "[t]o the extent Plaintiffs maintain that the
Officer and Doe Defendants were indifferent to Green's serious need of medical care, [because]
the Complaint and the Police Reports (quoted in the Complaint for their truth) do not plausibly
bear out such a conclusion; rather the allegations and incorporated/quoted police reports aver that
Green was maintained on his side to keep his airway clear upon being handcuffed; that he was
transported on a sheet while prone to get him to the ambulance; and that he was turned onto his
backside before being strapped into the ambulance"); *Krause v. Cnty. of Mohave*, No. 17-CV-
08185, 2020 WL 2541728, *12 (D. Ariz. May 19, 2020), *aff'd*, 846 Fed. Appx. 569 (9th Cir.
2021) ("[I]t is evident that the deputies did not act with deliberate indifference to Krause's

medical needs.  The deputies requested emergency medical services within sixty seconds of the

shooting. . . .  Emergency medical care arrived within eight minutes").

 However, the Sixth Circuit has noted that "[s]ince 2005, it has been clearly established

that responding officers may not engage in behavior that could be construed as idle, and thus

indifferent to a suspect's serious medical needs."  *Id.* at \*11 (citing *Est. of Owensby v. City of*

*Cincinnati*, 414 F.3d 596, 603 (6th Cir. 2005)); *see also Stevens-Rucker v. City of Columbus, OH*,

739 Fed. Appx. 834, 846 (6th Cir. 2018).  Courts have permitted deliberate indifference claims to

go to a jury where "[a] jury could [] infer that the [officer] delay was deliberately indifferent"

where medical aid was delayed by minutes or longer.  *Wade v. Daniels*, 36 F.4th 1318, 1327 (11th

Cir. 2022) ("[A]fter waiting four minutes to ask for ambulance, it took an extra minute for the

investigators to report that Wade had been shot in the head").[13]

 The foregoing recitation of cases analyzing Fourteenth Amendment deliberate indifference

claims demonstrates that it is not clearly established that the Defendant officers were required to

render medical aid after the first firearm was discharged at Ms. Lakie.  There are no allegations in

Plaintiff's complaint that any of the officers on the scene delayed in rendering medical aid to Ms.

Lakie after the shots were fired.  Rather, the aid was rendered "immediately."  Dkt. No. 121 at ¶

50; Dkt. No. 150 at 53.  This does not violate any clearly established case law.  *See Marshall v.*

*Russell*, 391 F. Supp. 3d 672, 689 (S.D. Tx.) ("[T]he shooting unfolded within two minutes of

---

[13] "While decisions by other circuit courts are obviously not binding precedent here, the Supreme
Court has instructed that a right may be clearly established even absent 'controlling authority'
from the Supreme Court or the governing circuit court if there is or was a 'robust consensus of
cases of persuasive authority' from the other circuits establishing the right. . . .  Hence, the Second
Circuit has from time to time cited case law from other circuits to show that courts generally were
divided over the lawfulness of a particular behavior, as extra support for a finding that the
behavior was not clearly unlawful."  *Lara-Grimaldi v. Cnty. of Putnam*, No. 17-CV-622, 2018
WL 1626348, \*16 n. 14 (S.D.N.Y. Mar. 29, 2018) (quoting *Taylor v. Barkes*, 575 U.S. 822, 826
(2015)).

Sgt. Russell's arrival on scene, and within one minute thereafter, Sgt. Russell notified dispatch shots were fired and called for EMS to move from their staging area to provide medical care. . . . Plaintiffs failed to cite any relevant case law where a claim for deliberate indifference was found to exist under similar circumstances, particularly in a situation that unfolded rapidly in under two minutes").  Therefore, this aspect of the Syracuse Defendants' motion is granted.  *See McKinney v. City of Middletown*, 49 F.4th 730, 742 (2d Cir. 2022) ("McKinney has not shown that it is a violation of clearly established law for the police to ensure that a violent suspect has been secured before *withdrawing* the significant force required to subdue the suspect.  In light of the possibility that McKinney would resume his active resistance once force was withdrawn, we cannot say that it was 'objectively unreasonable for the officers to believe that their conduct was lawful' under the circumstances").

Next, as to Plaintiff's theory that the Defendant officers were deliberately indifferent to Ms. Lakie's medical needs because they should have provided Ms. Lakie with certain services instead of using force, the Court declines to alter its previous conclusion that Plaintiff has failed to state a claim.  In the Court's decision, it also explained that dismissal of Plaintiff's claim "that the officers should have provided Ms. Lakie with treatment instead of using force against her . . . is appropriate because this aspect of the deliberate indifference claim is duplicative of, or subsumed by, the excessive force claim.  This is appropriate because the excessive force analysis provides the most specific constitutional protection against the improper use of force and can provide complete relie[f] for any injury Ms. Lakie suffered as a result of that conduct."  *Id.* at 37.

The Court also stated in a footnote, in discussing whether Plaintiff has alleged a claim under New York State Human Rights Law § 28, that "Section 28 does not apply to pre-arrest/pre-detention conduct, but rather creates a duty once the person 'is under arrest or otherwise in the

custody of a police officer[.]'  Ms. Lakie was neither under arrest or otherwise in Defendants' custody during the incident in question."  *Id.* at 54 n.11.

The Court carefully considered the first motion to dismiss as well as the motions for reconsideration.  Plaintiff asks this Court to now reconsider its decision but does so without providing case law or argument as to why the Court should alter its conclusions.  *See id.* at 52-53. The Court will not do so.  *See Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 316 (S.D.N.Y.), *aff'd*, 626 Fed. Appx. 20 (2d Cir. 2015).

Even if the Court were not bound by its own prior rulings under the law of the case doctrine, Plaintiff's deliberate indifference claim concerning the use of force instead of rendering additional services would not survive.  Plaintiff summarily argues that Ms. Lakie "was in custody because a reasonable person in her position would feel she was not free to leave."  Dkt. No. 150 at 52.  Plaintiff does not present any legal authority which stands for the proposition that an individual who is in their own home, or a family member's home, and moving freely about, is in police custody.  *See id.*  As the Syracuse Defendants state in their reply, courts have concluded "that a police standoff—such as what transpired here—are noncustodial in nature."  Dkt. No. 166-2 at 21 (citing *People v. Bower*, 27 A.D.3d 1122, 1123 (4th Dept. 2006); *New York v. Borges*, No. 032782005, 2007 WL 9190552, *7 (Sup. Ct. Nov. 15, 2007)); *see also Briggs v. Cnty. of Monroe*, 293 F. Supp. 3d 379, 388 (W.D.N.Y. 2018) (comparing cases where an individual was in custody because "law enforcement terminated Decedent's phone line, rather than merely assigning a new number, and there is evidence that they sought to keep Decedent confined in his apartment, rather than encouraging him to leave," with those instances where a plaintiff had access to a telephone and was being encouraged to leave the apartment).

Plaintiff states that "this Court has indicated that being in custody is not a requirement, as each case is different." Dkt. No. 150 at 52-53 (citation omitted). Plaintiff cites one of this Court's statements made in relation to Plaintiff's ADA claim, but the Court's current analysis is focused on Plaintiff's Fourteenth Amendment claim. Nevertheless, Plaintiff is not entirely wrong.

Plaintiff is correct insofar as he states that the Fourth and Fourteenth Amendments apply to different conduct. *See* Dkt. No. 150 at 52; *see also Maldonado v. Town of Greenburgh*, 460 F. Supp. 3d 382, 392 (S.D.N.Y. 2020) ("The Fourth Amendment is not triggered unless a search or seizure has occurred"). "Although '[a]s a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause,' . . . state actors may be liable under section 1983 if they affirmatively created or enhanced the danger of private violence." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 427-28 (2d Cir. 2009) (quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989); citing *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993), *overruled on other grounds by Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164, (1993)). "'[T]hough an allegation simply that police officers had failed to act upon reports of past violence would not implicate the victim's rights under the Due Process clause, an allegation that the officers in some way had assisted in creating or increasing the danger to the victim would indeed implicate those rights.'" *Id.* (quotation omitted).

"The state-created danger exception applies where (1) a 'governmental official takes an affirmative act that creates an opportunity for a third party to harm a victim (or increases the risk of such harm),' . . . and (2) the government action shocks the contemporary conscience." *Correction Officers' Benevolent Ass'n, Inc. v. City of New York*, 415 F. Supp. 3d 464, 469

(S.D.N.Y. 2019) (quoting *Lombardi v. Whitman*, 485 F.3d 73, 80 (2d Cir. 2007)) (citation omitted). "'It is not enough to allege that a government actor failed to protect an individual from a known danger of bodily harm or failed to warn the individual of that danger.'" *Id.* (quotation omitted). "The complaint must allege 'affirmative, risk-creating acts,' . . . that 'actually contributed to the vulnerability of the plaintiff.'" *Id.* (quoting *Robischung-Walsh v. Nassau County Police Dept.*, 421 Fed. Appx. 38, 41 (2d Cir. 2011); *Hemphill v. Schott*, 141 F.3d 412, 419 (2d Cir. 1998)).

Plaintiff does not espouse a state-created danger theory in his amended complaint. *See* Dkt. No. 121. Plaintiff does not make any arguments about the state-created danger theory in his response to the motions to dismiss. *See* Dkt. No. 150. It is "simply not [the Court's] job, at least in a counseled case[,]" to develop arguments on Plaintiff's behalf. *Sioson v. Knights of Columbus*, 303 F.3d 458, 460 (2d Cir. 2002). This is Plaintiff's second bite at the apple in explaining why his claims are sufficient. Plaintiff has not presented any case law or argument as to why Ms. Lakie was in "custody" during the incident beyond a one-sentence conclusory statement. He likewise provides no case law to support a Fourteenth Amendment claim based on a police officer's use of force instead of providing specific aid or services.

Plaintiff does not respond to the County's arguments concerning Plaintiff's Fourteenth Amendment claims. *See* Dkt. No. 150 at 52-53. Neither of Plaintiff's theories of liability relate to the County. Plaintiff does not allege or argue that a County employee was at the scene when the deadly force was used; therefore, no County employee "allow[ed] this force to be used, rather than providing [Ms. Lakie] with mental health intervention and services on the scene," or "delayed providing [Ms. Lakie] with treatment by continuing to fire at her instead of providing medical care immediately after the first shot." Dkt. No. 121 at ¶¶ 93, 95.

"'Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Felix-Torres v. Graham*, 521 F. Supp. 2d 157, 162-63 (N.D.N.Y. 2007) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (additional quotation omitted). "The doctrine of respondeat superior is not a substitute for personal involvement." *Id.* (citing *Polk County v. Dodson*, 454 U.S. 312, 325 (1981)). Plaintiff does not allege the personal involvement of a County employee in the use of force that underlies his deliberate indifference claims.

Based on the foregoing, Plaintiff's deliberate indifference claims are dismissed.

### 5. Claims Against the Supervisory Individuals

The Syracuse Defendants argue that Plaintiff has failed to state a claim the Supervisory Defendants. *See* Dkt. No. 142-6 at 50 n.20. The Supervisory Defendants note that none of them were present during the underlying incident. *See id.* at 52. They argue that "the Supervisor[y] Defendants are mentioned in the Amended Complaint *only* in the context of implementing police reform efforts mandated by the State of New York." *Id.* at 54. As such, the Supervisory Defendant argue that "[a]t most, Plaintiff's allegations indicate that they are merely being sued because they are supervisors, which is plainly insufficient and improper under a post-*Tangreti* regime." *Id.*

In its September 2023 decision, the Court dismissed Plaintiff's claims against the Supervisory Defendants because "[t]he Supervisory Defendants are mentioned in the complaint only in the context of local police reform efforts and an alleged failure to train, supervise, and discipline individual officers. Plaintiff does not allege that the Supervisory Defendants were present or otherwise involved in the use of deadly force on October 21, 2021." Dkt. No. 48 at 42. As Plaintiff notes in response to the Supervisory Defendants' motion, this Court stated in its

decision on the motions for reconsideration, that "Plaintiff has added additional factual support

for . . . the Section 1983 claims against Mayor Walsh, Deputy Mayor Owens, and Police Chief

Buckner" which supported the Court granting leave to amend the original complaint.  Dkt. No.

120 at 6-7; *see also* Dkt. No. 150 at 53.

### a.  Section 1983 claims

As to Plaintiff's § 1983 claims, he argues as follows:

> [Supervisory D]efendants had personal knowledge and were on
> notice of the tragedies that occurred when armed police officers,
> rather than mental health providers, are the primary responders in
> incidents involving individuals in the throes of a mental health
> crisis, they were mandated by the Governor's Executive Order to
> make changes, yet they entered into a contract with Liberty
> Resources that was destined to fail, that did not remedy the
> problem, and they failed to provide adequate training to officers and
> 911 operators.

Dkt. No. 150 at 54.

"'It is well settled in this Circuit that personal involvement of defendants in the alleged

constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  *Forrest v.

Cnty. of Greene*, 676 F. Supp. 3d 69, 78 (N.D.N.Y. 2023) (quoting *Johnson v. Miller*, No. 9:20-

CV-622, 2020 WL 4346896, *9 (N.D.N.Y. Jul. 29, 2020)).  "As to supervisory liability, there is

no 'special test,' and 'a plaintiff must plead and prove "that each Government-official defendant,

through the official's own individual actions, has violated the Constitution."'"  *Id.* (quoting

*Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020)) (additional quotation omitted).  "To

establish a violation of § 1983 by a supervisor, as with everyone else, then, the plaintiff must

establish a deliberate, intentional act on the part of the defendant to violate the plaintiff's legal

rights."  *Id.* (quotation and quotation omitted).  "It is not sufficient to plead that an official was

'conceivably personally involved.'"  *Id.* (quoting *Tangreti*, 983 F.3d at 615-16).

Plaintiff has not sufficiently alleged the Supervisory Defendants' personal involvement in the conduct that allegedly violated Plaintiff's constitutional rights. The three individuals were not present on the day of the incident, nor are there any facts alleging that they directed the Defendant officers' conduct on that day or were aware of the events as they were unfolding. *See generally* Dkt. No. 121. Insofar as Plaintiff alleges the Supervisory Defendants contracted with Liberty Resources "to provide services to individuals suffering from a mental health crisis at the scene in order to avoid having the police use unnecessary force," Dkt. No. 121 at ¶ 30, Plaintiff does not claim that the contract itself violates a constitutional right.

Plaintiff argues that the Supervisory Defendants "had personal knowledge and were on notice of the tragedies that occurred when armed police officers, rather than mental health providers, are the primary responders in incidents involving individuals in the throes of a mental health crisis, [and] they were mandated by the Governor's Executive Order to make changes[.]" Dkt. No. 150 at 53. Plaintiff asserts that despite this knowledge, "they entered into a contract with Liberty Resources that was destined to fail, that did not remedy the problem, and they failed to provide adequate training to officers and 911 operators." *Id.* at 53-54. These statements do not allege excessive force, deliberate indifference, and failure to intervene claims. Plaintiff's contentions that the Liberty Resources contract "was destined to fail" and "did not remedy the problem," are wholly conclusory and not supported by any factual allegations. *Id.* at 54. Plaintiff does not provide a single example of the contract or training failing that put the Supervisory Defendants on any sort of notice of the alleged problems. *See generally* Dkt. No. 121.

The Court previously concluded that Plaintiff failed to allege such claims. *See* Dkt. No. 48 at 41-44. The Court's September 2023 statements are applicable to this decision insofar it stated as follows:

> The Supervisory Defendants are mentioned in the complaint only in the context of local police reform efforts and an alleged failure to train, supervise, and discipline individual officers.  Plaintiff does not allege that the Supervisory Defendants were present or otherwise involved in the use of deadly force on October 21, 2021.  Accordingly, in the absence of some tangible connection between Defendants and the alleged used of excessive force, deliberate indifference to serious medical needs, or the failure to intervene, these claims against the Supervisory Defendants.

*Id.* at 42.

Plaintiff has not presented any new allegations in his amended complaint that tie the Supervisory Defendants directly to the incident that occurred on October 21, 2021.  *See generally* Dkt. No. 121.  Accordingly, Plaintiff's excessive force, deliberate indifference, and failure to intervene claims against the Supervisory Defendant must again be dismissed.  *See In re New York City Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 410-11 (S.D.N.Y. 2021) (concluding that the "allegations do not provide a sufficient basis from which this Court can infer that [Police] Commissioner Shea had any personal involvement in the alleged violations of [the p]laintiffs' constitutional rights.  With regard to the allegations that he learned of the misconduct, '[r]eceipt of notice after the violation is insufficient to constitute personal involvement in the violation.' . . .  And while [the p]laintiffs allege in conclusory fashion that in some instances the Commissioner 'personally directed, promoted and/or condoned the deployments and operations that led to this violence,' . . . they plead no facts in support of that allegation") (quotations omitted).  As such, this aspect of the Syracuse's Defendants' motion is granted.

### b.  State Law Claims

The Supervisory Defendants argue that Plaintiff fails to state wrongful death and conscious pain and suffering claims against them because they were not present or involved in the

use of force.  *See* Dkt. No. 142-6 at 55.  Plaintiff argues that he "seeks to hold Walsh, Owens and

Buckner liable under the state law claims of wrongful death and conscious pain and suffering, not

on a theory of vicarious liability, but for their own actions and because they 'permitted the[ir]

subordinate[s] to act in a manner that created an unreasonable risk of harm' to" Ms. Lakie.  Dkt.

No. 150 at 54 (quoting *Tabchouri v. Hard Eight Rest. Co., LLC*, 219 A.D.3d 528, 533 (2d Dept.

2023)).

   As with Plaintiff's § 1983 claims, he has not presented any facts sufficient to establish that

Mayor Walsh, Chief Buckner, or Deputy Mayor Owens engaged in conduct that caused Ms.

Lakie's death or alleged pain and suffering.  "In New York, 'wrongful death' and 'conscious pain

and suffering' are two separate causes of action, but they are commonly brought together."  *Santos

v. City of New York*, No. 20-CV-6091, 2023 WL 5756513, *3 (E.D.N.Y. Mar. 13, 2023).  "In

order to prevail on a wrongful death claim, a plaintiff must prove five elements: (1) a death, (2)

caused by the wrongful conduct of a defendant, (3) that gives rise to a cause of action which could

have been maintained, at the moment of death, by the decedent if death had not ensued."  *Id.*

(citing N.Y. E.P.T.L. § 5-4.1).  "'Wrongful death actions, although commenced by the

administrator of a decedent's estate, are based not upon damage suffered by the decedent's estate,

but rather upon the pecuniary loss suffered by the decedent's distributees.'"  *Id.* (quoting *Est. of

Matter of Wallace*, 239 A.D.2d 14, 15 (3d Dept. 1998)) (citations omitted).  "Wrongful death

claims entail matters involving controversies between living persons and not matters affecting the

estate of the decedent."  *Id.* (quotations and quotation marks omitted).

   "A claim for 'conscious pain and suffering' runs in tandem with a wrongful-death claim."

*Id.*  "In order to prevail on a conscious pain and suffering claim, a plaintiff must prove that the

decedent was conscious or partially conscious between the time of the injury and the time of

death and that he suffered pain physical or mental pain during that period of consciousness." *Id.* (citing *Dullard v. Berkeley Assocs. Co.*, 606 F.2d 890, 894-95 (2d Cir. 1979)). "A plaintiff cannot plead a conscious pain and suffering claim without alleging that the decedent died in connection with the alleged injuries." *Id.*

"Under the common-law doctrine of respondeat superior, an employer—including the State—may be held vicariously liable for torts, including intentional torts, committed by employees acting within the scope of their employment." *Rivera v. State*, 34 N.Y.3d 383, 389 (2019) (citing *Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932, 933 (1999)) (addition citations omitted). "'The doctrine of respondeat superior does not apply to impose vicarious liability upon supervisors.'" *Tabchouri*, 219 A.D.3d at 533 (quoting *Connell v. Hayden*, 83 A.D.2d 30, 50 (2d Dept. 1981)) (additional citation omitted). "Rather, a supervisor will generally only be held liable for the actions of a subordinate where the supervisor directed or permitted the subordinate to act in a manner that created an unreasonable risk of harm." *Id.* (citing *Ruggiero v. Miles*, 125 A.D.3d 1216, 1217 (3d Dept. 2015)) (additional citations omitted).

Plaintiff does not allege or argue that the Supervisory Defendants were the Defendant officers' employers. *See* Dkt. Nos. 121, 150. Likewise, there are no allegations in Plaintiff's amended complaint which indicate that the Supervisory Defendants directed or permitted any of the Defendant officers' conduct on October 20, 2021. *See* Dkt. No. 121. Therefore, Plaintiff has failed to state wrongful death and conscious pain and suffering claims against the Supervisory Defendants. *See Tabchouri*, 219 A.D.3d at 534 ("The complaint also failed to sufficiently allege that the . . . defendants in some way directed, permitted, or participated in the incident in question. . . . Accordingly, the complaint failed to state a cause of action) (citations omitted); *see also*

*Williams v. City of New York*, No. 23-CV-2700, 2024 WL 3967307, *15 (S.D.N.Y. Aug. 28, 2024).

The Syracuse Defendants' motion is granted on this issue.

**C.    Motion to Amend**

In response to Defendants' motions to dismiss, Plaintiff filed his memorandum of law in opposition which included a single paragraph at the end of the brief seeking the following relief:

> Plaintiff requests leave to submit a proposed [second amended complaint] to defendants and the Court for approval after defendants' motions are decided and the County discloses the names of personally involved County officials, as the County was granted a stay of discovery. Plaintiff will seek to join those individuals and add the additional allegations set forth herein at pages 2, 9-11. These allegations are Mayor Walsh's statement on October 1, 2024[,] and allegations further demonstrating the County's involvement. This is a basis for amendment and joinder.

Dkt. No. 150 at 55. Plaintiff also submitted a separate one paragraph document that is filed as a cross motion to amend and/or correct the amended complaint and join parties. *See* Dkt. No. 151. On December 4, 2024, Plaintiff filed another letter explaining that he received a YouTube link to a meeting held by Syracuse on November 26, 2024. *See* Dkt. No. 158. The meeting concerned the use of Liberty Resources as a Crisis Response Service. *See id.* Plaintiff requested "that the Court consider what was stated at the meeting in deciding the pending motions. This additional information will be added to a Second Amended Complaint and defendants will have an opportunity to respond to this letter in their reply briefs." *Id.* at 1.

As explained at the beginning of this Memorandum-Decision and Order, Plaintiff has failed to comply with the Court's Local Rules. Local Rule 15.1 mandates that "[a] party moving to amend a pleading pursuant to Fed. R. Civ. P. 14, 15, 19-22 must attach an unsigned copy of the proposed amended pleading to its motion papers." N.D.N.Y. L.R. 15.1(a). "Except if the Court

otherwise orders, the proposed amended pleading must be a complete pleading, which will supersede the pleading sought to be amended in all respects.  A party shall not incorporate any portion of its prior pleading or exhibits thereto into the proposed amended pleading by reference." *Id.*  "The motion must set forth specifically the proposed insertions and deletions of language and identify the amendments in the proposed pleading, either through the submission of a redline/strikeout version of the pleading sought to be amended or through other equivalent means."  *Id.*

Plaintiff did not file an unsigned copy of his proposed second amended complaint, did not file a complete pleading, and did not submit a redline/strikeout version of the pleading.  *See* Dkt. Nos. 150, 151.  Plaintiff did identify the factual allegations he seeks to add in his memorandum of law.  *See* Dkt. No. 150 at 55; Dkt. No. 151.  Additionally, Plaintiff worded part of his requests as seeking *leave* to amend; therefore, affording Plaintiff's counsel the benefit of the doubt, it is plausible that counsel did not comply with Local Rule 15.1 because he has not yet formally moved for leave to amend.  Plaintiff also seeks to amend his first amended complaint "after [D]efendants' motions are decided and the County discloses the names of personally involved County officials."  Dkt. No. 151.

The Court will not permit Plaintiff to file a second amended complaint.  The use-of-force incident underlying this case occurred on October 20, 2021.  *See* Dkt. No. 121 at ¶ 35.  This case has been pending since September 12, 2022.  *See* Dkt. No. 1.  Since then, this case has made little progress toward a resolution.  This Court has now twice ruled on the sufficiency of Plaintiff's pleadings and dealt with motions for reconsideration.  The Court has been quite clear with its intention to move this case forward.  Permitting amendment would serve only to further delay this case.

"After the twenty-one day period in which to serve an amendment as of right has expired, 'a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave to amend when justice so requires.'" *Krul v. Brennan*, 501 F. Supp. 3d 87, 95 (N.D.N.Y. 2020) (quoting FED. R. CIV. P. 15(a)(2)). "The Second Circuit has explained that 'district courts should not deny leave [to amend] unless there is a substantial reason to do so, such as excessive delay, prejudice to the opposing party, or futility.'" *Exec. Trim Constr., Inc. v. Gross*, 525 F. Supp. 3d 357, 367 (N.D.N.Y. 2021) (quoting *Friedl v. City of New York*, 210 F.3d 79, 87 (2d Cir. 2000)).

Amendment would be futile and cause excessive delay. Plaintiff seeks to add allegations concerning statements made in 2022 and 2024—years after the incident underlying this case. *See* Dkt. No. 150 at 14-16. As Defendants argued in a letter responding to Plaintiff's filings, Plaintiff does not explain how post-incident statements have any bearing on the municipalities' or individual officers' actions on October 20, 2021. *See id.*; *see also* Dkt. No. 159 at 1 n.1; FED. R. EVID. 407 ("When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove . . . negligence [or] culpable conduct").

"'One appropriate basis for denying leave to amend is that the proposed amendment is futile,' and a proposed amendment 'is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).'" *Express Gold Cash, Inc. v. Beyond* 79, LLC, No. 1:18-CV-00837, 2020 WL 9848431, *2 (W.D.N.Y. Dec. 15, 2020) (quoting *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002)); *see also Watson v. Wheeler Clinic, Inc.*, No. 3:21-CV-0503, 2022 WL 2916825, *19 (D. Conn. July 25, 2022). "Although courts commonly look to proposed amendments to determine futility, courts need not determine futility based only

on an assessment of the proposed amendments—that is, the complaint presented to the court for its consideration." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 Fed. Appx. 617, 622 (2d Cir. 2009) (citing *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 235 (2d Cir. 2007)). "Instead, courts may consider all possible amendments when determining futility." *Id.*

Plaintiff's purported amendments do not alter the Court's conclusion regarding dismissal of the deliberate indifference claims, the claims against the Supervisory Defendants, and specific ADA and RA claims against the City and County. The Court considered the amendments throughout this Memorandum-Decision and Order, but they did not alter the Court's conclusion on any of Plaintiff's claims. Nor can the Court think of a possible amendment that would change the outcome of the pending motions. Specifically, Defendant Walsh's statement from October 1, 2024, that "[t]he need for crisis intervention is tragically high in Syracuse," does not save Plaintiff's claims against Defendant Walsh from being dismissed. Dkt. No. 150 at 7. That allegation provides no information about Defendant Walsh's knowledge or actions on October 20, 2021. The proposed amendments concerning statements made by the County on May 23, 2022, indicate that the County was aware of and involved in the contract with Liberty Resources, but does not plausibly allege that the County intentionally discriminated against Plaintiff on October 20, 2021. *See id.* at 15.

Plaintiff does suggest one proposed amendment that concerns the time before the use of force incident—the Onondaga County District Attorney's Office Plan, dated March 9, 2021. *See id.* Although the Plan was issued prior to the incident underlying this case, the substance of it does not save Plaintiff's claims from dismissal. *Id.* It discusses that the District Attorney's Office recommended "that it '[r]ecognize Onondaga County as responsible for the coordination of a collaborative plan to enhance the relationships and communication between Police Departments

and mobile mental health crisis teams.  A committee associated with County Mental Health Services would be responsible for overseeing the transition to this model of diversion services." *Id.* (quotation omitted).  The Plan also noted that "[t]his January, Liberty Resources, Inc. Regional Mobile Crisis Team launched a Countywide 24/7 response team.  They have a number of Memorandums of Understanding (MOU) with area Police, homeless shelters and a specific one to serve the City of Syracuse."  *Id.*  These statements corroborate Plaintiff's allegations concerning the Liberty Resource's contract and that the City and County were aware of the issues concerning police interactions with individuals with mental health and substance abuse disorders.  However, they do not add to Plaintiff's deliberate indifference or discrimination claims nor do they concern any of the Supervisory Defendants.  Because the proposed amendments would not allow the claims that are being dismissed, to survive, amendment is futile.

Amendment would also cause excessive delay.  Discovery has been stayed numerous times because of Defendants' motions to dismiss.  *See* Dkt. Nos. 34, 112, 149.  Discovery was most recently stayed on November 26, 2024.  *See* Dkt. No. 149.  This case is four months away from being three years old.  *See* Dkt. No. 1.  Permitting Plaintiff to amend his complaint, again, will only further delay this case to an unnecessary degree considering the futility of the amendments.  Accordingly, Plaintiff's request for leave to amend and/or to amend is denied.

Finally, the Court notes that it would not be prudent for either party to move for reconsideration at this juncture.  It is highly unlikely that the Court will receive any information which would warrant reconsideration of its rulings, and, as the Court has repeatedly stated, this case needs to proceed to summary judgment or trial.[14]

---

[14] On May 23, 2025, Plaintiff filed a letter "requesting permission to write a one paragraph letter informing the Court of the relevance of a May 15, 2025[,] unanimous decision by the United States Supreme Court to plaintiff's claims under the Fourth and Fourteenth Amendments."  Dkt.

## IV. CONCLUSION

Upon careful consideration of the entire record in this matter, the parties' submissions and the applicable law, and for the reasons set forth herein it is hereby

**ORDERED** that the Defendant Onondaga County's motion to dismiss (Dkt. No. 141) is **GRANTED in part and denied in part**; and the Court further

**ORDERS** that the Syracuse Defendants' motion to dismiss (Dkt. No. 142) is **GRANTED in part and DENIED in part**; and the Court further

**ORDERS** that Plaintiff's claims against Defendants Walsh, Buckner, and Owens are **DISMISSED;** and the Court further

**ORDERS** that Plaintiff's ADA and RA disparate treatment and impact discrimination claims, and Fourteenth Amendment deliberate indifference claims are **DISMISSED**; and the Court further

**ORDERS** that the following claims are permitted to proceed to the extent set forth in this Memorandum-Decision and Order: (1) ADA and RA reasonable accommodation claims against Syracuse and the County; and (2) excessive force, failure to intervene, assault and battery, wrongful death, and conscious pain and suffering claims against the individual officer Defendants (Dkt. No. 121); and the Court further

**ORDERS** that Plaintiff's motion for leave to amend and/or motion to amend the first amended complaint (Dkt. Nos. 150, 151) is **DENIED**; and the Court further

**ORDERS** that Plaintiff's letter motion (Dkt. No. 170) is **DENIED**; and the Court further

---

No. 170. Plaintiff's request is denied. The Court is aware of the Supreme Court's recent decision and, contrary to Plaintiff's assertion, *Barnes v. Felix*, No. 23-1239, 2025 WL 1401083, *2 (U.S. May 15, 2025), does not concern the Fourteenth Amendment. Insofar as Plaintiff seeks to argue that the case impacts his Fourth Amendment claim, such argument would not alter the conclusions in this Memorandum-Decision and Order.

     **ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Dated:  May 27, 2025
        Albany, New York

Mae A. D'Agostino
U.S. District Judge